# EXHIBIT 1

## CO-PUBLISHING AGREEMENT

AGREEMENT made as of this 1st day of April, 1994 by and between ZOMBA ENTERPRISES, INC. (herein called "Company") - and - DANGEROUS MUSIC, INC. of ~~██████████████████~~, ~~████████████~~ ⟨985 Anden Rd Atlanta, GA 30310⟩ f/s/o Todd Shaw p/k/a "Too Short" (herein called "you").

WHEREAS, the parties desire that Company and you shall jointly own the musical compositions subject to this Agreement and that Company shall administer such musical compositions upon all of the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the promises and the mutual covenants herein contained, the parties do hereby agree as follows:

Reference is made to the agreement dated February 2, 1988, between Randy Austin and Todd Shaw and us regarding the exclusive services of Todd Shaw p/k/a "Too Short" as a songwriter, as amended (the "Prior Agreement").

Although, as a matter of convenience, this agreement incorporates some provisions the same as or similar to those in the Prior Agreement, this agreement will not constitute or be deemed a modification or an extension of the Prior Agreement, as this agreement is a new one and will have the full force and effect of a new agreement executed on the date shown above. You further acknowledge, understand, and agree, and the Writer acknowledges, understands, and agrees, after consulting with counsel, that this agreement is a new promise by the Writer and you to deliver Compositions as provided in this agreement, which promise is supported by new consideration from us, including, without limitation, the consideration provided in the agreement between you and us dated as of April 1, 1994, relating to your services as a provider to us of songwriters (the "Overall Agreement").

The term of the Prior Agreement is hereby terminated, and all parties will be deemed to have fulfilled all of their obligations under the Prior Agreement, except those obligations that survive the end of the term of the Prior Agreement (e.g., warranties and royalty accounting and payment obligations). This agreement will be in full force and effect immediately upon the termination of the Prior Agreement.

## 1.   DEFINITIONS

As used in this Agreement, the following expressions shall have the meanings set forth below:

WP/DANGEROUS/Exhibit.D                    1

(a) "Compositions" - (i) all musical compositions owned and/or controlled, in whole or in part, directly or indirectly, by you, which have heretofore been written, composed or created, in whole or in part, by the "Writer" (as defined below) or any "Affiliated Person" (as defined below), including, without limitation, the musical compositions listed on Schedule 1, annexed hereto and made a part hereof, and which have not been heretofore committed by written agreement to any third party music publisher, it being understood that all such musical compositions which have been heretofore committed by written agreement to any third party music publishers are set forth on Schedule 2, annexed hereto and made a part hereof and (ii) all musical compositions acquired, owned and/or controlled, in whole or in part, by you, which are written, composed or created, in whole or part during the "Term" (as defined below) by Writer or by any Affiliated Person, and (iii) all musical compositions pursuant to Schedule 2 which have heretofore been written, composed or created in whole or in part by Writer or by any Affiliated Person and which revert to you, Writer or any Affiliated Person during the Term hereof. For the avoidance of doubt, the expression "Compositions" shall a) comprehend the Compositions only to the extent of your, the Writers and/or any Affiliated Person's contribution or the contribution of any other writer which is owned or controlled by you, Writer or any Affiliated Person; and b) include, but not be limited to, the titles, words, lyrics, music, libretti and musical scores thereof and all interpolations, collections, compilations and all arrangements, adaptations, versions and translations thereof.

(b) "Gross Receipts" - all monies (less all sums charged by collection agents, sub-publishers and others) actually earned and received by Company in the United States from the exploitation of the Compositions throughout the Territory.

(c) "Person" and "Party" - Any entity, including but not limited to an individual, corporation, partnership, association or other organized group of persons or successors or representatives of the foregoing.

(d) "Affiliated Person" - Any Person that (i) is now or hereafter owned or controlled, in whole or in part, directly or indirectly, by you and/or Writer, (ii) that owns or controls, in whole or in part, directly or indirectly, you and/or Writer, or (iii) is under common ownership or control with you and/or Writer. As used in this Agreement, "you" and "your" shall refer collectively to you and any Affiliated Person.

(e) "Advances" - The amounts recoupable by Company from any and all monies payable or heretofore paid to you pursuant to this Agreement. It is understood and agreed that royalties attributable to this Agreement and/or the Prior Agreement may be used to recoup Advances paid to you pursuant to this Agreement and/or the Prior Agreement.

(f) "Territory" - the world and the entire universe.

(g) "Artist" - Todd Shaw p/k/a "Too Short".

(h) "Writers" - the individual, Todd Shaw p/k/a "Too Short", together with all writers, if any, who write or compose upon records of the Artist. The term "Writers" or "Writer", as used herein, shall reflect the Writers individually and collectively.

(i) "Side" - a recording of a Composition which is licensed at seventy-five (75%) percent of the minimum statutory mechanical royalty rate and which is of sufficient playing time to constitute one (1) side of a 45 rpm record but not less than two (2) minutes of continuous sound and which embodies the performance of such Composition by the Artist. Such recording must be of a musical composition one hundred (100%) percent of which is governed by this Agreement to be deemed one (1) Side. In the event that such recording consists of a musical composition not wholly falling under this Agreement then each such recording shall be deemed only a portion of a full Side equal to that percentage interest that is governed by this Agreement.

(j) "Album" - one (1) newly recorded studio record and all configurations thereof (including but not limited to compact disc, cassette and vinyl) embodying thereon not less than eight (8) newly recorded Sides by the Artist which (i) is commercially released in the United States and distributed by a major United States record company; and (ii) contains Compositions which (A) have not been previously recorded and commercially released on phonographic records and are previously undelivered to the Company and (B) are available for Company to collect one hundred (100%) percent of the Gross Receipts earned by such Compositions throughout the Territory; and (iii) contains musical compositions of which one hundred (100%) percent are owned and controlled by you and are Compositions hereunder. For the avoidance of doubt an E.P., compilation album, solo album, mini LP, soundtrack album, A "Best of" or "Greatest Hits" album, or a "live" album shall not be deemed Album(s) hereunder but Compositions thereon shall be subject to the provisions of this Agreement.

(k) "Minimum Commitment" - During each contract period of the Term, one (1) Album from which at least one (1) side 45 rpm single record shall contain a Side as either "A" or "B" side of the same, or, in the event that the term of the exclusive recording agreement between you and Zomba Recording Corporation, dated April 1, 1994, (the "Recording Agreement"), shall end and, consequently, no Album is to be released in that particular contract period, then the Minimum Commitment for that period shall be changed to ten (10) new and original Compositions of marketable commercial quality, equivalent in each case to one (1) Side being recorded and released in the United States by a major U.S. record company. For the purposes of this subparagraph, a Composition written and/or composed by Writer in collaboration with others shall be treated as a

WP/DANGEROUS/Exhibit.D                3

fraction of a Composition, the numerator of which shall be one (1) and the denominator of which shall be the applicable number of writers and composers, including Writer, and a Composition which is not one hundred (100%) percent controlled by you for any other reason whatsoever shall be treated as a percentage of a Composition equal to that percentage of said Composition which you do in fact own and/or control.

(1) "Term"

(i) a period ("the First Contract Period") commencing upon the date hereof and continuing until the later of June 11, 1995 or the date nine (9) months following the release in the United States of the Minimum Commitment for the First Contract Period, being the Album immediately following the album by Artist, entitled "Get In Where You Fit In"; and

(ii) if Company exercises its option for the next period ("the Second Contract Period"), the Second Contract Period shall commence upon the expiry of the First Contract Period and continue for a period being the later of one (1) year therefrom or nine (9) months following the release in the United States of the Minimum Commitment for the Second Contract Period; and

(iii) if Company exercises its option for the next period ("the Third Contract Period"), the Third Contract Period shall commence upon the expiry of the Second Contract Period and continue for a period being the later of one (1) year therefrom or nine (9) months following the release in the United States of the Minimum Commitment for the Third Contract Period.

## 2.    GRANT OF RIGHTS

You hereby irrevocably and absolutely assign, convey and set over to Company an undivided fifty (50%) percent interest in all worldwide right, title and interest, and ownership of every nature, kind and description in and to the Compositions, including but not limited to the worldwide copyright therein, and any and all extensions, renewals and revised terms of such copyrights.

## 3.    GRANT OF ADMINISTRATION RIGHTS

(a) You hereby grant to Company the sole and exclusive right to act throughout the Territory, as the exclusive administrator of all rights in and to the Compositions for the period referred to in paragraph 2 above, and such grant shall include, but not be limited to the following exclusive rights:

WP/DANGEROUS/Exhibit.D                    4

(i)  The  right  to  secure  copyright  registration  and
renewal copyright registration in the joint names of you and Company
under  any  law now in effect or hereinafter enacted and shall  upon
Company's  request  execute the short form copyright assignment. set
out in Exhibit C;

(ii)  All  rights  of  control,  publication,  printing,
performance, mechanical or other reproduction, synchronization, sale
exploitation,   arrangement,   adaptation,   translation,  use   and
disposition, now or hereafter known;

(iii)  The right to transpose, revise, add to, take  from
and  substitute,  and  to  prepare derivative works based  on,  the
Compositions;

(iv)  The  right to use the name, photograph, likeness,
and/or  biographical  material  of any and all  songwriters  of  the
Compositions  for  the purposes of trade or otherwise in  connection
with the Compositions;

(v)  All  rights  to license,  assign  and enter  into
agreements  to  or with any person or entity with respect to all  or
any rights or part of the rights granted hereunder;

(vi) All rights to collect any and all monies accruing or
earned  therefrom  (other  than songwriters' shares  of  performance
fees)  including  but not limited to any monies accruing  or  earned
prior  to the date hereof but not paid or payable to you, Writer and
any Affiliated Persons, as of the commencement of the Term including
the  so-called  "writer's"  and  "publisher's"  share  of   income
attributable to the Audio Home Recording Act of 1992;

(vii)  Such  other  rights as are granted by  the  United
States  Copyright  Law  or any  other  applicable  copyright  laws
throughout the Territory now in effect or hereinafter enacted;

(viii)  The  right  to exercise any right Company deems
reasonably  necessary  or  desirable  in  connection  with  the
administration, exploitation, or protection of the Compositions.

(b) Small performing rights in the Compositions, to the extent
permitted  by  law,  shall  be assigned  to  and  licensed  by  the
performing  rights  society  to  which both  parties  belong.  Said
society  shall  be and is hereby authorized and directed to  collect
and  receive  all monies earned from the public performance  of  the
Compositions  in  the United States and Canada and shall be  and  is
hereby  directed  to pay to Company the entire amount  allocated  by
said society as the Company's public performance fees for the United
States  and  Canada.  Annexed hereto as Exhibit D is  the  form  of
letter  of direction from you to BMI or ASCAP (as applicable)  which

WP/DANGEROUS/Exhibit.D                    5

shall effectuate the provisions of this subparagraph.    You shall
sign and deliver to Company copies of said letter simultaneously
herewith, and in default thereof Company is hereby authorized and
empowered by you to sign copies of said letter for and on behalf of
you and submit same to the appropriate society.

(c)    The rights granted herein shall endure for a period co-
extensive with the protection of any and all worldwide property
rights in the Compositions at common law or by statute, whether
heretofore or hereafter enacted, including the worldwide copyrights
therein and any and all extensions, renewals and revised terms
thereof.

## 4.    ADMINISTRATION COSTS

Company shall deduct and retain from Gross Receipts, the
following:

(a) All reasonable administrative and exploitation expenses of
Company with respect to the Compositions, including, without
limitation, copyright registration fees and all other Copyright
Office fees and charges; advertising and promotion expenses directly
related to the Compositions, the costs of transcribing lead sheets,
the costs of producing demonstration records, and costs of
collecting income in respect to the Compositions, but excluding
overhead, rents and salaries; and

(b)    Any payments to third parties who own and/or control or
otherwise participate in an interest in and to the Compositions;
and

(c)    An administration fee equal to ten (10%) percent of the
Gross Receipts.

## 5.    SONGWRITER AGREEMENT

(a)    You hereby warrant and represent that you are party to an
exclusive songwriter agreement with Writer (the "Songwriter
Agreement"), the term of which shall remain in effect for at least
as long as the full Term of this Agreement (as such may be extended
or suspended).    The Songwriter Agreement shall provide, among other
provisions, that you shall own and control all musical compositions
written, or acquired, in whole or in part, by Writer during the Term
hereof;    that you (and your designees) shall have the right to
utilize the name and likeness of Writer in connection with the
Compositions;    that you shall have the right to grant all of the

rights granted to Company hereunder; and that, in the event of the expiration or termination of the Songwriter Agreement (for any reason whatsoever) during the Term hereof, then Company shall automatically be deemed to acquire all of the rights theretofore granted to you pursuant to the Songwriter Agreement.

(b) Upon Company's request, you shall provide Company with a counterpart original of the Songwriter Agreement and of all other existing agreements, if any, with any other songwriters of the Compositions now subject to this Agreement, and you shall provide Company with a counterpart original of all agreements with songwriters that become effective during the Term hereof. Each agreement with any songwriter other than Writer shall contain all of the same provisions as are fully described above with respect to the Songwriter Agreement.

(c) You warrant and represent that in no event shall the royalties payable to Writer and/or any of such other songwriters, in accordance with Paragraph 5(a) hereof, exceed the royalty rates set forth on Exhibit "B" annexed hereto; however, in the event that you are in breach of the foregoing, then you, and not Company, shall be solely responsible for any such excess payments and, without limitation of Company's rights, Paragraph 11 shall be applicable.

6.   OPTIONS

You hereby irrevocably grant to Company the below listed options to be exercised by written notice from Company to you as follows:

(a) the rights to renew the Term of this Agreement after the First Contract Period for the Second Contract Period, and the Third Contract Period, (as applicable) as provided for in the Paragraph 1 definition "Term" hereof, by Company giving notice to you of the exercise of such right at any time prior to the commencement of the applicable period to which the applicable option applies provided that Company, at its election, need not exercise such option unless you shall have given to Company by notice (Attn: Sr. V.P. Business Affairs) the following:

(i) A copy of the Album of the Minimum Commitment for the contract period for which the option applies or, if applicable, i.e., if the Recording Agreement ends, a copy of each recording embodying a Composition of the Minimum Commitment.

(ii) the date of release in the United States and the releasing distributor in the United States of the Album of the Minimum Commitment together with the price thereof or, if applicable, the date of release in the United States and the releasing distributor in the United States of each recording embodying a Composition of the Minimum Commitment

WP/DANGEROUS/Exhibit.D               7

(iii) the applicable writer credits and percentages of Compositions falling hereunder embodied upon each such Album of the Minimum Commitment, including samples contained thereon, if any, or that same information for each recording embodying a Composition of the Minimum Commitment.

(b) The applicable period of the Term shall be automatically extended until such time as Company has received the materials referenced to in paragraph 6(a) above and Company need not exercise its option for any contract period unless Company has received such materials, it being understood that any such extension of a particular contract period shall not exceed a period of three (3) years.

(c) You acknowledge, warrant and agree that for each contract period of the Term of the Agreement the Company shall be entitled to the Minimum Commitment and you shall use your best efforts to fulfill said Minimum Commitment in a timely fashion. In the event you fail to fulfill the Minimum Commitment, Company's obligation to make Advance payments pursuant to this Agreement, and/or exercise an option, shall be automatically extended until such Minimum Commitment is fulfilled.

## 7.   ADVANCES

(a) In consideration of the acquisition of all rights and interests as provided in this Agreement and conditioned upon such acquisition and in reliance upon the warranties covenants and representations made by you Company shall pay you the following sums as Advances against all royalties and other sums paid or payable to you, Writers and Affiliated Persons pursuant to this Agreement:

(i) Twenty-Five Thousand ($25,000) Dollars for the First Contract Period, it being acknowledged that Company has already made this payment to you.

(ii) Twenty-Five Thousand ($25,000) Dollars upon the initial commercial release in the USA of the Minimum Commitment for the First Contract Period, being the Album immediately following the album by Artist entitled "Get In Where You Fit In".

(iii) Seventy-Five Thousand ($75,000) Dollars upon the exercise by Company of its option for the Second Contract Period.

(iv) One Hundred Thousand ($100,000) Dollars upon the exercise by Company of its option for the Third Option Period.

(b) In the event that Company is not entitled to collect one hundred (100%) percent of any and all income howsoever arising from all the musical compositions embodied upon each Album of the Minimum Commitment, then the Advance otherwise payable in connection

WP/DANGEROUS/Exhibit.D            8

therewith (which shall include the total Advances for each contract period, i.e., on exercise of option and release) shall be reduced. The reductions shall be computed by multiplying the specified total Advance by a fraction the numerator of which shall be equal to the number of Compositions embodied upon the applicable Album for which Company has a right to collect one hundred (100%) percent of any and all income as aforesaid and denominator of which shall be the total number of musical compositions embodied upon the applicable Album.

(c)  In the event Company cannot collect the mechanical income from any of the Compositions at seventy-five (75%) percent of the statutory rate in the USA and Canada applicable at the time of manufacture and distribution of records embodying such of the Compositions then the Advances hereunder shall be reduced by a proportion equal to that proportion of the statutory rate as aforesaid that Company is unable to collect. By way of example only, if Company can only collect seventy-five (75%) percent of seventy-five (75%) percent of the statutory rate as aforesaid, then Advances paid or payable hereunder shall be reduced by twenty-five (25%) percent.

## 8.    ROYALTIES

(a)  Company shall pay to you an amount being the total amount of royalties due to you as Co-publisher and the total amount of royalties due to Writers, equal to seventy-five (75%) percent of the Gross Receipts remaining after deduction of any and all sums and expenses properly deductible pursuant to paragraph 4 above.

(b) Intentionally Deleted.

(c)  Public performing rights "societies" shall be authorized and directed to pay the "publisher's share" of performance fees in respect of the Compositions to Company, and such fees shall be included in Gross Receipts remaining after deduction of any and all sums and expenses properly deductible pursuant to paragraph 4 above, save that Company shall pay to you fifty (50%) percent of Gross Receipts, except with respect to "cover" recordings Company shall be entitled to retain the "publisher's share" of public performance fees for its own use and benefit. It is acknowledged that the "writer's share" of performance fees shall be paid by the applicable societies directly to the Writers and any Affiliated Persons.

(d) Intentionally Deleted.

## 9.    STATEMENTS

(a)  On or before September 30th and March 31st of each year, Company shall render to you statements showing the net amount of royalties, if any, which shall be payable hereunder for the preceding semi-annual period ending June 30th and December 31st,

WP/DANGEROUS/Exhibit.D              9

respectively, accompanied by payment of royalties shown to be due in such statements, after deducting any and all unrecouped advances and administration costs.

(b) Intentionally Deleted.

(c) At any time within one (1) year after any royalty statement is rendered to you hereunder, you shall have the right to give Company written notice of your intention to examine Company's books and records with respect to such statement. Such examination shall be commenced within three (3) months after the date of such notice, at your sole cost and expense, by any certified public accountant or attorney designated by you. Such examination shall be made during Company's usual business hours at the place where Company maintains the books and records which relate to you and which are necessary to verify the accuracy of the statement or statements specified in your notice to Company and your examination shall be limited to the foregoing. Your right to inspect Company's books and records shall be only as set forth in this subparagraph and Company shall have no obligation to produce such books and records more than once with respect to each statement rendered to you. Unless notice shall have been given to Company as provided in this subparagraph, each royalty statement rendered to you shall be final, conclusive and binding upon you and shall constitute an account stated. You shall be foreclosed from maintaining any action, claim or proceeding against Company in any forum or tribunal with respect to any statement or accounting rendered hereunder unless such action, claim or proceeding is commenced against Company in a court of competent jurisdiction within two (2) years after the rendering of such statement or accounting. For the purpose of calculating the period for audits and legal action by you, a statement shall be deemed to have been received thirty (30) days after the same is due unless, within such period, Company shall receive notice of nonreceipt of such statement from you.

(d) You acknowledge that Company's books and records contain confidential trade information. Neither you nor your representatives will communicate to others or use on behalf of any other person any facts or information obtained as a result of such examination of Company's books and records.

(e) If Company shall fail to remit any payments to you for reasons beyond Company's control (e.g., governmental or currency restrictions) such failure shall not constitute a default hereunder. In such event Company shall at your request and expense and if Company is able to do so (subject to recoupment of Advances) deposit such royalties to your credit in a bank account in the country of the Territory and such deposit shall fulfill Company's obligations with respect thereto.

(f) Company shall have the right to deduct and withhold any income, sales, value added or other tax required by the laws of the Territory from all sums payable to you hereunder.

WP/DANGEROUS/Exhibit.D                    10

## 10.    REPRESENTATIONS AND WARRANTIES

You represent and warrant to Company that:

(a) you have the full right, power and authority to enter into this Agreement and to grant to Company all of the rights herein granted;

(b) the Compositions are and shall be new and original and do not and shall not infringe upon any common law or statutory rights of any Person, including without limitation the copyright, property, privacy, or rights with respect to name and likeness, or any other rights of any Person;

(c) you shall be fully responsible for and shall pay all Writers royalties and advances in connection with the exploitation of the Compositions hereunder;

(d) to the extent Writer has written any part of a Composition, such part shall have been one hundred (100%) percent owned and controlled by you and shall fall under the provisions of this Agreement.

(e) the Compositions on Schedule 1 and Schedule 2 hereof are all the musical compositions of you, the Writers, and any Affiliated Persons written/composed in whole or in part prior to the commencement of the Term of this Agreement, and the percentage of ownership set forth therein is accurate.

(f) you have not made any transfer or entered into any agreement which is inconsistent with the terms and conditions of this Agreement or which could interfere with or derogate from the full enjoyment of all of the rights herein granted to Company including but not limited to Company's right to collect one hundred (100%) percent of all monies derived from Company and your interest in the Compositions in the Territory other than the Writer's share of the public performance income.

(g) as provided in Paragraph 5 above, you are party to an exclusive songwriter agreement with Writer, a copy of which will be supplied to Company upon Company's request;

(h) the Compositions and the rights herein granted to Company are and shall at all times be free and clear of any claims, demands, liens, or encumbrances; and

(i) you shall cause all of the Writers now or hereafter having Songwriters Agreements with you to execute and deliver to Company an inducement letter in the form annexed hereto as Exhibit A promptly after the execution of Songwriters Agreements with you if thereafter for subsequent Writers, if any.

(j)  during  the  Term  hereof,  all  persons  becoming  members  of
Artist shall be bound by this Agreement and, further, you shall upon
Company's  request,  cause  all  such  persons  to  sign  any  documents
necessary to evidence and effectuate same.

(k)  you have not received and shall not solicit or accept any
advance  payments  or  guarantees  from  BMI  or  ASCAP  or  any  other
performing/rights  society or any other third party and you have not
or  will not encumber company's right to collect one hundred  (100%)
percent of the monies payable from such society in respect of the so
called "publisher share of performance income".

(l)  Company shall be entitled to receive for each Composition
not  less  than seventy-five (75%) percent of the minimum  statutory
mechanical  royalty rate for the United States of America applicable
at the time that records embodying the compositions are sold.

(m) You shall use your best efforts to cause Writer to fulfill
the Minimum Commitment hereunder in a timely fashion.

(n) Intentionally deleted.

(o) Upon  request by Company, you shall promptly  deliver  to
Company:   (i) typed lyric sheets of any of the Compositions;  (ii)
copies  of  recordings containing any of the Compositions, or  if  a
demonstration tape or record is made prior to the commercial release
of  a  record  album  containing any such  Compositions,  then  such
demonstration  tape  of  album;   (iii) lead sheets of  any  of  the
Compositions,  if  available;  and/or (iv) copies  of  photographs,
likenesses,  and  biographical  material  of  the  songwriters  of
Compositions.

## 11.   INDEMNIFICATIONS

You  shall  indemnify  and defend Company,  its  assigns,  and
licensees,  and hold them free and harmless from and against any and
all  claims,  losses, damages, liabilities, and expenses  (including
but  not  limited  to reasonable attorneys' fees)  arising  out  of,
connected  with,  or resulting from any alleged breach or breach  of
any  of your covenants, undertakings, representations, or warranties
in  this  Agreement,  which  claim is reduced to  a  judgment  or  a
settlement  entered into by Company with your consent, which consent
shall  not be unreasonably withheld.  Company shall give you  prompt
notice  of  any such claim, action or demand and you shall have  the
right,  at  your own expense, to participate in the defense  thereof
with  counsel of your own choosing; provided, however, that Company
shall  control  the defense with respect to such claim,  action,  or
demand.   You shall upon request reimburse Company for any  payments
made  by Company in accordance with the foregoing within thirty (30)
days of Company's request.

WP/DANGEROUS/Exhibit.D            12

## 12.    EQUITABLE RELIEF

The right to own and exploit the Compositions and the use of the name of likeness of the songwriters thereof are of unique, exceptional, and extraordinary value, and in the event of any breach by you, Writer or the songwriters of the undertakings or obligations set forth in this Agreement, Company shall be entitled to equitable relief including but not limited to an injunction to enforce the same, in addition to any other remedies available to Company.

## 13.    SUITS, ACTIONS AND PROCEEDINGS

Company shall have the sole right, but not the obligation, to initiate, prosecute, defend, settle, and compromise, in its sole discretion, any and all suits, actions, and proceedings in respect of the Compositions, including, but not limited to , suits against any alleged infringer of any Composition. With regard to any recovery made by Company as a result of any such legal action, Company shall pay to you an amount equal to such percent of such recovery as to which you would have otherwise have been entitled hereunder. In the event Company declines to prosecute or defend any suit, action or proceeding in respect of the Compositions, you shall have the right to prosecute and/or defend same, at your own cost and you shall pay Company an amount equal to such percent of such recovery as to which Company would have otherwise been entitled hereunder.

## 14.    CLAIMS

If any claim, whether written or oral, is presented against Company which is inconsistent with any of your covenants, undertakings, representations, or warranties herein contained, and if because of such claim Company, in its sole discretion, deems itself placed in jeopardy, then Company shall thereupon notify you as to the full details of such claim as then known to Company, and you shall have the right to participate in the defense thereof, by counsel of your own choosing, at your sole expense. Thereafter and until such claim has been finally adjudicated or settled, Company, in its sole discretion, shall have the right to withhold any and all monies becoming due and payable to you and/or Writer hereunder in an amount reasonably related to Company's anticipated liability therefore. You shall have the right to promptly post a bond reasonably satisfactory to Company and in Company's favor in the amount of such claim (including Company's anticipated attorney's fees and costs) guaranteed by a bonding company reasonably acceptable to Company, and in such event, Company shall not withhold any monies becoming due and payable to you and/or Writer hereunder. Upon the final adjudication or settlement of such claim, Company shall disburse all funds held by it in accordance with the terms of any settlement, judgment, or other final disposition thereof.

## 15.   FURTHER DOCUMENTS AND ACTS

You shall execute, acknowledge, and deliver, or cause to be executed, acknowledged, or delivered, all such further reasonable instruments or reasonable documents, and shall perform all such further acts, as Company may deem reasonably necessary or desirable to effectuate the terms and provisions thereof. You hereby irrevocably appoint Company or any of its officers as your true and lawful attorney to make, sign execute, acknowledge, and deliver, in your name, any and all instruments which Company may deem desirable or necessary to vest in Company, its successors, assigns, and licensees, any or all of the rights herein granted to Company.

## 16.   ASSIGNMENT

(a) The rights, benefits and obligations in this Agreement are not assignable by any party except with the consent of the other parties, provided, however, that Company may assign all or a part of its rights, benefits, and obligations to (i) any of its subsidiaries, affiliates or parent or; (ii) any successors who substantially own all of the business assets of Company; or (iii) any party into which or with which Company may merge or consolidate; or (iv) any third party, subject to your written consent, such consent not to be unreasonably withheld; in which case you shall not be released from your obligations hereunder; and provided further, that nothing contained in this Agreement shall be construed as limiting Company's absolute right to assign or license its rights hereunder to sub-publishers, collection agents or others to the extent necessary or advisable in Company's sole discretion to implement the rights granted to Company herein.

(b) Without limiting the generality of any other provision of this Agreement, in the event of any of the following contingencies and without prejudice to any of Company's other rights or remedies, Company may, at its election and upon notice to you, either (i) terminate the Agreement, (ii) suspend performance (i.e., no Advances or royalties shall be paid and the Term shall also be in suspension), or (iii) continue its performance under the Agreement.

(i) If you are adjudicated a bankrupt, or if a petition in bankruptcy is filed by, for or against you, or if you make any assignment for the benefits of your creditors or takes the benefit of any insolvency law, or if a receiver is appointed for you for a substantial part of your business assets; or

(ii) If you shall sell or otherwise dispose of substantially all of your assets to a third party, or if control of you shall be transferred and the management thereby changed; or

(iii) If you shall breach any of your agreements, warranties or representations contained in this Agreement or otherwise fail to comply with your obligations pursuant to this Agreement.

WP/DANGEROUS/Exhibit.D                    14

Notwithstanding any termination of the Term of this agreement, Company shall nevertheless continue to have all the rights granted under this Agreement with respect to all Compositions and the benefit of all of your warranties, representations and agreements hereunder, for the remaining balance of the Term [and for the full Retention Period]. In such event, Company shall continue to account to you for the payment of royalties in accordance with this Agreement.

(c) Company shall have the right, by giving you written notice thereof, to suspend Company's obligations under this Agreement for the duration of the following contingencies, if, by reason of such contingencies, Company's normal business operations are hampered, interrupted or become commercially impracticable: labor disagreements, fire, catastrophe, shortage of materials or any other cause beyond Company's control. A number of days equal to (60) days, shall be deemed added to the end of the current Contract Period in which such contingency has occurred (and the dates for the exercise of any options and the commencement of subsequent Contract Periods shall be deemed extended accordingly).

## 17.   NOTICES

Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by hand or by registered or certified mail (prepaid) return receipt requested, at the respective addresses hereinabove set forth, or such other address or addresses as may be designated by either party. Such notices shall be deemed given when mailed or delivered, except that notice of change of address shall be effective only from the date of its receipt. All notices to Company shall be sent to the attention of the Sr. V.P. of Business Affairs. A courtesy copy of all notices given by you to Company shall be sent to Grubman Indursky & Schindler, P.C., (Attention: Arthur Indursky) Carnegie Hall Tower, 152 West 57th Street, 30th Floor, New York, NY 10019.

## 18.   SUB-PUBLISHER'S SHARE OF INCOME

Company shall not agree to permit any foreign sub-publisher to retain for such sub-publisher's own benefit more than the percentages indicated below of the respective categories of income derived from the Compositions (exclusive of, without limitation, licensing or collection agency or Society fees, adaptors, arrangers, and translators fees) without your prior approval:

    Original mechanicals - twenty (20%) percent
    Cover mechanicals - forty (40%) percent
    Performances - thirty (30%) percent

WP/DANGEROUS/Exhibit.D                 15

In the event a foreign sub-publisher retains lesser percentages of income than those indicated above, you shall have the benefit of such lesser percentages of income being retained. You acknowledge and agree that Company has engaged and may engage such sub- publishers which are related to subsidiary to or otherwise affiliated by direct or indirect common ownership with Company.

## 19. RIGHT OF FIRST REFUSAL

In the event that you shall desire at any time or from time to time, to sell any interest you have in any or all of the Compositions to a third party, pursuant to a bona fide third party offer you shall first provide written notice to Company of such bona fide third party offer, and Company shall have a period of sixty (60) days within in which to notify you that Company will match the terms of such offer and acquire said interest in the Compositions; provided, however, that the sale to such third party shall be consummated within one hundred and twenty (120) days after Company's refusal to match such third party offer, and shall be upon all of the terms and conditions contained in the third party offer submitted by you to Company. You shall provide Company with an executed copy of the agreement with such third party within seven (7) days of such agreement's execution, and shall advise the third party that Company administers the Compositions pursuant hereto. If any sale to a third party is not consummated within one hundred and twenty (120) days, then you shall not sell or dispose of all or any of your interest in the Compositions without offering same to Company in conformity with this paragraph.

## 20. MISCELLANEOUS

(a) This Agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and cannot be changed or terminated by you except by an instrument signed by an officer of Company. A waiver by either party of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. All remedies, rights, undertakings, obligations, and agreements contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

(b) No breach of this Agreement on the part of Company or you shall be deemed material, unless notice of such breach is given and the party receiving such notice shall fail to discontinue the practice complained of or otherwise cure such breach, within sixty (60) days after receipt of such notice, provided such breach is reasonably capable of being fully cured within such sixty (60) day period.

(c)   You agree that Company shall have the right to insure Writer's life.  Furthermore, you shall cause Writer to sign any documents related thereto and attend any medical examination for this purpose.

(d)   If any part of this Agreement shall be determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having jurisdiction to make such determination, the remainder of this Agreement shall remain in full force and effect.

(e)   This Agreement has been entered into in the State of New York and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely therein with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance, or breach of this Agreement.  Any process in any action or proceeding commenced in the courts of the State of New York or elsewhere arising out of any such claim, dispute or disagreement, may, among other methods, be served upon Company or you by delivering or mailing the same, via registered or certified mail, addressed at the address first above written or such other address as may be designated pursuant to the notice provisions hereof.  Any such delivery or mail service shall be deemed to have the same force and effect as personal service with the State of New York or the jurisdiction in which such action or proceeding may be commenced.

(f)   This agreement shall not be binding upon either of the parties until duly executed by both you and Company.  Nothing contained herein shall constitute a partnership between or a joint venture by Company and you.  Neither party hereto shall hold itself out contrary to the terms of this subparagraph, and neither party shall become liable for any obligations, act or omission of the other party contrary to the provisions hereof.

(g)   YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHT TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH THE NEGOTIATION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND BEEN REPRESENTED BY SUCH LEGAL COUNSEL OR HAVE KNOWINGLY AND VOLUNTARILY WAIVED YOUR RIGHT TO SUCH LEGAL COUNSEL.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective at and as of the day and year first above written.

BY

FOR AND ON BEHALF OF COMPANY

Dangerous Music Inc.            Federal ID#

WP/DANGEROUS/Exhibit.D            17

**EXHIBIT A**

Dated:

To:  Zomba Enterprises, Inc.
137-139 West 25th Street
New York, NY 10001

Gentlemen:

I hereby acknowledge that DANGEROUS MUSIC, INC. ("Co-publisher") and you wish to become parties to Co-Publication and Exclusive Administration Agreement ("Agreement") dated and effective as of April 1, 1994. The Agreement relates to musical compositions written by me, I have read the Agreement and I am fully familiar with all the terms and conditions thereof.

I hereby acknowledge that I am a party to an Exclusive Songwriter's Agreement with Co-publisher pursuant to which I have granted to Co-publisher all rights in the musical compositions written by me, and that such grant will enable Co-publisher to fully perform the terms and conditions of the Agreement.

As an inducement for you to enter into the Agreement, it being to my benefit that you so execute the Agreement, I hereby agree as follows:

1.   I confirm, covenant, warrant and represent that Co-publisher has the right, insofar as I am concerned, to enter into the Agreement and to make and assume all of its covenants, undertakings, representations and warranties therein; and that Co-publisher shall continue to have such right during the Term of the Agreement and thereafter until all such covenants, warranties and representations have occurred and/or have been fully performed and discharged. I join in and confirm all of Co-publisher's undertakings, covenants, representations and warranties which concern me; and I shall duly and to the best of my ability perform and discharge all of the covenants, representations and warranties in the Agreement insofar as acts or forbearances are required from me for the occurrence, performance and/or discharge thereof. I represent and warrant that the royalties payable to me under the songwriter's agreement with Co-publisher are as provided in Exhibit "B" of the Agreement, a copy of such Exhibit "B" is attached hereto.

2.   If during the Term of the Agreement or any extensions or renewals thereof Co-publisher shall cease to be entitled to my songwriting services, or if Co-publisher shall fail or refuse to enable you to enjoy your interest in the above-described musical compositions pursuant to the terms of the Agreement, then I shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as

WP/DANGEROUS/Exhibit.D                    18

you would have had under the Agreement if such circumstances had not occurred; and such rights, privileges and benefits shall be enforceable by you or on your behalf against me. In such event, I shall be entitled to the payment by you of royalties in accordance with the terms and provisions of my songwriter's contract with Co- publisher.

3. You or your designee shall have the right to use and publish my name (both legal and professional), photograph, likeness and/or biographical material and the name and trademark of any recording group with which I perform for purposes of trade in connection with the sale and other exploitation of the musical compositions covered by the Agreement.

4. No termination of the Agreement shall operate to diminish my liability or obligation hereunder without your written consent.

5. You may in your own name institute any action or proceeding against me to enforce your rights under the Agreement, under this letter agreement or pursuant to my songwriter's contract with Co-publisher.

6. Insofar as your rights in musical compositions written by me are concerned, I agree that in the event of any variance between the terms and conditions of my songwriter's agreement with Co-publisher on the one hand and the Agreement on the other, the terms and conditions of the Agreement shall govern and prevail.

7. I confirm that the musical compositions listed on Schedule 1 and 2 attached hereto shall be deemed "Compositions" under the Agreement.

8. I agree that the Advance Payments paid by you to Co- publisher under the terms of the Agreement shall be deemed to be advances to me under my songwriter's contract with Co-publisher and that you may recoup such Advance Payments from the royalties and other monies otherwise due to me under my song writer's contract, and under the Agreement.

Very truly yours,

_Todd Shaw p/k/a "Too Short"_          4-28-66
Todd Shaw p/k/a "Too Short"          Date of Birth        / SS #

WP/DANGEROUS/Exhibit.D                    19

## EXHIBIT B

(a)  Eight  (8¢)  cents  per  copy  for  each  regular  piano-vocal
edition,  stage  dance  band,  concert  band,  marching  band,  or  choral
edition  of each Composition published and sold in the United States
of America for which Company receives payment;

(b)  Fifty  (50%)  percent of all  Net Income  received  by  or
credited  to  Company in the United States of America,  less  taxes,
duties,  and  tariffs,  for other arrangements and editions  of  the
Compositions  published and sold in the United States of America for
which  Company  receives  payment;  provided, however, that  if  any
Composition  is published in a folio or other composite work, Writer
shall receive a fraction of the applicable payment, the numerator of
which  fraction  shall be the number of copyrighted Compositions  in
such  composite work and the denominator of which fraction shall  be
the total number of musical compositions contained therein;

(c) A sum equal to fifty (50%) percent of all other Net Income
received  by or credited to Company in the United States of America,
less collection fees, sub-publisher fees, and taxes, if any, for all
other  uses  of  the Compositions, including mechanical  rights  and
lyric-only uses, but not including public performance rights;

(d)  A  sum  equal to fifty (50%) percent of  all  Net  Income
received  by or credited to Company in the United States of  America
from any and all sources, less collection fees, sub-publishers fees,
and taxes, if any, with respect to publication and all other uses of
the Compositions outside the United States of America, except public
performance fees;

(e) If Writer is one of two or more collaborators with respect
to  any of the Compositions rather than the sole author thereof, the
royalties  set  forth herein shall be divided in equal shares  among
all  the collaborators including Writer unless Company is instructed
otherwise in writing by all collaborators including Writer or unless
Writer  supplies  Company  with a copy of the  applicable  agreement
between Writer and any co-songwriters;  and

(f)  Writer  shall  receive his public performance  royalties
throughout  the  world directly from his own  affiliated  performing
rights  society  and shall have no claim whatsoever against  Company
for  any  royalties received by Company from any  performing  rights
society  which makes payments directly to composers, authors, and/or
songwriters.

(g)  For the purposes of this agreement, "Net Income" shall be
defined  as  gross receipts less all reasonable administrative  and
exploitation  expenses of Company with respect to the  Compositions,
including,  expenses directly related to the Compositions, the costs
of transcribing lead sheets and the costs of producing demonstration
records.

WP/DANGEROUS/Exhibit.D                    20

(h) For the purposes of this agreement, "Gross Receipts" shall be defined as "all monies (less all sums charged by collection agencies, subpublishers and others actually earned and received by Company in the United States from the exploitation of the Compositions throughout the world.

## EXHIBIT C
## SHORT FORM COPYRIGHT ASSIGNMENT

IN CONSIDERATION of the sum of One Dollar ($1.00) and other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned does hereby sell, assign, transfer and set over unto Zomba Enterprises, Inc., its successors and assigns, an undivided fifty (50%) percent of its right, title and interest in and to the copyrights, whether vested or contingent, including any renewals and extensions thereof (whether presently available or subsequently available as a result of intervening legislation) in the U.S.A. and elsewhere throughout the world, in the following musical composition which was written by the following indicated persons:

| TITLE | WRITERS | COPYRIGHT OFFICE |
|-------|---------|------------------|
|       |         |                  |

IN WITNESS WHEREOF, the undersigned has hereunto set his hand and seal this _____ day of _____ 199_.

By: _____

WP/DANGEROUS/Exhibit.D                22

## EXHIBIT D

Dated as of ..............

Publisher Relations Department
Broadcast Music Inc.
320 West 57th Street
New York, N.Y.  10019

Gentlemen:

This is to advise BMI that we have entered into an agreement with
another BMI publisher for the administration of our catalog, and
that BMI's records should be marked to reflect the agreement as
follows:

1.    Name of BMI publisher acting as our administrator:

           ZOMBA SONGS, INC.


2.    Effective date of agreement:

           [ ] Immediately, including all royalties now payable or which
      hereafter become payable, regardless of when performances took
      place.

CHECK  [ ] Effective with performances on and after
ONE    .............., 199.

           (Must be as of the beginning of a calendar quarter, i.e., Jan
           1, April 1, July 1 or Oct.  1)

3.    Checks for all our BMI royalties, both domestic and foreign,
      should be made payable to the administrator and should be sent
      together with statements and all other correspondence to the
      administrator at its address on BMI's records.

We understand that BMI cannot mark its records at this time so as to
indicate the termination date of the administration agreement and
that, therefore, the above information will continue to be reflected
on BMI's record until such time as we or the administrator notifies
BMI that the administration agreement is about to terminate.

                              Very truly yours,

                              By:_____
                                 Dangerous Music, Inc.


WP/DANGEROUS/Exhibit.D              23

## EXHIBIT D

To: ALL RECORD MANUFACTURERS
    LICENSED TO MECHANICALLY
    REPRODUCE COMPOSITIONS
    OF WHICH THE UNDERSIGNED     TO:  HARRY FOX AGENCY
    (OR ONE OF MORE OF THEM)      TO:  CMRRA
    ARE THE COPYRIGHT PROPRIETORS

                                  TO:  ALL OTHER PARTIES
                                            IN INTEREST

Please be advised that, effective as of _____, 199_, we have granted to ZOMBA ENTERPRISES, INC. the exclusive right in (territory) in respect of the Compositions listed on Schedule 1 hereto, of which the undersigned are the co-copyright proprietors (the "Composition(s)"):

(i)     To license and cause others to license the use of the Compositions; and

(ii)    To administer and grant rights in and to the Compositions and the copyrights therein; and

(iii)   To publish and sell sheet music and/or folios of the Compositions if it so elects; and

(iv)    To collect all monies payable with respect to the Compositions, including all monies heretofore earned and/or accrued but not yet paid, and all monies due from and after and until further notice from the undersigned and _____ _____; and

(v)     Otherwise administer the Compositions and the copyrights therein and to act as the publishers thereof.

                         Very truly yours,

                         By_____
                           Dangerous Music, Inc.

**EXHIBIT D**

Dated as of ............

ASCAP
One Lincoln Plaza
New York, N.Y.  10023

Gentlemen:

This  is to advise ASCAP that we have entered into an agreement with
another  ASCAP publisher for the administration of our catalog,  and
that  ASCAP's  records should be marked to reflect the agreement  as
follows:

1.     Name of ASCAP publisher acting as our administrator:

       ZOMBA ENTERPRISES, INC.

2.     Effective date of agreement:

       [ ] Immediately, including all royalties now payable or which
       hereafter become payable, regardless of  when  performances
       took place.

CHECK [ ] Effective with performances on and after
    ONE        ............., 199.

       (Must be as of the beginning of a calendar quarter, i.e., Jan
       1, April 1, July 1 or Oct.  1)

3.     Checks  for  all  ASCAP  royalties,  both  domestic  and
       foreign,  should  be  made payable to the  administrator and
       should  be  sent  together  with  statements  and  all  other
       correspondence to the administrator at its address on ASCAP's
       records.

We  understand that ASCAP cannot mark its records at this time so as
to indicate the termination date of the administration agreement and
that, therefore, the above information will continue to be reflected
on  ASCAP's  record  until  such time as we  or  the  administrator
notifies ASCAP that the administration agreement is about to
terminate.

                              Very truly yours,


                              By_____
                              Dangerous Music, Inc.


WP/DANGEROUS/Exhibit.D              25

## SCHEDULE 1

**(Existing Compositions Not Committed to Third Parties)**

| TITLE<br>COMPOSITION | % OF<br>OWNERSHIP |
|---|---|

WP/DANGEROUS/Exhibit.D                    26

## SCHEDULE 2

### (COMPOSITIONS COMMITTED TO THIRD PARTIES)

| TITLE | PERCENTAGE | PUBLISHER | DATE OF | REVERSION |
|-------|------------|-----------|---------|-----------|

Those compositions subject to the Prior Agreement.

WP/DANGEROUS/Exhibit.D                    27

MAY.19.1997    2:12PM    ZOMBA 212 242 7462                                    NO.014    P.15/26



**ZOMBA MUSIC PUBLISHING**
127-139 WEST 25TH STREET, NEW YORK, NY 10001
TELEPHONE: 212-727-0016
FAX: 212-242-7462

ZOMBA ENTERPRISES INC. (ASCAP)
ZOMBA SONGS INC. (BMI)

May 9, 1997

Mr. Todd Shaw p/k/a "Too Short"
c/o Katz, Smith & Cohen
3423 Piedmont Road NE
Suite 200
Atlanta, Georgia 30305
Attn: Jeffrey B. Kempler, Esq.

Re:  <u>Todd Shaw p/k/a "Too Short"/Co-Publishing Agreement</u>

Dear Todd:

        We refer you to the Co-Publishing Agreement between Dangerous Music, Inc. ("Dangerous")
and us, for your exclusive services, dated April 1, 1994, as amended (the "Agreement"). All defined
terms in this amending letter (the "Letter") shall be those definitions found in the Agreement.
Notwithstanding anything to the contrary contained in the Agreement, it is hereby agreed as follows:

        1.    <u>Parties</u>.        Effective as of the date of this Letter, you will be deemed substituted for
Dangerous as a party to the Agreement.  You agree to assume and perform all of Dangerous'
obligations under the Agreement.  Your exclusive services as a songwriter, which are currently
required under the Agreement to be furnished to us by Dangerous, will be rendered directly by you to
us for the balance of the Term of the Agreement, including any and all renewals and extensions
thereof.  All royalties previously credited to Dangerous' royalty account will be credited to your royalty
account, and, if your account is recouped, will be paid to you in accordance with the terms of the
Agreement.  All Advances previously charged to Dangerous' royalty account will likewise be charged to
your royalty account.  Any of our obligations pursuant to the Agreement shall no longer be to
Dangerous, rather all such obligations shall instead be to you, including, but not limited to, accountings.

        2.    <u>Albums</u>.        Each Album of the Minimum Commitment for each Contract Period under
the Agreement (an "MC Album"), shall sometimes be referred to individually, in this Letter, as the First
Album (i.e., being the MC Album of the First Contract Period), the Second Album, Third Album, the
Fourth Album, the Fifth Album, the Sixth Album and the Seventh Album, respectively, in the order
which the same occur.

LONDON OFFICE: ZOMBA HOUSE, 165-167 HIGH ROAD, WILLESDEN, LONDON NW 10 2SG, ENGLAND, TELEPHONE: (44) (81)-459-8899, FAX (44) 181-451-6300

EUROPEAN OFFICE: ZOMBA MUSIC HOLDINGS B.V., NEEFLOE 34, 1221 ES LAREN (N.H.), HOLLAND, TELEPHONE: (31) 2153-12214, FAX: (31) 2153-16788

LOS ANGELES OFFICE: 9000 SUNSET BOULEVARD, SUITE 300, LOS ANGELES, CA 90069, TELEPHONE: (310) 247-8300, FAX: (310) 247-8366

NASHVILLE OFFICE: 914-916 19TH AVENUE SOUTH, NASHVILLE, TN 37212, TELEPHONE: (615) 321-4880, FAX: (615) 321-0615

A ZOMBA COMPANY

TooShort/Amendmts/AL.050997(5)

MAY.19.1997   4:02PM   ZOMBA 212 242 7462                    NO.025   P.3/3

Todd Shaw
May 9, 1997
Page 2

3.    Third Contract Period Advance.    Upon the full execution of this Letter, we shall
commit to pay you an Advance in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00).
Two Hundred Thousand Dollars ($200,000.00) of which shall be payable upon execution of this Letter,
and Fifty Thousand Dollars ($50,000.00) of which shall be payable upon the Delivery (as that term is
defined in the ZRC Agreement [as hereinafter defined]) to and acceptance by Zomba Recording
Corporation ("ZRC") of the MC Album for the Third Contract Period under the Agreement (the "Third
Album"), along with complete writer and publisher splits and sample information.    Notwithstanding
anything to the contrary set forth in this Letter or the Agreement, in the event that the Third Album is
not Delivered to ZRC by September 30, 1997 (other than as a direct result of ZRC's acts or omissions),
then the balance of the total Advance set forth in this paragraph 3 shall no longer be payable to you.
Of the total Advance set forth in this paragraph 3, One Hundred Twenty-Five Thousand ($125,000.00)
Dollars shall be deemed a general Advance, and One Hundred Twenty-Five Thousand Dollars
($125,000.00) shall be deemed a prepayment of future Advances payable pursuant to the Agreement.
At your request, and as an accommodation to you, upon the full execution of this Letter, we shall direct:
(i) Twelve Thousand Five Hundred Dollars ($12,500.00) of the Two Hundred Thousand Dollars
($200,000.00) otherwise payable to you upon full execution of this Letter, and (ii) Twelve Thousand
Five Hundred Dollars ($12,500.00) of the Fifty Thousand Dollars ($50,000.00) otherwise payable to
you upon the Delivery to, and acceptance by, ZRC of the Third Album (i.e., a total of Twenty-Five
Thousand Dollars ($25,000.00) Dollars), to your lawyers, Katz, Smith & Cohen, taxpayer identification
number 58-1275026. The total Advance set forth in this paragraph 3 shall be recoupable from any and
all royalties otherwise credited to your royalty account under the Agreement, including, but not limited
to, those royalties for the semi-annual accounting period ending December 31, 1996.

4.    Fourth Contract Period Advance.    Rather than One Hundred Thousand Dollars
($100,000.00) as it is currently set forth in the Agreement, the Advance for the Fourth Contract Period
shall be One Hundred Fifty Thousand Dollars ($150,000.00), subject always, however, to the
provisions of paragraph 7(d) of this Letter.

5.    Fifth Contract Period Advance.    Rather than One Hundred Thousand Dollars
($100,000.00) as it is currently set forth in the Agreement, the Advance for the Fifth Contract Period
shall be One Hundred Seventy-Five Thousand Dollars ($175,000.00), less any unrecouped balance in
your royalty account as of the last semi-annual royalty accounting statements rendered to you by us,
prior to the initial United States commercial release of the MC Album of the Fifth Contract Period (the
"Fifth Album"), but in no event will this total Advance be reduced by greater than Fifty Thousand Dollars
($50,000.00), subject always, however, to the provisions of paragraph 7(d) of this Letter. For purposes
of clarification, it is acknowledged that the reduction of this total Advance, payable for the Fifth Contract
Period, by the unrecouped balance in your royalty account, in accordance with the terms of this
paragraph 5, shall be applied prior to any further reduction as set forth in paragraph 7(d) of this Letter.

6.    Term.

    (a)    You hereby irrevocably grant us two (2) further separate and successive options
to extend the Term of the Agreement for a Sixth Contract Period and a Seventh Contract Period,
respectively.

    (b)    The Third Contract Period will continue until thirty (30) days following the initial
United States release of the MC Album for the Fourth Contract Period. The Fourth Contract Period,
Fifth Contract Period and Sixth Contract Period each will continue, if applicable, for the longer of: (i)

TooShort/Amendmts/AL.050997(6)

Case 09-61855-bem   Doc 34-1   Filed 10/27/09   Entered 10/27/09 00:54:10   Desc
Exhibit 1   Page 31 of 40

Todd Shaw
May 9, 1997
Page 3

one (1) year, or (ii) thirty (30) days following the initial United States release of the MC Album for the next successive Contract Period. The Seventh Contract Period will end thirty (30) days following the initial United States release of the MC Album for the Seventh Contract Period.

(c)   Notwithstanding anything to the contrary contained in this Letter and/or in the Agreement, neither the Term, nor any contract period, will end unless and until you deliver to us a notice expressly referring to this paragraph 6(c), and indicating that we have theretofore failed during the Current Contract Period to exercise our option to extend the Term for the next contract period. If we fail to exercise our option on or before the date that is thirty (30) days after we receive such notice from you, then the Term will end at 12:00 o'clock PM in New York, New York on such thirtieth (30th) day, as if that date were the original expiration date of the Term, without our having any liability or additional obligations to you in connection therewith.

(d)   Notwithstanding anything to the contrary set forth in this Letter, or in the Agreement, no Contract Period shall continue for more than three (3) years.

(e)   Notwithstanding anything to the contrary set forth in this Letter, or in the Agreement, if we do not exercise an option for a subsequent Contract Period, the then-previously unexploited Compositions embodied upon the MC Album for such subsequent Contract Period for which our option has not been exercised, will not be further subject to the Agreement. All other Compositions, however, will remain fully subject to the Agreement in all events.

7.   Sixth Contract Period Advance and Seventh Contract Period Advance.

(a)   The amount of the Advance payable in connection with the Sixth Contract Period and Seventh Contract Periods will, in each case, be equal to : (i) the sum of Seventy percent (70%) of the net United States mechanical income credited to your royalty account which is attributable to the MC Album for the Contract Period immediately preceding the Contract Period for which the Advance is being paid (as shown by the last semi-annual royalty accounting statements rendered to you by us, up to and including the last accounting statement rendered to you by us before such calculation is made), multiplied by (ii) a fraction, the numerator of which is the total penny rate mechanical royalty, collectable by us, directly attributable to the Compositions written, owned and controlled by you on the MC Album for the Contract Period for which the Advance is being calculated, and the denominator of which is the total penny rate mechanical royalty, collectable by us, directly attributable to the Compositions written, owned and controlled by you on the MC Album for the Contract Period immediately preceding the Contract Period for which the Advance is being calculated (in no event, however, shall this fraction be equal to more than one (1)).

(b)   The Advances for the Sixth Contract Period and Seventh Contract Period will be no less than the applicable minimum, nor more than the applicable maximum, specified below:

|                        | Maximum   | Minimum   |
|------------------------|-----------|-----------|
| Sixth Contract Period: | $400,000. | $100,000. |
| Seventh Contract Period: | $500,000. | $100,000. |

TooShort/Amendmts/AL.050997(5)



Todd Shaw
May 9, 1997
Page 4

      (c)     Solely for the purposes of calculating the Sixth Contract Period and Seventh Contract Period Advances, in computing the amount of royalties credited to your account, we shall include "pipeline income." For the purposes hereof, the term "pipeline income" shall be defined as Seventy percent (70%) of your net share of United States mechanical income attributable to the MC Album for the Contract Period immediately preceding that Contract Period for which the Advance is being calculated, which has been actually received by us in the United States, as of the date the applicable Advance is calculated, but which has not yet been accounted for to you.

      (d)    (i)     Notwithstanding anything to the contrary set forth in the Agreement and/or this Letter, any and all Advances for the Fourth Contract Period, Fifth Contract Period, Sixth Contract Period and Seventh Contract Period will, in each case, be payable as follows: (i) Twenty-Five percent (25%) on or before the Delivery (as that term is defined in the ZRC Agreement) to, and acceptance by, ZRC of the MC Album for the Contract Period concerned, and (ii) Seventy-five percent (75%) on or before our exercise of our option for the Contract Period concerned. Additionally, the Advances for the Fourth Contract Period and Fifth Contract Period only are based upon you writing, owning and controlling One Hundred percent (100%) of the compositions embodied on the respective MC Album, and will be reduced proportionately in the event that you write, own and control less than One Hundred percent (100%) of said compositions.

            (ii)     Furthermore, if, with respect to any MC Album, we are unable to collect royalties for the mechanical reproductions in the United States of the Compositions contained on such Album equal to One Hundred percent (100%) of the amount that would be collectible by us if Ten and One-Half (10.5) of the Compositions on such Album were subject to a mechanical royalty rate of the greater of either: (i) Seventy-Five percent (75%) of the United States statutory mechanical copyright royalty rate in effect as of the date of Delivery (as that term is defined in the ZRC Agreement) to ZRC of such Album, or (ii) the mechanical royalty rate actually paid to us, by the applicable record company, for each composition embodied upon such Album, in respect of all copies of such Album on which royalties are otherwise paid or credited to you (that is, all net royalty-bearing copies) by the applicable record company, then the Advance payable with respect to such Album will be proportionately reduced (for example, if, with respect to the Compositions contained on a particular MC Album, we can only collect Fifty percent (50%) of the mechanical royalties which would have been payable if Ten and One-Half (10.5) of the compositions on such Album were written by you, and such Compositions were subject to a mechanical royalty rate of Seventy-Five percent (75%) of the United States statutory mechanical copyright royalty rate, then we will pay you Fifty percent (50%) of the Advance otherwise payable in connection with such Album).

    8.     <u>Definition Of "Album."</u>     Notwithstanding the provisions of paragraph 1(j) of the Agreement, during the Fourth, Fifth, Sixth and Seventh Contract Periods, a record which contains compositions of which, in the aggregate, at least Thirty percent (30%) are written, owned and controlled by you, shall be deemed an "Album" under the Agreement . For the avoidance of doubt, the former requirement of paragraph 1(j) of the Agreement of One Hundred percent (100%) ownership and/or control is hereby reduced to Thirty percent (30%) authorship, ownership and control for the Fourth Contract Period, Fifth Contract Period, Sixth Contract Period and Seventh Contract Period.

TooShort/Amendmts/AL_050997(8)



Case 09-01655-bem    Doc 54-1    Filed 10/27/09    Entered 10/27/09 09:54:19    Desc
Exhibit 1    Page 33 of 40

Todd Shaw
May 9, 1997
Page 5

9.    Definition Of "Gross Receipts."    Notwithstanding the provisions of the Agreement and, in particular, paragraph 1(b) thereof, those royalties which arise, pursuant to the Agreement, from the exploitation of the Compositions written after the date of this Letter, in the United Kingdom, Belgium, the Netherlands and Luxembourg only, will be calculated and paid to you on an "at source" basis, i.e., based on the gross sums arising in each such country, which are actually received by or credited to us in the United States with respect to the exploitation of such Compositions throughout the Territory.

10.    Administration Fee.    Notwithstanding anything to the contrary set forth in paragraph 4(c) of the Agreement, commencing with the semi-annual accounting period immediately following the Delivery (as that term is defined in the ZRC Agreement) to, and acceptance by, ZRC of the Third Album (including, but not limited to, complete writer and publisher information, together with splits, as well as complete sample information), the administration fee shall be reduced from Ten percent (10%) to Zero (0%) percent with respect to any newly created and previously unexploited Compositions embodied on the Third Album and any Compositions created, in whole, after the Delivery (as that term is defined in the ZRC Agreement) to, and acceptance by, ZRC of the Third Album. With respect to all Compositions created prior to the Delivery (as that term is defined in the ZRC Agreement) to, and acceptance by, ZRC of the Third Album, the administration fee shall be reduced from Ten percent (10%) of Gross Receipts to Five percent (5%) of Gross Receipts commencing with the semi-annual accounting period immediately following the Delivery (as that term is defined in the ZRC Agreement) to, and acceptance by, ZRC of the Third Album. With respect to all Compositions, under the Agreement, regardless of when created, the administration fee shall be reduced to Zero percent (0%) commencing with the semi-annual accounting period immediately following the Delivery (as that term is defined in the ZRC Agreement) to, and acceptance by, ZRC of the Album of the Minimum Commitment for the Sixth Contract Period.

11.    Recoupment Of Advances.    Without restricting any of our rights whatsoever to apply any and all income towards the recoupment of Advances, we agree to limit our ability to apply One Hundred percent (100%) of your share of royalties credited to your royalty account under the Agreement which are directly attributable to those Compositions commercially released prior to the initial United States release of the Sixth Album towards the recoupment of the total contractual Advances paid to you for the Sixth Contract Period and Seventh Contract Period, if applicable. Rather, only Seventy-Five percent (75%) of your share of royalties credited to your royalty account under the Agreement that are attributable to those Compositions released prior to the initial United States release of the Sixth Album may be applied towards the recoupment of those contractual Advances paid to you for the Sixth Contract Period and Seventh Contract Period, if applicable. For the avoidance of doubt, Twenty-Five percent (25%) of your share of royalties credited to your royalty account under the Agreement, which are directly attributable to those Compositions commercially released prior to the initial United States release of the Sixth Album, shall be credited to your royalty account under the Agreement without regard to recoupment of said Advances for the Sixth Contract Period and Seventh Contract Period, if applicable. For the avoidance of doubt, we shall continue to be entitled to apply One Hundred percent (100%) of those royalties directly attributable to: (i) the Compositions written and/or released after the initial United States release of the Sixth Album, (ii) the Compositions embodied upon the Sixth Album, and (iii) those Compositions embodied upon the Seventh Album, towards the recoupment of any and all Advances paid to you under the Agreement, including, but not limited to, those Advances for the Sixth Contract Period, and the Seventh Contract Period, if applicable.

TooShort/Amendmts/AL.050997(6)



Todd Shaw
May 9, 1997
Page 6

12.   Option Exercise.     In accordance with the terms of the Agreement, we hereby exercise our option for the Fourth Contract Period under the Agreement. The Fourth Contract Period shall commence upon the expiry of the Third Contract Period. You hereby acknowledge the valid exercise of our option for the Third, and now Fourth Contract Periods under the Agreement.

13.   Administration.

(a)   Notwithstanding anything to the contrary contained in the Agreement, we will not knowingly authorize a synchronization license for the exploitation of a Composition for the following use, without your prior written consent, which consent may be withheld in your sole discretion:

(i)   A theatrical motion picture with a rating of "NC-17" or "X."

(ii)   A political campaign advertisement.

(iii)   A commercial for alcohol products in the United States.

(iv)   A commercial for tobacco products in the United States.

(v)   A commercial advertisement for personal hygiene products.

(b)   Notwithstanding anything to the contrary contained in the Agreement, we will not knowingly authorize any of the following with respect to a Composition, without your prior written consent, which consent may be withheld in your sole discretion:

(i)   A material change to the English text of the English language version (this does not affect our right to undertake translations into languages other than English),

(ii)   Uses in connection with endorsements.

(iii)   So-called "grand rights," provided, however, that in the event we agree to license grand rights in a Composition for a dramatic production, any other compositions written by the Writer in connection with such dramatic production will be deemed Acquired Compositions hereunder; and further provided that we will have the right to grant a license to use one or more Compositions in a dramatic production for which such Compositions were not originally written without your consent.

(c)   All licenses and agreements concerning the Compositions will be issued on an "arm's-length" basis.

(d)   Notwithstanding anything to the contrary contained in the Agreement, we will make available to you for your reasonable approval any pictures or biographical material about you which we propose to use in connection with the Compositions in the United States during the Term of the

TooShort/Amendmts/AL.050997(6)



Todd Shaw
May 9, 1997
Page 7

Agreement.  We will not use any such material, provided you have disapproved thereof in writing within
five (5) days from the time such materials are made available to you, and further provided that you furnish
substitute material, satisfactory to us in our sole and reasonable discretion, on a timely basis.  This
subparagraph will not apply to any material previously approved by you or used by us for a similar
purpose.  No inadvertent failure to comply with this subparagraph will constitute a breach of this
Agreement, and you will not be entitled to injunctive relief to restrain the continuing use of any material
used in contravention of this subparagraph.  You shall have the right to submit replacement or additional
photographs, likenesses and biographical material and your submission of same shall constitute your
approval thereof.

        Our inadvertent failure to comply with any part of this paragraph 13 shall not be deemed a
breach of the Agreement.  We agree to use best efforts to promptly cure such failure, if and when
possible, prospectively.

    14.     <u>Agreements, Approval And Consent.</u>

        (a)     As to all matters to be determined by mutual agreement, or as to which your
approval or consent is required, such agreement, approval or consent will not be unreasonably
withheld unless otherwise specified in this Letter and/or in the Agreement.

        (b)     Your agreement, approval or consent, wherever required, will be deemed given
unless you notify us otherwise in writing within five (5) days following our request for it, subject to
paragraph 14(a) above. We will address all such requests for agreement, approval or consent to your
attention, at the address set forth on page one (1) of this Letter.  Your response (or lack thereof) will be
binding on you.

    15.     <u>Royalties.</u>

        (a)     Notwithstanding anything to the contrary contained in the Agreement, solely with
respect to income attributable to synchronization uses of the Compositions, we will credit your royalty
account with Seventy percent (70%) of the Gross Receipts remaining after deduction of any and all
sums and expenses properly deductible pursuant to paragraph 4 of the Agreement and paragraph 10
of this Letter.

        (b)     Notwithstanding anything to the contrary contained in the Agreement and/or this
Letter, if a Composition is embodied on a so-called "motion picture soundtrack album" which is
commercially released by ZRC, then solely with respect to income attributable to any synchronization use
of that Composition in said motion picture, we will credit your royalty account with Seventy-Five percent
(75%) of the Gross Receipts remaining after deduction of any and all sums and expenses properly
deductible pursuant to paragraph 4 of the Agreement and paragraph 10 of this Letter.

TooShort/Amendmts/AL.050997(S)



Todd Shaw
May 9, 1997
Page 8

16.    Acquired Compositions:    With respect to those musical compositions in which you, directly or indirectly, during the Term, obtain or acquire, in whole or in part, from an unaffiliated third party (the "Third Party"), a publishing interest, be it copyright ownership, income participation, and/or administration rights (the "Acquired Compositions"), it is understood that such Acquired Compositions shall be deemed Compositions under the Agreement.  (For the avoidance of doubt, it is acknowledged that the term Acquired Compositions shall refer only to that interest in a musical composition which is attributable to the authorship of the Third Party, and does not refer to the interest attributable to your authorship.)   Notwithstanding the above, however, it is further understood that in the event that it is necessary for an advance to be paid to such Third Party, specifically in consideration for such acquired publishing  interest regarding such Acquired Compositions (the "Third Party Advance"), then you shall give prompt written notice to us (the "Acquisition Notice"), which Acquisition Notice shall include the Third  Party's and/or third party writer's musical and professional background, the amount of the Third Party Advance, demo recordings, if available, and such other information we may reasonably request, in which case the following shall apply:

(a)    You and we shall promptly enter into good faith negotiations and we shall have ten (10) business days from the  receipt of such Acquisition Notice in which to agree, in writing, to: (i) pay One Hundred percent (100%) of such Third Party Advance, and (ii) to enter into a publishing agreement with  you and such Third Party the "boilerplate" terms of which shall be negotiated in good faith promptly thereafter (the "Third Party Agreement").

(b)    If we agree to enter into such Third Party Agreement, then the Third Party's interest in the applicable Acquired Compositions shall be subject to the terms and  conditions of the Third Party Agreement including, but not limited to, the royalty provisions contained therein, it being understood that we shall account to the Third Party in accordance with the accounting provisions of such Third Party Agreement. With  respect to all Acquired Compositions, whether subject to a Third Party Agreement or not, we agree to establish, for each applicable Third Party, a separate royalty account (the "Third Party  Account") that will not be cross-collateralized with any other such Third Party Account, nor with your account under the Agreement.  For the avoidance of doubt, your acquired interest and, if applicable, the interest applicable to your authorship, in  such Acquired Composition ("Your Combined Interest") shall always be subject to all of the terms  and conditions of the Agreement.

(c)    With respect to any Third Party Advance, if we, at our option as set forth above, or otherwise, agree to  pay One Hundred (100%) percent of any Third Party Advance, One Hundred percent (100%) of such Third Party Advance shall be charged against the applicable Third Party Account, it being understood, however,  that, if such Third Party Advance has not been fully recouped within one (1) year of the date on which such Third Party Advance was paid, then we shall always have the right, at our sole discretion, to charge your royalty account, under the Agreement, with the balance of that unrecouped Advance, up to a maximum of Fifty percent (50%) of such total Third Party Advance.  For the avoidance of doubt, we shall not have the right to recoup the Third Party Advance twice (i.e., from both you and the Third Party).

(d)    Notwithstanding anything to the contrary contained in the Agreement, it is further agreed that, with respect to Acquired Compositions only, we shall have the right to charge an administration fee of not less than Five percent (5%) of Gross Receipts (as defined in the Third Party

MAY.19.1997   2:15PM   ZOMBA 212 242 7462                NO.014   P.23/26

Todd Shaw
May 9, 1997
Page 9

Agreement), but only with respect to the Third Party's original interest, i.e., no administration fee shall be charged with respect to the interest attributable to the your authorship interest in an Acquired Composition in the event that you are a co-writer of same. Furthermore, if the Third Party Agreement is a co-publishing agreement, or a form of a publishing agreement which transfers any portion of copyright ownership to you and/or us (i.e., excluding an "administration agreement," as that term is commonly used in the music industry) , then it is agreed, by both you and us, that the royalty splits contained in such Third Party Agreement shall not be more favorable to the Third Party than those royalty splits contained in the Agreement.

(e)     If we either fail to give you notice within ten (10) business days as aforesaid, or give you notice that we elect not to pay such Third Party Advance, then you shall have the right to either: (i) pay such Third Party Advance on your own, or (ii)  enter into an agreement with a third party music publisher (the "Outside Publisher"), with respect to those applicable Acquired Compositions, whereby such Outside Publisher pays such advance to the Third Party, it being understood that such advance paid by you or such Outside Publisher must be equal to at least  that amount which we were requested to pay and the basic terms of the agreement must be the same as those last discussed with us, and, in either such case, those applicable Acquired Compositions shall consequently be deemed excluded from this Agreement and thereby not deemed "Compositions" hereunder.

(f)     It is understood that prior to your, and/or such Outside Publisher, entering into an agreement with such Third Party, regarding such Acquired Compositions (the "Outside Agreement"), you shall Deliver to us the material terms of such Outside Agreement including, but not limited to, the advance amounts.   If the terms of the Outside Agreement are more favorable to either  you and/or the Outside Publisher than those last offered to us prior to our election not to pay such Third Party . Advance (by way of example, if the advance payable to such Third Party pursuant to such Outside Agreement is less than the Third Party Advance that we were last requested, or offered, to pay), then we shall have an additional five (5) business days in which to elect, by written notice to you, to enter into an agreement with you and  such Third Party, regarding the Acquired Compositions, in lieu of the Outside Publisher, and/or you alone, based on those terms and conditions contained in the Outside Agreement.

17.     The "P&D Agreement."     The Pressing And Distribution/Joint Venture Agreement, dated as of May 1, 1997, between Todd Shaw, Inc. and ZRC shall hereinafter be referred to as the "P&D Agreement."  With respect to each artist submitted to ZRC pursuant to the P&D Agreement, you agree to use best efforts to cause each such artist, as well as any producers and/or other songwriters associated with recordings by such artist, to enter into some form of publishing agreement with you and us with respect to the musical compositions embodied in the recordings by such artist (i.e., an administration agreement, a co-publishing agreement, or a songwriter agreement, as those terms are commonly used in the music industry), and accordingly, such publishing agreement would then be subject to the provisions of paragraph 16 of this Letter..

18.     Right Of Set Off.     All defined terms in this paragraph 18 shall be those definitions found in the recording agreement between you and ZRC dated May 1, 1997 (the "ZRC Agreement").

(a)     (i)     You irrevocably and unconditionally acknowledge and agree that, upon the occurrence of an Event Of Secured Collateral Default under the ZRC Agreement, and upon the

TooShort/Amendmts/AL.050997(6)

MAY.19.1997    2:15PM    ZOMBA 212 242 7462                    NO.014    P.24/26

Todd Shaw
May 9, 1997
Page 10

giving of Notice by ZRC to ZEI and to you that an Event Of Secured Collateral Default has occurred, ZEI shall set off any payments (including, without limitation, royalty payments and payments of advances) due from ZEI to you (collectively "Contract Payments") pursuant to the Publishing Agreement(s), and to pay such amounts to ZRC until One Million Two Hundred Fifty Thousand Dollars($1,250,000.00) of the First ZRC Advance paid to you, and any Default Fees charged to you pursuant to the ZRC Agreement, are paid to, or recouped by, ZRC (any payments set off against, pursuant to this paragraph 18, being hereinafter referred to as the "Set Off Amount") or are otherwise repaid to ZRC pursuant to this Letter or the ZRC Agreement.

(ii)    Any Set Off Amount shall be applied in dollar-for-dollar reduction of the outstanding unpaid or unrecouped balance of your royalty account equal to the aggregate amount of the Artist's First ZRC Advance Obligation and any Default Fees, as evidenced by a written statement of account provided to ZEI and to you by ZRC, and on which ZEI shall have the right to rely.

(iii)    ZEI shall exercise its right of set off pursuant hereto by withholding the Contract Payments, and remitting same to ZRC, with a subsequent Notice confirming such set off and payment to be provided by ZEI to you.

(b)    You represent, warrant and covenant that, as of the date hereof, you have the full power and authority and the legal right, with ZRC's consent, to direct to ZRC the Contract Payments otherwise payable by ZEI to you (as contemplated hereunder), and that you have not transferred, assigned and/or otherwise encumbered in whole or in part your right to receive any such Contract Payments.

(c)    You specifically acknowledge and agree that ZEI's compliance with the terms of this paragraph 18, and the payment of any amounts in accordance herewith, shall be deemed to satisfy fully all of ZEI's obligations to pay such amounts under the Publishing Agreement(s). Nothing contained in this paragraph 18 or in the ZRC Agreement shall in any manner affect any of your obligations to ZEI pursuant to the Publishing Agreement(s), and you agree to be fully responsible for all of your obligations described therein.

(d)    The parties hereto acknowledge and agree that, notwithstanding anything contained in this paragraph 18 to the contrary:

(i)    ZEI's execution of the ZRC Agreement, and compliance with the provisions of this paragraph 18, are strictly as accommodations to ZRC and you;

(ii)    ZEI's compliance with this paragraph 18 shall not be deemed to be a waiver of or take priority over any of ZEI's rights or any of your obligations under the Publishing Agreement(s) (including, without limitation, ZEI's right to recoup sums paid to or on behalf of you and/or to withhold sums otherwise payable to you in the event of a breach of or default under the Publishing Agreement(s) by you in accordance with the provisions of the Publishing Agreement(s));

(iii)    The ZRC Agreement and ZEI's compliance with the terms of this paragraph 18, are subject to the terms and conditions of the Publishing Agreement(s) (except that the Publishing Agreement(s) shall be deemed to conform to the provisions of this paragraph 18 insofar as

TooShort/Amendmts/AL.050997(6)

MAY.19.1997   2:16PM   ZOMBA 212 242 7462                                NO.014   P.25/26

Todd Shaw
May 9, 1997
Page 11

such provisions affect ZEI's payment obligations under the Publishing Agreement(s), and all of ZEI's rights and remedies under the Publishing Agreement(s);

       (iv)     Except as expressly set forth in this paragraph 18 and/or in the ZRC Agreement, this paragraph 18 and/or the ZRC Agreement shall not create in any way any agreement and/or obligation between ZEI and ZRC, and ZRC shall not be a third party beneficiary of the Publishing Agreement(s);

       (v)     ZEI shall have no obligation whatsoever to render to ZRC any accountings relating to the Contract Payments;

       (vi)     ZRC shall not have the right to examine and/or audit ZEI's books and records.

       (vii)     In the event that ZEI shall have received a Notice from any of the parties hereto of a dispute between ZRC and you over whether an Event Of Secured Collateral Default shall have occurred, or over ZEI's obligations under this paragraph 18 or the ZRC Agreement, ZEI shall have the right, in its discretion, to hold all Contract Payments in a segregated, interest-bearing account pending receipt of: (A) Notice signed by ZRC and you evidencing the mutual resolution of such dispute, or (B) a court order directing the disposition of such funds.

       (viii)     No payment of sums to ZRC made pursuant to the provisions of this paragraph 18 shall give rise by you to any claim against ZEI of breach of or default under the Publishing Agreement(s) (although nothing contained in this paragraph 18 or in the ZRC Agreement shall be deemed to affect your right to object to the accuracy of accountings and/or to audit ZEI as may be provided in the Publishing Agreement).

       (e)     You shall have the identical indemnification obligations to ZEI, with respect to this paragraph 18, as the identical indemnification obligations you have to ZRC pursuant to the ZRC Agreement and pursuant to the P&D Agreement.

    19.    Address/Payments.   For all purposes under the Agreement, including, but not limited to, notices, statements and/or payments, you hereby acknowledge and confirm that your address as set forth above is current and accurate.  Additionally, all payments due to you pursuant to the Agreement shall be made payable to the order of "Todd Shaw," taxpayer identification number 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.

(Rest of page intentionally left blank.)

TooShort/Amendmts/AL_050997(6)

Todd Shaw
May 9, 1997
Page 12

Apart from the foregoing, all terms and provisions of this Agreement shall remain in full force and effect.

Please signify your agreement to the above by signing and returning a copy of this letter to us.

Yours faithfully,

For and on behalf of
ZOMBA ENTERPRISES, INC.

READ AND AGREED:

For and on behalf of                          TODD SHAW p/k/a "TOO SHORT"
DANGEROUS MUSIC, INC.

CONFIRMED AND AGREED INSOFAR AS THIS LETTER PERTAINS TO US:

For and on behalf of
ZOMBA RECORDING CORPORATION

TooShort/Amendmts/AL_050997(6)