UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| TODD ANTHONY SHAW, | ) | CASE NO. 09-61855-BEM |
| | ) | |
| Debtor. | ) | |
| ------------------------------------ | ) ------------------------------------ | |
| | ) | |
| S. GREGORY HAYS, as Chapter 7 trustee, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | CONTESTED MATTER |
| | ) | |
| THE INTERNAL REVENUE SERVICE, | ) | |
| SOUND EXCHANGE, INC., BROADCAST | ) | |
| MUSIC, INC., SONY MUSIC | ) | |
| ENTERTAINMENT, BOBBY FRANK | ) | |
| ELLERBEE, as Administer of ESTATE OF | ) | |
| JAMES F. ELLERBEE, BOBBY FRANK | ) | |
| ELLERBEE, THE GEORGIA DEPARTMENT | ) | |
| OF REVENUE, GUILFORD FOREST | ) | |
| HOMEOWNERS ASSOCIATION, INC., | ) | |
| COLLECTIONS INC. OF SAN FRANCISCO | ) | |
| A CALIFORNIA CORPORATION, RONNIE | ) | |
| JACKSON, JR., and TODD ANTHONY SHAW, | ) | |
| | ) | |
| Respondents. | ) | |

**TRUSTEE'S MOTION FOR AUTHORITY TO SELL PROPERTY OF THE
BANKRUPTCY ESTATE FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES**

COMES NOW S. Gregory Hays, as Chapter 7 Trustee ("**Trustee**") for the bankruptcy

estate of Todd Anthony Shaw ("**Debtor**"), pursuant to 11 U.S.C. §§ 363(b), (f), and (m), and

Fed. R. Bankr. P. 2002(a)(2), 6004(a), 6004(c) and 9014, through undersigned counsel, and files

*Trustee's Motion for Authority to Sell Property of the Bankruptcy Estate Free and Clear of Liens, Claims, Interests, and Encumbrances* (the "**Sale Motion**"), respectfully showing:

### Venue and Jurisdiction

1.      This Court has jurisdiction over this Sale Motion under 28 U.S.C. §§ 157 and 1334.  Venue of this case in this District is proper under 28 U.S.C. §§ 1408 and 1409.  This Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2).

### Background

### *a. General Background*

2.      On January 26, 2009 (the "**Petition Date**"), Debtor filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code, initiating Case No. 09-61855-BEM (the "**Bankruptcy Case**" or "**Case**").

3.      Also on the Petition Date, Debtor filed under penalty of perjury his *Statement of Financial Affairs, Schedules "A"* through *"J",* and other bankruptcy documents. [Doc. No. 1].

4.      Trustee was thereafter appointed the duly acting Chapter 7 trustee in the Case under 11 U.S.C. § 701(a)(1), and he remains in this role.

5.      At the commencement of the Case, the Debtor's bankruptcy estate was created under 11 U.S.C. § 541(a) (the "**Bankruptcy Estate**"), and it includes all Debtor's legal or equitable interests in property as of the commencement of the Case and any interest in property that the Bankruptcy Estate acquires after commencement of the Case.  11 U.S.C. §§ 541(a)(1) and (7).

6.      Trustee is the sole representative of the Bankruptcy Estate.  11 U.S.C. § 323(a).

7.      The duties of Trustee include an obligation to "collect and reduce to money the property of the estate . . . ." 11 U.S.C. § 704.

### b. Music Royalties

### 1. Collections to Date

8.      On the Petition Date, Debtor was entitled to payments from certain music royalties, and Trustee has been collecting these payments since the Petition Date.

9.      And, although Debtor originally filed this Case as a no-asset case, Trustee has collected over $2.75M of music royalties since the Petition Date, and as a result of previous distributions authorized by the Court, he is currently holding approximately $1,000,000.00.

10.      A portion of these royalty payments arose out of a stipulation ("**Stipulation**") between Trustee and Zomba Recording LLC ("**Zomba**"), which was approved by order [Doc. No. 62] of the Court on November 24, 2009.

11.      This Stipulation resolved a dispute between Trustee and Zomba related to payments from Zomba Enterprises, Inc. ("**ZEI**") that were owed to the Bankruptcy Estate but in which Zomba claimed an alleged security interest.

12.      As a result of the Stipulation, Trustee was to receive 20% of royalty payments owed by ZEI; Zomba was to receive 80% of these royalty payments, until the alleged loan owed to Zomba is paid in full; and following satisfaction of this debt, Trustee was to receive 100% of the royalty payments.  This secured claim has been fully satisfied.

13.      Upon information and belief, sometime after entry of the Stipulation and the Court's order [Doc. No. 62] approving the same, Zomba transferred its loan rights and interests in recorded works that generate royalties to Sony Music Entertainment ("**Sony**"), and ZEI transferred its interests in the musical composition works that generate royalties to Universal Music Group, Inc. ("**Universal**").  Alternatively, rather than an asset purchase, it may be the case that Sony purchased Zomba, or that Universal purchased ZEI.

3

### 2. Employment of Broker

14.     On March 16, 2021, Trustee filed an application to employ MCE Management, LLC ("**MCE**") as Trustee's broker to assist Trustee in marketing and selling certain music royalty and other property interests of the Bankruptcy Estate [Doc. No. 209] (the "**Application to Employ**").

15.     On March 24, 2021, the Court entered an order [Doc. No. 210] granting the Application to Employ and authorizing Trustee to employ MCE.

16.     Trustee has been marketing the relevant assets since employing MCE in 2021.

### c. Alleged Liens, Interests, and Encumbrances

17.     Debtor scheduled several creditors with secured claims in what was his former residence, but he scheduled no secured claims in any other property interests. *See* [Doc. No. 11].

18.     Upon information and belief, other than the now fully paid secured claim of: (a) Zomba that was the subject of the Stipulation; and (b) the Georgia Department of Revenue, no other creditors hold valid liens, security interests, or encumbrances in the assets that are the subject of this Sale Motion. *See* [Doc. No. 11]; [Doc. No. 62]; [Doc. No. 177]; [Proof of Claims No. 2-1 and 5-2].

19.     To the extent a judgment creditor asserts a lien in the Transferred Assets (defined below), they do not attach to those assets because they are choses in action. *See, e.g., Levine v. Weyer (In re DOTMD, LLC)*, 303 B.R. 519, 525-527 (Bankr. N.D. Ga. 2003) (Bihary, J.).

### d. Filed Claims Against the Bankruptcy Estate

20.     The total of the filed claims against the Bankruptcy Estate is $2,903,980.95. $479,969.96 of this amount is the secured claim of Zomba, which, as mentioned before, has been paid in full.  And, $46,375.28 of this amount arises through the priority claims of the Internal

Revenue Service and the Fulton County Tax Commissioner, which was later withdrawn at Docket No. 155. Because of interim distributions made to date, as authorized by the Court, the total of the remaining unpaid claims against the Bankruptcy Estate is approximately $1,582,000.00.

**Proposed Sale Free and Clear of All Liens, Claims, Interests, and Encumbrances**

21.    After much negotiation, Trustee entered into an *Asset Purchase Agreement* for Trustee to sell, assign, and transfer the Bankruptcy Estate's right, title, and interest in and to certain Transferred Assets[1] to Reservoir Media Management, Inc. (the "**Purchaser**"), "as is, where is," for a sale price of $7,550,000.00 (the "**Purchase Price**"),[2] subject to Bankruptcy Court approval (the "**Sale Agreement**").[3] A true and correct copy of the Sale Agreement,[4] is attached hereto and incorporated herein by reference as Exhibit "A."

22.    As set forth in the Sale Agreement, the Contemplated Transaction is subject to higher and better offers. As a result, and as set forth in Section 10.03 of the Sale Agreement, Trustee and Purchaser have agreed (again, subject to Bankruptcy Court approval) to a Break-Up Fee in an aggregate amount not to exceed $50,000.00 for Purchaser's actual, reasonable, and

---

[1]    Capitalized terms not defined in this Sale Motion shall have the meanings ascribed to them in the Sale Agreement. The term Transferred Assets is defined at page 7 of the Sale Agreement.

[2]    As set out in the Sale Agreement, there will be a Holdback of $550,000.00 from the Purchase Price, and Trustee will keep and set-off any funds he has received since the Cash Date of October 1, 2022 against the Purchase Price such that the amount the Purchaser actually pays to Trustee will be reduced by the Post-Cash Date Pre-Closing Receipts that Trustee has received.

[3]    In the interest of time, the Sale Agreement attached as Exhibit "A" does not include completed Schedules A, B, C, D, or E. To the extent necessary and if requested, Trustee will provided copies of these schedules once they are finalized.

[4]    Nothing in this Sale Motion regarding the terms of the Sale Agreement is meant to be comprehensive. To the extent that any provision in this Sale Motion conflicts with the express terms of the Sale Agreement, the terms of the Sale Agreement shall control.

documented legal and financial due diligence costs, provided that Trustee consummates a sale of the Transferred Assets to a Competing Bidder.

23.　　The Purchaser was procured through the efforts of Trustee and his Broker, is a *bona fide* purchaser, and is not an insider of Debtor, Trustee, or the Broker.

24.　　Trustee's proposed Sale Agreement for a Purchase Price of $7,550,000.00 is: (a) the highest and best offer that Trustee has received; and (b) an appropriate selling price for the Transferred Assets.

25.　　Subject to Bankruptcy Court approval, the closing of the sale of the Transferred Assets is scheduled to occur within five (5) Business Days following the date of the Bankruptcy Court's entry of a Final Order in the Bankruptcy Case (the "**Closing Date**").

**Relief Requested**

26.　　Trustee requests an order from the Court granting this Sale Motion; approving the Sale Agreement; and authorizing Trustee to sell, assign, and transfer the Bankruptcy Estate's right, title, and interest in and to the Transferred Assets to Purchaser for a Purchase Price of $7,550,000.00 free and clear of all liens, claims, interests, and encumbrances but otherwise on an "as is, where is" with all faults basis.

27.　　Trustee requests an order from the Court finding that Trustee and Purchaser have proceeded in good faith and that Trustee and Purchaser are entitled to the protections of 11 U.S.C. § 363(m).

28.　　Trustee requests an order from the Court authorizing Trustee to execute any documents necessary to consummate the proposed sale, assignment, and transfer of the Transferred Assets to Purchaser, including those documents attached to the Sale Agreement as Exhibits 1 through 10.

29.    Trustee requests an order from the Court approving the Break-Up Fee, in accordance with the terms of Section 10.03 of the Sale Agreement.

30.    Trustee requests an order from the Court ordering and directing the following Payors (as defined in the Sale Agreement) to account and pay the applicable royalty payments and income specified below in respect of the Subject Compositions and Subject Recordings (as applicable) to Purchaser following the Closing Date, in accordance with the Sale Agreement:

    a.    BMI to account and pay to Purchaser One Hundred Percent (100%) of the Songwriter Performance Royalties otherwise payable by BMI on or after the Cash Date in respect of the interest of the Bankruptcy Estate/Debtor in the BMI Compositions.

    b.    UMPG (and any successor-in-interest thereto) to account and pay to Purchaser One Hundred Percent (100%) of the Publisher Royalties and Songwriter Non-Performance Royalties otherwise payable by UMPG (and/or any successor-in-interest thereto, including Debtor to the extent Debtor recaptures rights from UMPG pursuant to the United States Copyright Act) on or after the Cash Date as provided in the UMPG Agreements in respect of the interest of the Bankruptcy Estate/Debtor in the Subject Compositions.

    c.    SoundExchange to account and pay to Purchaser One Hundred Percent (100%) of the Neighboring Rights Artist Share of Neighboring Rights Royalties otherwise payable by SoundExchange on or after the Cash Date in respect of the interest of the Bankruptcy Estate/Debtor in the Subject Recordings.

    d.    Sony (and any successor-in-interest thereto) to account and pay to Purchaser One Hundred Percent (100%) of the Subject Recording Royalties otherwise payable by

Sony (and any successor-in-interest thereto) on or after the Cash Date as provided

in the Sony Agreements in respect of the interest of the Bankruptcy Estate/Debtor

in the Subject Recordings (including any and all SME Accounts pertaining

thereto).

## Legal Analysis

### a. Sale Free and Clear

31.     Section 363 of the Bankruptcy Code authorizes a trustee "after notice and a

hearing . . . [to] use, sell, or lease, other than in the ordinary course of business, property of the

estate . . . ." 11 U.S.C. § 363(b)(1).  Section 105 of the Bankruptcy Code grants this Court the

authority to "issue any order, process, or judgment necessary or appropriate to carry out the

provisions of this title."  11 U.S.C. § 105(a).

32.     The standard to grant a sale of property outside of the ordinary course of business

is the sound business judgment of the trustee.  *In re Chateaugay*, 973 F.2d 141 (2d Cir. 1992);

*Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Abbotts Dairies of Penn.,

Inc*., 788 F.2d 143 (3d Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re

Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).  In this regard, a trustee's showing need not

be exhaustive; rather, a trustee is "simply required to justify the proposed disposition with sound

business reason." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

33.     Trustee can satisfy his burden here because the proposed sale is for a Purchase

Price of $7,550,000.00, which will allow Trustee to make a substantial distribution to holders of

filed claims (if not pay all filed claims, including interest and penalties, in full), and it will allow

Trustee, barring unforeseen events and after payment of administrative expenses, including

income taxes and fees and expenses, to make a substantial surplus distribution to Debtor in

excess of seven figures. This would be a wonderful result in this Case, which, as mentioned before, Debtor filed as a no-asset case.

34.    In turn, Section 363(f) of the Bankruptcy Code authorizes a trustee to sell property under 11 U.S.C. § 363(b) free and clear of any interest in the subject property if, among other things, the price at which the property is to be sold is greater than the aggregate of the liens on such property, or if such interest is the subject of a bona fide dispute. 11 U.S.C. § 363(f). Specifically, that code section provides:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if-
>
> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2)    such entity consents;
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4)    such interest is in bona fide dispute; or
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*Id.*

35.    As set forth above and below, Trustee can, under 11 U.S.C. § 363(f), sell the Transferred Assets free and clear of all liens, claims, interests, and encumbrances with any lien (to the extent valid, perfected, enforceable, and unavoidable) attaching to the proceeds of the sale with the same priority and extent as it had in the Transferred Assets.

36.    The proposed Purchase Price is significantly greater than the amounts owed to any party holding a valid lien or security interest in the Transferred Assets. As a result, Section 363(f)(3) is satisfied.

37.    Alternatively, all alleged judgment liens that a creditor asserts has attached to the Transferred Assets are the subject of a bona fide dispute because those assets are choses in

action, and Section 363(f)(4) is satisfied.  *See, e.g., Levine v. Weyer (In re DOTMD, LLC)*, 303 B.R. 519, 525-527 (Bankr. N.D. Ga. 2003) (Bihary, J.).

38.     Notably, the proposed sale of the Transferred Assets is not in the ordinary course of business, as allowed by 11 U.S.C. § 363(b). Any lien to the extent valid, perfected, enforceable, and unavoidable will attach to the proceeds of the sale as provided by 11 U.S.C. § 363(f).

### b. Good Faith of Trustee and Purchaser

39.     Moreover, 11 U.S.C. § 363(m) provides that the reversal or modification on appeal of an authorization of a sale or lease of property does not affect the validity of the sale or lease under such authorization to an entity that purchased or leased the property in good faith. *See* 11 U.S.C. § 363(m).

40.     Although the Bankruptcy Code does not define good faith, courts have recognized that the kind of misconduct that would destroy a good faith status involves fraud, collusion between the purchaser and other offerors or the trustee, or an attempt to take grossly unfair advantage of other offerors.  *See In re Abbott Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).

41.     Trustee and Purchaser have proceeded in good faith, and the Purchaser is a *bona fide,* good-faith purchaser and not an insider of Debtor, Trustee, or the Broker.  Consequently, Trustee and Purchaser are entitled to the protections of 11 U.S.C. § 363(m).

### Other Relief Requested

42.     In addition, Trustee requests that the Court waive the stay of the order approving the proposed sale as authorized under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

**Request for Higher and Better Offers**

43.     Finally, following notice to all creditors and parties in interest of the Sale Motion and the date of the hearing, Trustee invites any and all parties wishing to submit a competing cash bid, which exceeds the present Purchase Price, with no contingencies, and the ability to close within ten (10) days from Bankruptcy Court approval, so long as any such bid is filed with the Court in the form of an objection to the Sale Motion within two (2) business days of the hearing set forth in the notice of hearing filed contemporaneously with this Sale Motion.

44.     To the extent that any entity asserts a right of first refusal as to the Transferred Assets, Trustee invites offers from those entities in accordance with the terms of the underlying agreement.

WHEREFORE, Trustee respectfully requests that the Court enter an Order:

(a)     Granting the Sale Motion;

(b)     Authorizing and approving the Sale Agreement and the sale of the Transferred Assets free and clear of all liens, interests, and encumbrances;

(c)     Finding that Purchaser is a good faith Purchaser and that Trustee and Purchaser are entitled to the protections of 11 U.S.C. § 363(m);

(d)     Authorizing Trustee to execute any document necessary to comply with the terms of the Sale Agreement;

(e)     Approving the Break-Up Fee, in accordance with the terms of Section 10.03 of the Sale Agreement;

(f)     Requiring the Payors (as defined in the Sale Agreement) to account and pay the applicable royalty payments and income (specified above) in respect of the Subject Compositions and Subject Recordings (as applicable) to Purchaser following the Closing Date,

in accordance with the Sale Agreement;

(g)    Authorizing the proposed sale to be consummated immediately as allowed by Federal Rules of Bankruptcy Procedure Rule 6004(h); and

(h)    Granting such other and further relief as the Court deems just or appropriate.

Respectfully submitted this 1st day of May, 2023.

ROUNTREE LEITMAN KLEIN & GEER LLC
*Attorneys for Trustee*

By:*/s/ Michael J. Bargar*

Century Plaza I                                    Michael J. Bargar
2987 Clairmont Road, Suite 350          Georgia Bar No. 645709
Atlanta, GA 30329                              mbargar@rlkglaw.com
404-410-1220

12

**EXHIBIT "A" FOLLOWS**

## ASSET PURCHASE AGREEMENT

This AGREEMENT (this "Agreement") dated as of April 5, 2023 (the "Effective Date") is made by and between S. Gregory Hays, as and only as Chapter 7 trustee ("Seller") of the bankruptcy estate of Artist-Writer (as hereinafter defined), on the one hand, and Reservoir Media Management, Inc. ("Purchaser"), on the other hand.

### RECITALS

WHEREAS, on January 26, 2009, Artist-Writer filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code in the United States Bankruptcy Court, Northern District of Georgia, Atlanta Division;

WHEREAS, shortly thereafter, Seller was appointed the Chapter 7 trustee for Artist-Writer's bankruptcy estate (the "Bankruptcy Estate"), and Seller remains in that role;

WHEREAS, in the role of Chapter 7 trustee of the Bankruptcy Estate, Seller is the sole representative of the Bankruptcy Estate, under 11 U.S.C. § 323(a);

WHEREAS, Seller wishes to sell to Purchaser, and Purchaser wishes to purchase from Seller, all of the Bankruptcy Estate's right, title and interest in and to the Transferred Assets (as hereinafter defined), upon the terms and subject to the conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the promises and mutual covenants and agreements hereinafter set forth, Seller and Purchaser agree as follows:

### ARTICLE I

### DEFINITIONS; INTERPRETIVE PROVISIONS

Section 1.01 Definitions.

The following defined terms shall have the meanings ascribed to them in this Section 1.01 for all purposes of this Agreement:

"Accounts" means the applicable royalty, writer and/or client account name(s) and number(s) of Seller and/or Artist-Writer associated with each Payor hereunder set forth on Schedule A, attached hereto and made a part hereof.

"Advance" means any amounts paid to Seller or any other Entity on Seller's behalf as a prepayment, advance or loan against future earnings derived from the Subject Compositions or Subject Recordings.

"Affiliate" means with respect to any Entity, any other person or entity controlling, controlled by or under common control with such Entity. As used in this definition, the term "control" (including the terms "controls", "controlled by" and "under common control with") means possession, directly or indirectly, including through one or more intermediaries, of the power to direct or cause the direction of the management or policies of an Entity, whether through the ownership of voting securities, by Contract, or otherwise.

"Approval Order" means an order by the Bankruptcy Court entered in the Bankruptcy Case approving this Agreement and the Contemplated Transactions of this Agreement.

"Artist-Writer" means Todd Anthony Shaw p/k/a "Too Short", individually and sometimes d/b/a Srand Music (BMI).

"Authorship Share" means the percentages of the Subject Compositions accorded to the applicable songwriter(s) (including Artist-Writer) as the author or writer of the Subject Compositions, as specified on the applicable Schedules attached hereto and made a part hereof.

"Bankruptcy Case" means the bankruptcy case of Artist-Writer styled as *In re Todd Shaw* (Case No. 09-61855-BEM) in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code §§ 101, et. seq., as amended.

"Bankruptcy Court" means the United States Bankruptcy Court, for the Northern District of Georgia, Atlanta Division.

"Bankruptcy Estate" shall have the meaning set forth in the Recitals of this Agreement.

"BMI" means Broadcast Music, Inc.

"BMI Account" means BMI writer account number 003288223 (and any related or successor account(s)).

"BMI Agreements" means any and all Contracts entered into by and between Artist-Writer, on the one hand, and BMI, on the other hand that govern the BMI Compositions, and any modifications, extensions, and amendments thereof, including that certain songwriter membership agreement by and between Artist-Writer and BMI, dated as of October 23, 1985.

"BMI Compositions" means, to the extent of the Bankruptcy Estate's right to receive Songwriter Performance Royalties, the musical compositions and musical works written in whole or in part by Artist-Writer prior to January 26, 2009, and currently registered under the BMI Account, as set forth on Schedule B attached hereto and made a part hereof, as well as any Derivative Works thereof. Artist-Writer's Authorship Share in each of the BMI Compositions is set forth on Schedule B.

"Business Day" means any day other than a Saturday, a Sunday, legal holiday or other day on which commercial banks in the United States are authorized or required by Law to close.

"Cash Date" means October 1, 2022.

"Catalog Materials" means, to the extent of Artist-Writer's interest therein, which are in Seller's possession, (i) digital copies of the Subject Composition Agreements and Subject Recording Agreements; (ii) digital copies of any and all accounting statements, royalty statements, and source earning statements relating to the Transferred Assets; and (iii) Seller's account usernames, passwords, and any other applicable login credentials for any online platform or portals operated by each of BMI, SME, SoundExchange and UMPG in connection with the Transferred Assets (the "Logins").

"Claim" shall have the meaning set forth in Article IX.

"Closing" means completion of this Agreement and the transfer of the Transferred Assets to Purchaser in accordance with the terms of this Agreement.

"Closing Date" means five (5) Business Days following the date of the Bankruptcy Court's entry of a Final Order in the Bankruptcy Case.

"Closing Payment" shall mean an amount equal to the Purchase Price less an amount equal to the aggregate of: (i) the Post-Cash Date Pre-Closing Receipts, and (ii) the Holdback.

"Contemplated Transactions" means the transactions contemplated by this Agreement.

"Contract" means any contract, agreement, indenture, note, bond, loan, lease, sublease, conditional sales contract, mortgage, license, sublicense, franchise agreement, obligation, promise, undertaking, commitment or other binding arrangement (in each case, whether written or oral).

"Copyrights" means all rights under United States federal or state copyright or foreign copyright, including, all renewals, extensions, continuations, restorations, revivals and reversions thereof (whether vested, contingent or inchoate, whether registered or unregistered and whether such renewals, extensions, continuations, restorations, revivals and reversions are now in existence or come into existence for any reason, including as a result of future legislation or the interpretation thereof), in all countries of the world or otherwise throughout the universe, as well as all United States or foreign applications for copyright registration and all causes of action, including those for infringement, arising from the date of creation of the work subject to such copyright, whether now known or unknown to Seller or Purchaser in all events.

"Copyright Act" means the United States Copyright Act, 17 U.S.C. 101, et. seq., as amended.

"Derivative Work" means, with respect to any musical composition, musical work or sound recording, any arrangement, adaptation, edition, translation, interpolation or sample thereof or any other derivative work based thereon, and all right, title and interest in and to such derivative work.

"Entity" means any individual, corporation, partnership, association or any other organized group of persons or legal successors or representatives of the foregoing.

"Excluded Liabilities" shall have the meaning set forth in Section 2.03.

"Execution" shall have the meaning set forth in Section 4.02(a).

"Execution Date" shall have the meaning set forth in Section 4.02(a).

"Final Order" means an order from the Bankruptcy Court entered in the Bankruptcy Case: (a) which contains language to the effect that under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure the order shall be effective and enforceable immediately upon entry; or (b) if the order does not contain such language under Rule 6004(h), an order: (i) for which any appeal that has been taken has been finally determined or dismissed, or (ii) for which the time for appeal has expired and no appeal has been timely filed.

"Governmental Authority" means (i) any federal, provincial, state, local, municipal, national or international government or governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, court, tribunal, arbitrator or arbitral body (public or private), or (ii) any self-regulatory organization.

"Holdback" means Five Hundred Fifty Thousand Dollars ($550,000.00).

"Interest" means any ownership, administrative or income interest.

"Law" means any law, statute, ordinance, code, regulation, rule, or other requirement of any Governmental Authority.

"Neighboring Rights Agreements" means any and all Contracts by and between Artist-Writer, on the one hand, and any Neighboring Rights Organization, on the other hand, and any modifications, extensions, and amendments thereof, including the SoundExchange Agreements.

"Neighboring Rights Artist Share" means the entire share (as determined under any applicable sound recording performance, broadcast or copyright Laws in any country throughout the world, including under the Copyright Act, 17 U.S.C. 114(g), or under the rules and regulations of any Neighboring Rights Organization) of any Neighboring Rights Royalties payable or becoming payable to Seller in respect of Artist-Writer's status as a "featured artist" or "featured performer" or otherwise in respect of Artist-Writer's contribution as a recording artist, performer or producer of any of the Subject Recordings.

"Neighboring Rights Organization" means any neighboring rights or sound recording performing rights collection organization or society throughout the world, or any other Entity that licenses and collects income in respect of the public performance or broadcast of sound recordings, including SoundExchange and PPL.

"Neighboring Rights Royalties" means any and all royalties, fees, credits, earnings, income, revenues, remuneration, monies, advances, settlement amounts, and any other sums or amounts of any kind or description payable or becoming payable to Seller by any Neighboring Rights Organization in connection with the public performance of the Subject Recordings, including public performance by transmission, broadcast, digital broadcast, webcast, simulcast, satellite, and cable transmission and retransmission, and rental and lending communication, whether accorded pursuant to the Laws and regulations currently in effect or hereinafter enacted in any country of the world or under any applicable agreement. For the avoidance of doubt, the Neighboring Rights Royalties shall include the Neighboring Rights Artist Share, but shall expressly exclude the so-called "label's share" or "copyright owner's share" of Neighboring Rights Royalties payable in respect of the Subject Recordings.

"Ownership Interest" means the percentage share of the UMPG Compositions (out of a one hundred percent [100%] undivided ownership Interest in each UMPG Composition) that is owned and/or controlled by Seller, as specified on Schedule C, attached hereto and made a part hereof.

"Payors" means BMI, SME, SoundExchange and UMPG.

"Post-Cash Date Pre-Closing Receipts" means any and all monies, fees, royalties, revenues, amounts and sums of any kind or description received by Seller from any Entity from and after the Cash Date in connection with the Transferred Assets as of the Closing Date, i.e., __ _____ Dollars ($_____).

"Publisher Non-Performance Royalties" means any and all monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable to Seller by any Entity anywhere in the universe in respect of the use or exploitation of the Subject Compositions, excluding only the Publisher Performance Royalties and the Songwriter Royalties.

"Publisher Performance Royalties" means any and all monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable by any Entity

anywhere in the universe in respect of the public performance of the Subject Compositions, excluding only the Songwriter Royalties, but including the so-called "publisher's share" of public performance credits, monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable by ASCAP, BMI, or any other performing rights organization or society throughout the world or any other Entity in connection with the public performance of any of the Subject Compositions.

"Publisher Royalties" means the Publisher Non-Performance Royalties and the Publisher Performance Royalties.

"Purchase Price" shall have the meaning set forth in Section 3.01(a).

"Purchaser" shall have the meaning set forth in the Preamble.

"Seller" shall have the meaning set forth in the Preamble.

"SME" means Sony Music Entertainment, Inc. and its predecessors, successors and Affiliates, including, without limitation, Zomba Recording Corporation.

"SME Agreements" means any and all Contracts entered into by and between Artist-Writer, on the one hand, and SME, on the other hand, in connection with or relating to the Subject Recordings, and any modifications, extensions, and amendments thereof, including, without limitation, those Contracts set forth on Schedule E, attached hereto and made a part hereof.

"Songwriter Non-Performance Royalties" means any and all monies, fees, royalties, revenues, amounts and sums of any kind or description, excluding only the Songwriter Performance Royalties, payable or becoming payable by any Entity in respect of Artist-Writer's capacity as a songwriter, lyricist, composer or arranger of the Subject Compositions anywhere in the universe, including all monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable by any Entity in connection with the use or exploitation of the Subject Compositions. To the extent any of the foregoing amounts are not allocated into separate songwriter and publisher shares by the Entity collecting and distributing the same, the Songwriter Non-Performance Royalties shall be deemed fifty percent (50%) of such gross income.

"Songwriter Performance Royalties" means any and all public performance credits, monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable by any Entity in respect of Artist-Writer's capacity as a songwriter, lyricist, composer or arranger of the Subject Compositions anywhere in the universe, including all of the Seller's share of public performance royalties and fees payable or becoming payable by BMI or any other performing rights organization or society throughout the world or any other Entity in respect of the public performance of any of the Subject Compositions. Without limiting the foregoing, Songwriter Performance Royalties include Artist-Writer's share of public performance royalties and fees payable or becoming payable as a result of any public performance licenses of the Subject Compositions that may be issued directly by any Entity. To the extent any of the foregoing amounts are not allocated into separate songwriter and publisher shares by the Entity collecting and distributing the same, the Songwriter Performance Royalties have been deemed fifty percent (50%) of such gross income.

"Songwriter Royalties" means the Songwriter Performance Royalties and the Songwriter Non-Performance Royalties.

"SoundExchange" means SoundExchange, Inc.

"SoundExchange Agreements" means any and all Contracts by and between Artist-Writer, on the one hand, and SoundExchange, on the other hand, and any modifications, extensions, and amendments thereof.

"Source Agreements" means the Subject Composition Agreements and the Subject Recording Agreements.

"Subject Compositions" means the BMI Compositions and the UMPG Compositions.

"Subject Composition Agreements" means any and all Contracts entered into by Artist-Writer relating to the acquisition, ownership, use or exploitation of the Subject Compositions, including the BMI Agreements and the UMPG Agreements.

"Subject Composition Royalties" means an undivided one hundred percent (100%) of any and all credits, monies, fees, royalties, earnings, income, revenues, remuneration, advances, settlement amounts and any other sums or amounts of any kind or description accounted, credited, paid or payable by any Entity, including UMPG and BMI, anywhere in the universe to Artist-Writer and/or Seller with respect to the Bankruptcy Estate's current or future Interest in the Subject Compositions, including the Songwriter Royalties and the Publisher Royalties, whether pursuant to the Subject Composition Agreements or otherwise in connection with the use or exploitation of the Subject Compositions.

"Subject Recording Agreements" means any and all Contracts entered into by Artist-Writer relating to the acquisition, ownership, use or exploitation of the Subject Recordings, including the SME Agreements and the Neighboring Rights Agreements.

"Subject Recordings" means all audio-only and audiovisual recordings, sound recordings and phonorecords embodying Artist-Writer's musical performance (whether individually or together with other recording artists) or respecting which Artist-Writer rendered services as a recording artist, performer or producer, the creation of which was completed prior to January 26, 2009, and which are currently owned, controlled and/or distributed by SME pursuant to the SME Agreements, including those recordings and phonorecords set forth on Schedule D attached hereto and made a part hereof, and any Derivative Works based thereon in which SME claims an Interest pursuant to the SME Agreements.

"Subject Recording Royalties" means an undivided one hundred percent (100%) of any and all credits, monies, fees, royalties, earnings, income, revenues, remuneration, advances, settlement amounts and any other sums or amounts of any kind or description accounted, credited, paid or payable by any Entity, including SME and SoundExchange, anywhere in the universe to Artist-Writer and/or Seller with respect to the Bankruptcy Estate's current or future Interest in the Subject Recordings, including the Neighboring Rights Royalties, whether pursuant to the Subject Recording Agreements or otherwise in connection with the use or exploitation of the Subject Recordings, including, but not limited to, all such royalties and amounts credited to the applicable SME and SoundExchange Accounts set forth on Schedule A.

"Tax" or "Taxes" shall mean all past, present, and future federal, state, local and foreign taxes, including all levies, duties, imposts, deductions, charges, assessments, fees, liens or withholdings and all liabilities (including all interest, fines, assessments, penalties and additions to tax imposed in connection therewith or with respect thereto) imposed by any Governmental Authority on Seller, any of the Transferred Assets or the Contemplated Transactions.

"Transferred Assets" shall mean:

(i)    an undivided one hundred percent (100%) of all of the Bankruptcy Estate's right, title and Interest in and to the Subject Compositions throughout the universe and in perpetuity, whether retained, reverted, or reverting by operation of contract, law or otherwise (subject to the Subject Composition Agreements), including, without limitation:

(a)    the Copyrights therein and thereto (to the extent of the Bankruptcy Estate's ownership Interest therein), and all renewals, revivals and extensions thereof throughout the universe, and any reversionary Interest of any kind and any similar rights whether now or hereafter known throughout the universe; and

(b)    the sole and exclusive right to collect and retain for Purchaser's own account an undivided one hundred percent (100%) of any and all Subject Composition Royalties payable from and after the Cash Date;

(ii)    an undivided one hundred percent (100%) of all of the Bankruptcy Estate's right, title and Interest in and to the Subject Recordings throughout the universe and in perpetuity, whether retained, reverted, or reverting by operation of contract, law or otherwise (subject to the Subject Recording Agreements), including, without limitation, the sole and exclusive right to collect an undivided one hundred percent (100%) of any and all Subject Recording Royalties payable from and after the Cash Date;

(iii)    one hundred percent (100%) of the Bankruptcy Estate's contractual rights under the Source Agreements, including (to the extent assignable) the sole and exclusive right to exercise any and all of the Bankruptcy Estate's audit and approval rights thereunder in respect of the Subject Recordings or Subject Compositions, as applicable;

(iv)    the perpetual, non-exclusive, royalty-free, worldwide right to use Artist-Writer's name(s), approved likeness and approved biographical material in connection with the marketing, promotion and exploitation of the Subject Recordings and Subject Compositions, and in so-called "institutional advertisements/promotion" for Purchaser's music publishing and/or recording business (including via the Internet, Purchaser's website, etc.); and

(v)    the Catalog Materials.

"UMPG" means Universal Music Publishing Group, Inc. and its Affiliates and predecessors-and successors-in-interest, including, without limitation, Zomba Enterprises, Inc. and Willesden Music, Inc. (BMI).

"UMPG Agreements" means any and all Contracts entered into by and between Artist-Writer, on the one hand, and UMPG, on the other hand, in connection with or relating to the UMPG Compositions, and any modifications, extensions, and amendments thereof, including, without limitation, those Contracts set forth on Schedule E, attached hereto and made a part hereof.

"UMPG Compositions" means the musical compositions and musical works written in whole or in part by Artist-Writer prior to January 26, 2009, whether the same were originally claimed or registered as a musical composition or as a musical part of a dramatico-musical work and any music, lyrics, titles, or cues of such compositions, whether domestic or foreign, or direct or indirect Interests therein, or other rights arising therefrom, including the Copyrights therein, which are currently owned, controlled, published and/or administrated by UMPG pursuant to the UMPG Agreements, as set forth on Schedule C attached hereto and made a part hereof, as well as any Derivative Works related thereto in which UMPG claims an Interest pursuant to the UMPG

Agreements. The Ownership Interest and Artist-Writer's Authorship Share in each of the UMPG Compositions is set forth on Schedule C.

Interpretative Provisions.

Unless the express context otherwise requires:

(a)     the words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(b)     words defined in the singular shall have a comparable meaning when used in the plural, and vice versa;

(c)     the words "Dollars" and "$" mean United States dollars;

(d)     references herein to a specific Article, Section, Subsection, Clause, Recital, Schedule or Exhibit shall refer, respectively, to Articles, Sections, Subsections, Clauses, Recitals, Schedules or Exhibits of or to this Agreement;

(e)     wherever the word "include", "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation";

(f)     reference to any gender shall include each other gender;

(g)     references to any Entity shall include such Entity's heirs, executors, personal representatives, administrators, successors and permitted assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted in this Agreement or create any third party beneficiaries;

(h)     with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding";

(i)     the word "or" shall be disjunctive and inclusive;

(j)     references herein to any Law shall be deemed to refer to such Law as amended, reenacted, supplemented or superseded in whole or in part and also to all rules and regulations promulgated thereunder;

(k)     references herein to any Contract means such Contract as amended, supplemented or modified (including any waiver thereto) in accordance with the terms thereof;

(l)     the headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement;

(m)     Seller and Purchaser have each participated in the negotiation and drafting of this Agreement and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or burdening either party by virtue of the authorship of any of the provisions in the Agreement;

(n)     any reference to "days" means calendar days unless Business Days are expressly specified; and

8

(o)     when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, and if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

## ARTICLE II

## SALE AND PURCHASE OF TRANSFERRED ASSETS; CONDITIONS TO CLOSING

Section 2.01  Sale and Purchase of Transferred Assets; § 363 Sale.

(a)     At the Closing, and subject to the conditions set forth in Section 2.04 of this Agreement, Seller shall sell, assign and transfer to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, free and clear of all liens, claims, encumbrances and other interests in the Transferred Assets, but otherwise in "as is and where is" condition, all of the Bankruptcy Estate's right, title and interest in and to the Transferred Assets.

(b)     § 363 Sale.     Seller will seek and diligently pursue approval and entry of the Final Order pursuant to a motion to be filed by Seller under § 363 of the Bankruptcy Code. The Final Order shall provide for a sale free and clear of all liens, claims, and encumbrances and other interests in the Transferred Assets under § 363(f) of the Bankruptcy Code, and shall make a finding under § 363(m) of the Bankruptcy Code that the Purchaser is purchasing the Transferred Assets in good faith.

Section 2.02  Duration of Purchased Rights.

Seller's  assignment to Purchaser includes all of the Bankruptcy Estate's rights in and to: (i) the Transferred Assets; and (ii) all claims, demands, actions and causes of action relating thereto for the full term of the Copyright therein, including all claims, demands, actions and causes of action arising from the date of creation of each Subject Composition and Subject Recording, whether now known or unknown to Seller or Purchaser, in each instance.

Section 2.03  Excluded Liabilities.

Purchaser will not, and nothing in this Agreement shall cause Purchaser to, assume or be obligated to pay, perform, or otherwise discharge any liabilities or obligations of Seller in connection with the Transferred Assets, whether direct or indirect, known or unknown, absolute or contingent (the "Excluded Liabilities"). All such Excluded Liabilities shall be retained by and remain obligations of Seller.   Other than the obligations of Seller expressly set forth in this Agreement, the sale, assignment, and transfer of the Transferred Assets by Seller shall be without recourse against Seller and the Bankruptcy Estate.

Section 2.04  Conditions to Closing.

(a)     Conditions to Seller's Obligation to Close.  All the following conditions must have been satisfied before Seller is obligated to close the Contemplated Transactions.  Seller may waive any failure to satisfy one or more of the conditions.

(i)     Purchaser's Representations and Warranties.    All of Purchaser's representations and warranties must be materially true on and before the Closing Date.

9

(ii)     Bankruptcy Court Approval.  Seller shall have no duty or obligation to close the Contemplated Transaction until: (A) the entry by the Bankruptcy Court of the Approval Order; and (B) the Approval Order becoming a Final Order.

(iii)     Closing Payment.  Purchaser pays the Closing Payment to Seller.

(b)     Conditions to Purchaser's Obligation to Close.  All the following conditions must have been satisfied before Purchaser is obligated to close the Contemplated Transactions. Purchaser may waive any failure to satisfy one or more of the conditions.

(i)     Seller's Representations and Warranties.    All of Seller's representations and warranties shall be accurate in all material respects on and as of the Closing Date as if again made by Seller on and as of such date, except for inaccuracies that do not affect Seller's ability to perform its obligations hereunder.

(ii)     Performance of the Obligations of Seller.    Seller shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date.

(iii)     Bankruptcy Court Approval.  Purchaser shall have no duty or obligation to close the Contemplated Transaction until: (A) the entry by the Bankruptcy Court of the Approval Order; and (B) the Approval Order becoming a Final Order, in form and substance reasonably satisfactory to Purchaser, and no order staying, reversing, modifying or amending the Final Order shall be in effect on the Closing Date.

(iv)     No Violation of Orders.  No preliminary or permanent injunction or other order that declares this Agreement invalid in any respect or prevents the consummation of the Contemplated Transactions shall be in effect.

## ARTICLE III

## PURCHASE PRICE

Section 3.01  Purchase Price.

(a)     In consideration of the sale and delivery of the Transferred Assets to Purchaser, the warranties and representations of Seller hereunder and Seller's performance of all obligations hereunder, Purchaser shall pay to Seller an aggregate amount equal to Seven Million Five Hundred Fifty Thousand Dollars ($7,550,000.00) (the "Purchase Price"), adjusted and payable as follows:

(i)     Closing Payment.  By or at the Closing, Purchaser shall deliver or cause to be delivered to Seller an amount equal to the Closing Payment by wire transfer of immediately available funds, in accordance with the payment instructions attached hereto as Exhibit 1.

(ii)     Holdback.  The Holdback shall be payable by Purchaser to Seller promptly following the date on which Purchaser has directly received the first regularly scheduled statements and payments of the respective Subject Composition Royalties from each of UMPG and BMI and the applicable Subject Recording Royalties from each of SME and SoundExchange.

# ARTICLE IV

## THE EXECUTION

Section 4.01  The Execution.

(a)      The execution of this Agreement by the parties (the "Execution") shall take place on a date to be agreed by the parties (the "Execution Date") remotely or electronically.

# ARTICLE V

## THE CLOSING; DELIVERIES AT CLOSING

Section 5.01  The Closing.

(a)      Seller's Deliveries.  By or at the Closing, Seller shall deliver or cause to be delivered to Purchaser the following:

(i)      an Asset Assignment, duly executed by Seller, substantially in the form of Exhibit 2;

(ii)      a Copyright Assignment in respect of the UMPG Compositions, duly executed by Seller, in the form of Exhibit 3;

(iii)      a duly executed Notice of Assignment and General Letter of Direction in the form of Exhibit 4;

(iv)      a duly executed SME Letter of Direction in the form of Exhibit 5;

(v)      a duly executed UMPG Letter of Direction in the form of Exhibit 6;

(vi)      with respect to the assignment of the BMI Songwriter Performance Royalties to Purchaser, a duly executed BMI Letter of Direction relating to the BMI Compositions in the form of Exhibit 7 (along with a completed and executed "BMI Royalty Assignment Verification Form" that identifies Purchaser as the assignee of Songwriter Performance Royalties with respect to the BMI Compositions as of the Closing Date); and

(vii)      with respect to SoundExchange:

(A)      a duly executed Certification of Assignment of SoundExchange Featured Artist Royalties in the form of Exhibit 8 (along with the SoundExchange List of Assigned Recordings attached hereto as Schedule D and made a part hereof), signed, dated and notarized (the "SoundExchange Certification of Assignment"; and

(B)      a duly executed SoundExchange Account Authorization Form relating solely to the Neighboring Rights Royalties payable by SoundExchange in connection with the Subject Recordings in the form of Exhibit 9, executed by Seller.

(viii)      The Catalog Materials; and

(ix)     The Income After Cash Date, as provided in Section 8.02 of this Agreement.

(b)     Purchaser's Deliveries.  By or at the Closing, Purchaser shall deliver or cause to be delivered to Seller the following:

(i)     The Closing Payment; and

(ii)     Such other documents deemed reasonably necessary by Seller to effectuate the Contemplated Transactions.

(c)     Schedule of Receipts.  On or before the Closing Date, Seller shall deliver to Purchaser a schedule of Post-Cash Date Pre-Closing Receipts together with true and complete copies of any and all accounting statements relating thereto provided to Seller or otherwise made available to Seller by any Entity in connection therewith.

(d)     Change of Logins.  Purchaser shall change all of the Logins promptly following the Closing Date.

(e)     Following the Closing, but before the closing of the Bankruptcy Case, Seller shall make reasonable efforts to pursue and, as soon as practical thereafter, deliver to Purchaser written confirmations (e-mail to suffice) from each of BMI, UMPG, SME and SoundExchange acknowledging the applicable letters of direction provided pursuant to Sections 5.01(a)(iv)-(vii) above.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as follows, as of the Closing Date:

Section 6.01   Corporate Organization.

Artist-Writer is in Chapter 7 proceedings in the Bankruptcy Court. Subject to any necessary authority from the Bankruptcy Court, Seller has all requisite power and authority to consummate the Contemplated Transactions hereunder.

Section 6.02   Authorization and Validity.

Seller has all requisite power and authority to enter into this Agreement and, subject to the Bankruptcy Court's entry of the Final Order, to carry out Seller's obligations hereunder and thereunder. This Agreement has been duly executed by Seller and, subject to the Bankruptcy Court's entry of the Final Order, constitutes valid and binding obligations, enforceable against the Bankruptcy Estate in accordance with their terms.

Section 6.03   Disclaimer of Other Representations and Warranties.

EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE VI ABOVE, SELLER MAKES NO OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THE TRANSFERRED ASSETS OF THE BANKRUPTCY ESTATE, INCLUDING WITHOUT LIMITATION, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, NON-INFRINGEMENT, AND ACCURACY AND COMPLETENESS OF ANY INFORMATION PROVIDED TO THE PURCHASER AND ITS

12

REPRESENTATIVES, AND ALL REPRESENTATIONS OR WARRANTIES THAT COULD BE MADE BY SELLER REGARDING THE TRANSFERRED ASSETS OR THE ACCURACY AND COMPLETENESS OF ANY INFORMATION PROVIDED TO THE PURCHASER AND ITS REPRESENTATIVES ARE HEREBY EXPRESSLY DISCLAIMED.  UNDER THE TERMS OF THIS AGREEMENT, PURCHASER IS PURCHASING THE TRANSFERRED ASSETS ON AN AS-IS, WHERE-IS BASIS WITH ALL FAULTS.

This Section 6.03 of the Agreement shall survive the Closing and after the Closing Date. The Seller and Purchaser agree that a failure to include the express language of this Section 6.03 of the Agreement in any transferring document related to the Contemplated Transactions and/or the Closing, including the Asset Assignment, the form of which is attached to this Agreement as Exhibit 2, or the Copyright Assignment, the form of which is attached to this Agreement as Exhibit 3, shall in no way impact the extent or nature of the sale, assignment, and transfer of the Transferred Assets to Purchaser by Seller.  The Seller and Purchaser agree that the merger doctrine will not apply to the Contemplated Transactions, and the Purchaser shall not assert any claims related to the merger doctrine based on a failure to include the language in this Section 6.03 of the Agreement in any transferring document related to the Contemplated Transactions and/or the Closing, including the Asset Assignment, the form of which is attached to this Agreement as Exhibit 2, or the Copyright Assignment, the form of which is attached to this Agreement as Exhibit 3.

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows, as of the Closing Date:

Section 7.01  Corporate Organization.

Purchaser has all requisite power and authority to own, lease, and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing, or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, qualified, or in such good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be likely to prevent, materially delay, or materially impair the ability of Purchaser to enter into or consummate the Contemplated Transactions and enter into and carry out its obligations under this Agreement.

Section 7.02  Due Authorization.

(a)     The execution and delivery by Purchaser of this Agreement and the consummation of the Contemplated Transactions have been duly and validly authorized and approved by all necessary action on the part of Purchaser.

(b)     This Agreement has been duly and validly executed and delivered by Purchaser and, assuming the due authorization, execution and delivery by the other parties hereto, constitutes and will constitute legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its terms, except to the extent that their enforceability may be limited by public policy, bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium, receivership and other similar Laws affecting the enforcement of creditors' rights in general and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 7.03 <u>Non-Insider Status of Purchaser</u>. Purchaser is not an insider of Artist-Writer as that term is defined under 11 U.S.C. § 101(31) or other applicable law.

Section 7.04 <u>Contemplated Transaction is As-Is, Where-Is, With All Faults</u>. Purchaser acknowledges and understands that it is purchasing the Transferred Assets on an AS-IS, WHERE-IS, WITH ALL FAULTS basis and, except as expressly set forth in Article VI above, that Seller makes no representations or warranties, whether express or implied, about the Transferred Assets, any information provided to the Purchaser and its representatives, or any other matter.

Section 7.05 <u>No Recourse</u>. Purchaser acknowledges and understands that the sale, assignment, and transfer of the Transferred Assets to Purchaser by Seller shall be without recourse against Seller, the Bankruptcy Estate, or any agents or employees of Seller or the Bankruptcy Estate. This Section 7.05 of the Agreement shall survive the Closing and after the Closing Date. The Seller and Purchaser agree that a failure to include the express language of this Section 7.05 of the Agreement in any transferring document related to the Contemplated Transactions and/or the Closing, including the Asset Assignment, the form of which is attached to this Agreement as Exhibit 2, or the Copyright Assignment, the form of which is attached to this Agreement as Exhibit 3, shall in no way impact the extent or nature of the sale, assignment, and transfer of the Transferred Assets to Purchaser by Seller. The Seller and Purchaser agree that the merger doctrine will not apply to the Contemplated Transactions, and the Purchaser shall not assert any claims related to the merger doctrine based on a failure to include the language of this Section 7.05 of the Agreement in any transferring document related to the Contemplated Transactions and/or the Closing, including the Asset Assignment, the form of which is attached to this Agreement as Exhibit 2, or the Copyright Assignment, the form of which is attached to this Agreement as Exhibit 3.

Section 7.06 <u>Higher and Better Offers</u>. Purchaser acknowledges and understands that Seller has a fiduciary duty to obtain the highest and best offer for the Transferred Assets and that the Contemplated Transactions are subject to higher and better offers.

Section 7.07 <u>Bankruptcy Court Approval</u>. Purchaser acknowledges and understands that the Contemplated Transactions and this Agreement are subject to Bankruptcy Court approval. Purchaser further acknowledges and understands that Seller shall have no duty or obligation to close the Contemplated Transaction until the Bankruptcy Court enters an Approval Order that becomes a Final Order.

Section 7.08 <u>Seller's Duties Following Closure of Bankruptcy Case</u>. Purchaser acknowledges and understands that Seller shall have no further duties or obligations with respect to this Agreement after the Bankruptcy Case is closed.

## ARTICLE VIII

## COVENANTS OF SELLER

Section 8.01 <u>No Changes to Source Agreements; No Advances</u>.

    (a)    From and after the date hereof, Seller shall not amend any of the Source Agreements without Purchaser's prior written approval.

    (b)    From and after the date hereof, Seller shall not solicit or accept any Advance against royalties payable under the Source Agreements, or otherwise encumber the Transferred Assets.

(c)      From and after the date hereof, Seller shall not terminate Seller's affiliation with BMI with respect to the BMI Compositions in any country of the world, nor shall Seller designate a different local collection agency with respect to the Subject Compositions, without Purchaser's prior written approval, and subject to the requirement that such termination or change of affiliation will not adversely affect the Transferred Assets herein granted to Purchaser and/or the right of Purchaser to collect the Songwriter Performance Royalties in respect of the Subject Compositions.

Section 8.02  Income After Cash Date.

If the Bankruptcy Court enters an Approval Order that becomes a Final Order, all Subject Composition Royalties and Subject Recording Royalties paid to or received by Seller on or after the Cash Date shall be the property of Purchaser (the "Income After Cash Date"), and Seller shall transmit the Income After Cash Date to Purchaser at the Closing.

Section 8.03  Further Assurances; Additional Documents.

(a)      If at any time after the Closing but before the closing of the Bankruptcy Case, any further reasonable action is necessary to carry out the purposes of this Agreement, Seller will take any reasonable such further action at Purchaser's cost and expense (including the execution, delivery and filing of such further instruments and documents) as Purchaser reasonably may request.  After the Bankruptcy Case closes, Seller shall have no further duties or obligations under this Agreement.

(b)      Seller agrees to make, execute, and deliver any further documents, instruments, and writings which are reasonably necessary to carry out the terms and purposes of this Agreement until the Bankruptcy Case is closed. After the Bankruptcy Case closes, Seller shall have no further duties or obligations under this Agreement.

Section 8.04  Bankruptcy Matters.

Seller and Purchaser shall use commercially reasonable efforts to cooperate, assist and consult with each other to secure the entry of the Final Order following the Execution Date, and to consummate the Contemplated Transactions, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and furnishing any testimony regarding the Contemplated Transactions, including to support the good-faith nature of the negotiations leading to this Agreement.

## ARTICLE IX

## PUBLIC ANNOUNCEMENT

Section 9.01  Public Announcement.

Purchaser shall have the right to issue a press release or other public announcement in connection with the acquisition of the Transferred Assets, provided any such press release or other public announcement shall be subject to Seller's prior written approval in each instance (not to be unreasonably withheld or delayed), and further provided that nothing contained herein shall prohibit Purchaser's public disclosure of information pertaining to the Transferred Assets if such disclosure is required by applicable laws, rules and/or regulations.

## ARTICLE X

## TERMINATION

Section 10.01  <u>Pre-Closing Termination</u>.

Notwithstanding anything to the contrary contained in this Agreement, Purchaser shall have the right to terminate this Agreement prior to the Closing Date upon written notice to Seller in the event that the Bankruptcy Court fails to issue an Approval Order that is a Final Order within ninety (90) days following the Execution Date.

Section 10.02  <u>Automatic Termination of Agreement</u>.

Subject to Section 10.03 of this Agreement, if the Bankruptcy Court denies approval of this Agreement, then, unless otherwise agreed to by Purchaser and Seller in writing, this Agreement shall terminate and be of no further force or effect, and Purchaser and Seller will be restored to their respective factual and legal positions which existed immediately prior to execution of this Agreement.

Section 10.03  <u>Break-Up Fee</u>. In the event that, as a result of any competitive bidding process related to the Bankruptcy Case following the Execution Date: (i) a third-party purchaser (a "<u>Competing Bidder</u>") makes an offer to purchase the Transferred Assets from Seller at a purchase price amount that exceeds the Purchase Price hereunder (a "<u>Competing Bid</u>"), which such Competing Bid is accepted by Seller and approved by the Bankruptcy Court; (ii) Purchaser elects not to increase the Purchase Price hereunder to exceed the purchase price of the Competing Bid; and (iii) Seller consummates a sale of the Transferred Assets to the Competing Bidder upon the terms of the Competing Bid: (A) the Contemplated Transactions shall not be consummated and Purchaser and Seller shall no longer have any obligations to one another, except as set forth in this Section 10.03 of the Agreement; and (B) Seller shall promptly file an appropriate motion (the "<u>Break-Up Fee Motion</u>") with the Bankruptcy Court for the Bankruptcy Court's approval of the reimbursement by Seller to Purchaser of Purchaser's actual, reasonable, documented (summary invoices shall suffice for such documentation purposes) legal and financial due diligence costs and related expenses incurred in connection with this Agreement and the Contemplated Transactions hereunder, in an aggregate amount not to exceed Fifty Thousand Dollars ($50,000) (the "<u>Break-Up Fee</u>").  If applicable pursuant to the foregoing, and if and only if the Break-Up Fee Motion and the Break-Up Fee are approved by the Bankruptcy Court, Seller shall pay the Break-Up Fee to Purchaser in accordance with the payment instructions attached hereto as <u>Exhibit 1</u> promptly following the Bankruptcy Court's approval of the Break-Up Fee Motion.

## ARTICLE XI

## MISCELLANEOUS

Section 11.01  <u>Expenses</u>.

Except as otherwise expressly provided herein, each party hereto shall pay all of its own fees, costs and expenses (including attorneys' and accountants' fees, costs and expenses) in connection with the negotiation of this Agreement, the performance of its obligations hereunder and the consummation of the Contemplated Transactions.

Section 11.02  Notices.

Any notice, request, demand, instruction, payment or other communication given under or in connection with this Agreement shall be deemed to have been duly given and made, upon receipt, if given in writing and served by personal delivery upon or certified mail, registered mail, or courier service, return receipt requested, sent to the party for whom the communication was intended at the address set forth below to the Entities indicated (provided that if by e-mail, any such communication shall be deemed to have been duly given and made upon its transmission):

If to Seller:

> S. Gregory Hays
> Hays Financial Consulting, LLC
> 2964 Peachtree Road NW, Ste. 555
> Atlanta, GA 30305
> Email: ghays@haysconsulting.net;
>     saskue@haysconsulting.net

With copies to:

> Rountree Leitman Klein & Geer, LLC
> Century Plaza I
> 2987 Clairmont Rd., Ste. 350
> Atlanta, GA 30329
> Attn: Michael J. Bargar, Esq.
> Email: mbargar@rlkglaw.com

If to Purchaser:

> Reservoir Media Management, Inc.
> 200 Varick Street, Suite 801A
> New York, New York 10014
> Attn: Rell Lafargue, President & COO; Jeff McGrath, EVP & General Counsel
> Email: rl@reservoir-media.com;
>     jm@reservoir-media.com

With copies to:

> Manatt, Phelps & Phillips, LLP
> 2049 Century Park East, Suite 1700
> Los Angeles, CA 90067
> Attn: Eric Custer, Esq.
> Email: ecuster@manatt.com

Section 11.03  No Third-Party Beneficiaries.

This Agreement shall be binding upon and inure solely to the benefit of Purchaser and Seller and their successors and permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall be construed to confer upon any other Entity any legal or equitable rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement. This Agreement may be amended or terminated, subject to Bankruptcy Court approval, and any provision of this Agreement may be waived, subject to Bankruptcy Court approval, in accordance with the terms hereof without the consent of any Entity other than Purchaser or Seller.

Section 11.04  Assignment.

Following the Closing, Purchaser may fully assign, license and transfer all or any portion of the Transferred Assets acquired pursuant to this Agreement or any of Purchaser's rights or obligations hereunder. In no event may Seller encumber, sell, assign, license or transfer, in whole or in part, any of the contractual benefits or contractual obligations under this Agreement without

17

the prior written consent of Purchaser, and any purported assignment or delegation of any such contractual benefits or contractual obligations in contravention of this Section 10.05 shall be null and void and of no force and effect. This Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the parties and their respective successors and permitted assigns.

Section 11.05  Entire Agreement.

This Agreement (including all Exhibits and Schedules) contains all of the terms, conditions, representations and warranties agreed to by the parties relating to the subject matter of this Agreement and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties or their representatives, oral or written, respecting such subject matter. Upon the Closing of the Contemplated Transactions, the Deal Memorandum – Asset Purchase Agreement – Subject to Contract relating to the Transferred Assets dated October 31, 2022 shall be deemed terminated as of the Execution Date by mutual consent of Seller and Purchaser without any further obligation on any party thereto. No modification, amendment or termination of this Agreement or of any provision hereof shall be effective unless confirmed by a written instrument signed by both parties and approved by the Bankruptcy Court.

Section 11.06  Waiver.

Waiver of any term or condition of this Agreement by any party shall only be effective if in writing and shall not be construed as a waiver of any subsequent breach or failure of the same term or condition or a waiver of any other term or condition of this Agreement.

Section 11.07  Cure.

No failure by either party to perform any of its respective obligations hereunder shall be deemed a breach hereof, unless the other party shall give the allegedly breaching party written notice of such failure and such other party does not cure such non-performance within thirty (30) days after receipt of such notice. The foregoing shall not apply to any breach not capable of cure and the foregoing 30-day cure period shall be reduced to ten (10) days for or with respect to any party's obligation to pay or remit any specified sum required hereunder.

Section 11.08  Governing Law.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Georgia, without regard to its conflict of laws principles.

Section 11.09  Bankruptcy Court Jurisdiction.

The Bankruptcy Court shall retain exclusive jurisdiction over Purchaser and Seller for enforcement of this Agreement and any and all disputes, controversies, or claims regarding the interpretation, validity, construction or other issue relating to or concerning this Agreement. An action relating to, based upon, or arising from a breach of this Agreement shall be brought only in the Bankruptcy Court which shall retain exclusive jurisdiction over the subject matter and Purchaser and Seller for this purpose. Each of the parties waives any defense of inconvenient forum to the maintenance of any such legal proceeding brought in the Bankruptcy Court in accordance with this Section 11.09. EACH OF THE PARTIES HEREBY EXPRESSLY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY CLAIM OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT) BROUGHT BY OR AGAINST IT THAT MAY BE BASED UPON, ARISE OUT OF, OR RELATE TO THIS AGREEMENT, OR THE NEGOTIATION, EXECUTION, OR

PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF, OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT OR AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT).

Section 11.10  Survival of Representations and Warranties.

All representations, warranties, covenants and other agreements made by either party under this Agreement or pursuant hereto shall survive any independent investigation of their truth and accuracy by or on behalf of the other and shall be true and accurate as of the Closing Date, and shall further survive the Closing Date and remain in full force and effect thereafter.

Section 11.11  Remedies Cumulative; Specific Performance.

Any and all remedies herein expressly conferred upon a party hereto shall be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party hereto of any one remedy shall not preclude the exercise of any other remedy and nothing in this Agreement shall be deemed a waiver by any party of any right to specific performance or injunctive relief. Each party hereto agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by them in accordance with the terms hereof or were otherwise breached and that each party hereto shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions hereof and to seek specific performance of the terms hereof, in addition to any other remedy at law or equity.

Section 11.12  Relationship Between the Parties.

Nothing contained herein will constitute a partnership between or a joint venture by Seller and Purchaser. Neither party hereto will hold itself out contrary to the terms of this Section 11.12, and neither party will become liable for any obligations, act or omission of the other party contrary to the provisions hereof. Nothing in this Agreement will constitute: (i) Seller, or any other Entity, as Purchaser's partner, agent, employer or employee; (ii) or Purchaser, or any other Entity, as Seller's partner, agent, employer or employee.

Section 11.13  Severability.

If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect and shall in no way be affected, impaired or invalidated so long as neither the economic nor the legal substance of the Contemplated Transactions is affected in any manner materially adverse to any party hereto. Upon such a determination, Purchaser and Seller shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner so that the Contemplated Transactions may be consummated to the fullest extent possible; provided, however, that any such changes to the terms of this Agreement shall be subject to Bankruptcy Court Approval.

Section 11.14  Voluntary Execution of this Agreement.

Purchaser and Seller hereby mutually acknowledge and represent and warrant that they have been fully advised by their respective legal counsel of their rights and responsibilities under this Agreement, that they have read, know, and understand completely the contents hereof, and that they have voluntarily executed the same. Purchaser and Seller further mutually acknowledge and represent and warrant that they have had input into the drafting of this Agreement and that, accordingly, in any construction to be made of this Agreement, it shall not be construed for or

against either Purchaser or Seller but rather shall be given fair and reasonable interpretation based on the plain language of this Agreement and the expressed intent of Purchaser and Seller.

Section 11.15  Counterparts.

This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement. Signatures (electronic or otherwise) affixed to this Agreement, and to any other agreements contemplated to be executed or submitted in connection with the consummation of the Contemplated Transactions, are acceptable.  This Agreement shall be deemed executed when, and only when, each party hereto shall have received a counterpart hereof signed by all of the other parties hereto. Delivery of an executed counterpart of this Agreement by electronic communication shall be as effective as delivery of a manually executed counterpart of this Agreement.

*[This page intentionally left blank. Signature pages follow.]*

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date set forth above.

**SELLER**

_____ Trustee

S. Gregory Hays, as and only as the Chapter 7
Trustee of the Bankruptcy Estate of Todd Anthony
Shaw p/k/a "Too Short"

Date of Execution: 4-6-23

**PURCHASER**

Reservoir Media Management, Inc.

By: _____

Rell Lafargue, President & Chief Operating
Officer

Date of Execution: 4/7/2023

**EXHIBITS TO ASSET PURCHASE AGREEMENT**

between

**S. Gregory Hays, as and only as Chapter 7 trustee ("Seller") of the bankruptcy estate of Todd Anthony Shaw p/k/a "Too Short", individually and sometimes d/b/a Srand Music (BMI) ("Artist-Writer")**

and

**Reservoir Media Management, Inc.**

Dated: April 5, 2023

**EXHIBITS**

Exhibit 1              Payment Instructions

Exhibit 2              Asset Assignment

Exhibit 3              Copyright Assignment

Exhibit 4              Notice of Assignment and General Letter of Direction

Exhibit 5              SME LOD

Exhibit 5A             Sony Change Request Payee Form

Exhibit 6              UMPG LOD

Exhibit 7              BMI LOD

Exhibit 7A             BMI Royalty Assignment Verification Form

Exhibit 8              Certification of Assignment of SoundExchange Featured Artist Royalties

Exhibit 9              SoundExchange Account Authorization Form

**EXHIBIT 1**

**Payment Instructions**

*See attached*

**EXHIBIT 2**

**Asset Assignment**

ASSIGNMENT, on April 5, 2023 ("**Effective Date**"), between S. Gregory Hays, as and only as the Chapter 7 trustee ("**Assignor**") of the bankruptcy estate (the "**Bankruptcy Estate**") of Todd Anthony Shaw p/k/a "Too Short", individually and sometimes d/b/a Srand Music (BMI) ("**Artist-Writer**"), on the one hand, and Reservoir Media Management, Inc. ("**Assignee**"), on the other hand.

References are made to the following:

(1)     That certain asset purchase agreement dated as of the Effective Date ("**Purchase Agreement**") between Assignor and Assignee.  Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to them in the Purchase Agreement.  In the event of any inconsistencies between this Assignment and the Purchase Agreement, the Purchase Agreement shall control.

(2)     "**Accounts**" means the applicable royalty, writer and/or client account name(s) and number(s) of Seller and/or Artist-Writer associated with each Payor hereunder set forth on Schedule A, attached hereto and made a part hereof.

(3)     "**Bankruptcy Case**" means the bankruptcy case of Artist-Writer styled as *In re Todd Shaw* (Case No. 09-61855-BEM) in the Bankruptcy Court.

(4)     "**Bankruptcy Court**" means the United States Bankruptcy Court, for the Northern District of Georgia, Atlanta Division.

(5)     "**BMI**" means Broadcast Music, Inc.

(6)     "**BMI Account**" means BMI writer account number 003288223 (and any related or successor account(s)).

(7)     "**BMI Compositions**" means, to the extent of the Bankruptcy Estate's right to receive Songwriter Performance Royalties, the musical compositions and musical works written in whole or in part by Artist-Writer prior to January 26, 2009, and currently registered under the BMI Account, as set forth on Schedule B attached hereto and made a part hereof, as well as any Derivative Works thereof.

(8)     "**Cash Date**" means October 1, 2022.

(9)     "**Catalog Materials**" means, to the extent of Artist-Writer's interest therein, which are in Seller's possession, (i) digital copies of the Subject Composition Agreements and Subject Recording Agreements; (ii) digital copies of any and all accounting statements, royalty statements, and source earning statements relating to the Transferred Assets; and (iii) Seller's account usernames, passwords, and any other applicable login credentials for any online platform or portals operated by each of BMI, SME, SoundExchange and UMPG in connection with the Transferred Assets (the "**Logins**").

(10)    "**Derivative Work**" means, with respect to any musical composition, musical work or sound recording, any arrangement, adaptation, edition, translation, interpolation or sample thereof or any other derivative work based thereon, and all right, title and interest in and to such derivative work.

(11)    "**Interest**" means any ownership, administrative or income interest.

(12)    "**Neighboring Rights Artist Share**" means the entire share (as determined under any applicable sound recording performance, broadcast or copyright Laws in any country throughout the world, including under the Copyright Act, 17 U.S.C. 114(g), or under the rules and regulations of any Neighboring Rights Organization) of any

Neighboring Rights Royalties payable or becoming payable to Seller in respect of Artist-Writer's status as a "featured artist" or "featured performer" or otherwise in respect of Artist-Writer's contribution as a recording artist, performer or producer of any of the Subject Recordings.

(13)  "**Neighboring Rights Royalties**" means any and all royalties, fees, credits, earnings, income, revenues, remuneration, monies, advances, settlement amounts, and any other sums or amounts of any kind or description payable or becoming payable to Seller by any Neighboring Rights Organization in connection with the public performance of the Subject Recordings, including public performance by transmission, broadcast, digital broadcast, webcast, simulcast, satellite, and cable transmission and retransmission, and rental and lending communication, whether accorded pursuant to the Laws and regulations currently in effect or hereinafter enacted in any country of the world or under any applicable agreement. For the avoidance of doubt, the Neighboring Rights Royalties shall include the Neighboring Rights Artist Share, but shall expressly exclude the so-called "label's share" or "copyright owner's share" of Neighboring Rights Royalties payable in respect of the Subject Recordings.

(14)  "**Publisher Non-Performance Royalties**" means any and all monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable to Seller by any Entity anywhere in the universe in respect of the use or exploitation of the Subject Compositions, excluding only the Publisher Performance Royalties and the Songwriter Royalties.

(15)  "**Publisher Performance Royalties**" means any and all monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable by any Entity anywhere in the universe in respect of the public performance of the Subject Compositions, excluding only the Songwriter Royalties, but including the so-called "publisher's share" of public performance credits, monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable by ASCAP, BMI, or any other performing rights organization or society throughout the world or any other Entity in connection with the public performance of any of the Subject Compositions.

(16)  "**Publisher Royalties**" means the Publisher Non-Performance Royalties and the Publisher Performance Royalties.

(17)  "**Purchaser**" shall mean the Assignee set forth in this Assignment above.

(18)  "**Seller**" shall mean the Assignor set forth in this Assignment above.

(19)  "**SME**" means Sony Music Entertainment, Inc. and its predecessors, successors and Affiliates, including, without limitation, Zomba Recording Corporation.

(20)  "**Songwriter Non-Performance Royalties**" means any and all monies, fees, royalties, revenues, amounts and sums of any kind or description, excluding only the Songwriter Performance Royalties, payable or becoming payable by any Entity in respect of Artist-Writer's capacity as a songwriter, lyricist, composer or arranger of the Subject Compositions anywhere in the universe, including all monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable by any Entity in connection with the use or exploitation of the Subject Compositions. To the extent any of the foregoing amounts are not allocated into separate songwriter and publisher shares by the Entity collecting and distributing the same, the Songwriter Non-Performance Royalties shall be deemed fifty percent (50%) of such gross income.

(21)  "**Songwriter Performance Royalties**" means any and all public performance credits, monies, fees, royalties, revenues, amounts and sums of any kind or description payable or becoming payable by any Entity in respect of Artist-Writer's capacity as a songwriter, lyricist, composer or arranger of the Subject Compositions anywhere in the universe, including all of the Seller's share of public performance royalties and fees payable or becoming payable by BMI or any other performing rights organization or society throughout the world or any other Entity in respect of the public performance of any of the Subject Compositions. Without limiting the foregoing, Songwriter Performance Royalties include Artist-Writer's share of public performance royalties and fees payable or becoming payable as a result of any public performance licenses of the Subject Compositions that may be issued directly by any Entity. To the extent any of the foregoing amounts are not allocated into separate songwriter and publisher shares by the Entity collecting and distributing the same, the Songwriter Performance Royalties have been deemed fifty percent (50%) of such gross income.

(22) "**Songwriter Royalties**" means the Songwriter Performance Royalties and the Songwriter Non-Performance Royalties.

(23) "**SoundExchange**" means SoundExchange, Inc.

(24) "**Source Agreements**" means the Subject Composition Agreements and the Subject Recording Agreements, including, without limitation, those set forth on Schedule E attached hereto and made a part hereof.

(25) "**Subject Compositions**" means the BMI Compositions and the UMPG Compositions.

(26) "**Subject Composition Agreements**" means any and all Contracts entered into by Artist-Writer relating to the acquisition, ownership, use or exploitation of the Subject Compositions, including the BMI Agreements and the UMPG Agreements.

(27) "**Subject Composition Royalties**" means an undivided one hundred percent (100%) of any and all credits, monies, fees, royalties, earnings, income, revenues, remuneration, advances, settlement amounts and any other sums or amounts of any kind or description accounted, credited, paid or payable by any Entity, including UMPG and BMI, anywhere in the universe to Artist-Writer and/or Seller  with respect to the Bankruptcy Estate's current or future Interest in the Subject Compositions, including the Songwriter Royalties and the Publisher Royalties, whether pursuant to the Subject Composition Agreements or otherwise in connection with the use or exploitation of the Subject Compositions.

(28) "**Subject Recording Agreements**" means any and all Contracts entered into by Artist-Writer relating to the acquisition, ownership, use or exploitation of the Subject Recordings, including the SME Agreements and the Neighboring Rights Agreements.

(29) "**Subject Recordings**" means all audio-only and audiovisual recordings, sound recordings and phonorecords embodying Artist-Writer's musical performance (whether individually or together with other recording artists) or respecting which Artist-Writer rendered services as a recording artist, performer or producer, the creation of which was completed prior to January 26, 2009, and which are currently owned, controlled and/or distributed by SME pursuant to the SME Agreements, including those recordings and phonorecords set forth on Schedule D attached hereto and made a part hereof, and any Derivative Works based thereon in which SME claims an Interest pursuant to the SME Agreements.

(30) "**Subject Recording Royalties**" means an undivided one hundred percent (100%) of any and all credits, monies, fees, royalties, earnings, income, revenues, remuneration, advances, settlement amounts and any other sums or amounts of any kind or description accounted, credited, paid or payable by any Entity, including SME and SoundExchange, anywhere in the universe to Artist-Writer and/or Seller with respect to the Bankruptcy Estate's current or future Interest in the Subject Recordings, including the Neighboring Rights Royalties, whether pursuant to the Subject Recording Agreements or otherwise in connection with the use or exploitation of the Subject Recordings, including, but not limited to, all such royalties and amounts credited to the applicable SME and SoundExchange Accounts set forth on Schedule A.

(31) "**Transferred Assets**" shall mean:

(i)   an undivided one hundred percent (100%) of all of the Bankruptcy Estate's right, title and Interest in and to the Subject Compositions throughout the universe and in perpetuity, whether retained, reverted, or reverting by operation of contract, law or otherwise (subject to the Subject Composition Agreements), including, without limitation:

(a)   the Copyrights therein and thereto (to the extent of the Bankruptcy Estate's ownership Interest therein), and all renewals, revivals and extensions thereof throughout the universe, and any reversionary Interest of any kind and any similar rights whether now or hereafter known throughout the universe; and

(b)        the sole and exclusive right to collect and retain for Purchaser's own account an undivided one hundred percent (100%) of any and all Subject Composition Royalties payable from and after the Cash Date;

(ii)   an undivided one hundred percent (100%) of all of the Bankruptcy Estate's right, title and Interest in and to the Subject Recordings throughout the universe and in perpetuity, whether retained, reverted, or reverting by operation of contract, law or otherwise (subject to the Subject Recording Agreements), including, without limitation, the sole and exclusive right to collect an undivided one hundred percent (100%) of any and all Subject Recording Royalties payable from and after the Cash Date;

(iii) one hundred percent (100%) of the Bankruptcy Estate's contractual rights under the Source Agreements, including (to the extent assignable) the sole and exclusive right to exercise any and all of the Bankruptcy Estate's audit and approval rights thereunder in respect of the Subject Recordings or Subject Compositions, as applicable;

(iv) the perpetual, non-exclusive, royalty-free, worldwide right to use Artist-Writer's name(s), approved likeness and approved biographical material in connection with the marketing, promotion and exploitation of the Subject Recordings and Subject Compositions, and in so-called "institutional advertisements/promotion" for Purchaser's music publishing and/or recording business (including via the Internet, Purchaser's website, etc.); and

(v)   the Catalog Materials.

(32)   "**UMPG**" means Universal Music Publishing Group, Inc. and its Affiliates and predecessors-and successors-in-interest, including, without limitation, Zomba Enterprises, Inc. and Willesden Music, Inc. (BMI).

(33)   "**UMPG Compositions**" means the musical compositions and musical works written in whole or in part by Artist-Writer prior to January 26, 2009, whether the same were originally claimed or registered as a musical composition or as a musical part of a dramatico-musical work and any music, lyrics, titles, or cues of such compositions, whether domestic or foreign, or direct or indirect Interests therein, or other rights arising therefrom, including the Copyrights therein, which are currently owned, controlled, published and/or administrated by UMPG pursuant to the UMPG Agreements, as set forth on Schedule C attached hereto and made a part hereof, as well as any Derivative Works related thereto in which UMPG claims an Interest pursuant to the UMPG Agreements.


As authorized by that certain sale order [Doc. No. <mark>xxx</mark>] (the "**Sale Order**") of the Bankruptcy Court entered in the Bankruptcy Case on <mark>XXXXX</mark>, 2023, and in accordance with the express terms of the Sale Order, in exchange for good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, Assignor hereby sells, assigns, transfers to Assignee, its successors and assigns, and Assignor hereby acquires and accepts from Assignor the Bankruptcy Estate's undivided right, title, and interest in and to the Transferred Assets.

Assignor incorporates by reference the express terms of the Sale Order and Purchase Agreement into this Assignment.

This Assignment shall be binding upon and inure solely to the benefit of Assignor and Assignee and their successors and permitted assigns.  This Assignment shall be governed by, and construed in accordance with, the laws of the State of Georgia, without regard to its conflict of laws principles.  The Bankruptcy Court shall have exclusive jurisdiction over Assignor and Assignee for enforcement of this Assignment and any and all disputes, controversies, or claims regarding the interpretation, validity, construction or other issue relating to or concerning this Assignment.  If any provision of this Assignment shall be held void, invalid or inoperative, no other provisions of this Assignment shall be affected and the remaining provisions of this Assignment shall remain in full force and effect.


[INTENTIONALLY LEFT BLANK]


IN WITNESS WHEREOF, the undersigned has duly executed this Assignment on the date hereof.

**ASSIGNOR:**

_____

**S. Gregory Hays**, as and only as the Chapter 7 trustee of the Bankruptcy Estate of Todd Anthony Shaw p/k/a "Too Short"

STATE OF _____

COUNTY OF _____, ss.:

On _____, 2023, before me, personally appeared S. Gregory Hays, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and that, by his signature on the instrument the person, executed said instrument.

_____

Notary Public

**EXHIBIT 3**

**Copyright Assignment**

Reference is hereby made to that certain asset purchase agreement dated April 5, 2023 (the "**Asset Purchase Agreement**"), between S. Gregory Hays, as and only as the Chapter 7 trustee ("**Assignor**") of the bankruptcy estate (the "**Bankruptcy Estate**") of Todd Anthony Shaw p/k/a "Too Short", individually and sometimes d/b/a Srand Music (BMI) ("**Artist-Writer**"), on the one hand, and Reservoir Media Management, Inc. ("**Assignee**"), on the other hand.  Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to them in the Asset Purchase Agreement.  In the event of any inconsistencies between this copyright assignment ("**Assignment**") and the Asset Purchase Agreement, the Asset Purchase Agreement shall control.

As authorized by that certain sale order [Doc. No. xxx] (the "**Sale Order**") of the Bankruptcy Court entered in the Bankruptcy Case on XXXXX, 2023, and in accordance with the express terms of the Sale Order, for valuable consideration, receipt of which is hereby acknowledged, effective as of October 1, 2022, Assignor hereby sells, assigns and transfers to Assignee an undivided One Hundred Percent (100%) of all of the Bankruptcy Estate's right, title and interest in and to those certain musical compositions set forth on Schedule 1 attached hereto and made a part hereof and any Derivative Works (as defined below) thereof (each a "**Subject Composition**", and collectively, the "**Subject Compositions**"), including, without limitation, the Copyrights (as defined below) therein and thereto (to the extent of the Bankruptcy Estate's ownership interest therein), and all renewals, revivals and extensions thereof throughout the universe and any reversionary interest of any kind and any similar rights whether now or hereafter known throughout the universe.

"**Derivative Work**" means, with respect to any musical composition, musical work or sound recording, any arrangement, adaptation, edition, translation, interpolation or sample thereof or any other derivative work based thereon, and all right, title and interest in and to such derivative work.

"**Copyrights**" means all rights under United States federal or state copyright or foreign copyright, including, all renewals, extensions, continuations, restorations, revivals and reversions thereof (whether vested, contingent or inchoate, whether registered or unregistered and whether such renewals, extensions, continuations, restorations, revivals and reversions are now in existence or come into existence for any reason, including as a result of future legislation or the interpretation thereof), in all countries of the world or otherwise throughout the universe, as well as all United States or foreign applications for copyright registration and all causes of action, including those for infringement, arising from the date of creation of the work subject to such copyright, whether now known or unknown to Assignor or Assignee in all events.

Assignor incorporates by reference the express terms of the Sale Order and Asset Purchase Agreement into this Copyright Assignment.

If any provision of this Assignment shall be held void, invalid or inoperative, no other provision of this Assignment shall be affected as a result thereof and, accordingly, the remaining provisions of this Assignment shall remain in full force and effect.

IN WITNESS WHEREOF, the undersigned duly executed this Assignment this ____ day of _____, 2023.

**ASSIGNOR:**

_____
**S. Gregory Hays**, as and only as the Chapter 7 trustee of
the Bankruptcy Estate of Todd Anthony Shaw
 p/k/a "Too Short"

**EXHIBIT 4**

**Notice of Assignment / General Letter of Direction**

**S. Gregory Hays**,
as and only as the Chapter 7 trustee
of the bankruptcy estate of Todd Anthony Shaw
c/o Hays Financial Consulting, LLC
2964 Peachtree Road NW, Ste. 555
Atlanta, GA 30305

Dated as of:  April 5, 2023

To Whom It May Concern:

Re:      **Notice of Sale and Assignment of Royalties –  Todd Anthony Shaw  p/k/a "Too Short"**

Dear Sir/Madam:

Reference is made to the Asset Purchase Agreement dated April 5, 2023 (the "**Effective Date**"), between S. Gregory Hays, as and only as the Chapter 7 trustee ("**Seller**") of the bankruptcy estate (the "**Bankruptcy Estate**") of Todd Anthony Shaw p/k/a "Too Short", individually and sometimes d/b/a Srand Music (BMI) ("**Artist-Writer**"), on the one hand, and Reservoir Media Management, Inc. ("**Purchaser**"), on the other hand (the "**Purchase Agreement**").

Please be advised that in accordance with the express terms of that certain sale order [Doc. No. xxx] (the "Sale Order") of the United States Bankruptcy Court, Northern District of Georgia, Atlanta Division entered in the Bankruptcy Case (Case No. 09-61855-BEM) of Todd Anthony Shaw p/k/a "Too Short" on XXXXX, 2023, and pursuant to the Purchase Agreement, Seller has sold, transferred and/or otherwise assigned to Purchaser an undivided one hundred percent (100%) interest in all of the Bankruptcy Estate's right to collect and receive: (i) all royalties and other income credited, paid and/or payable to Artist-Writer and/or Seller in respect of any and all of the musical compositions and musical works created, written, or composed, in whole or in part, by Artist-Writer as set forth on Schedule A and Schedule B attached hereto and made a part hereof, as well as any arrangement, adaptation, edition, translation or sample of such composition(s) or any other derivative work(s) based thereon  (the "**Subject Compositions**"), including, without limitation, the so-called "writer's share" of public performance royalties deriving from Artist-Writer's authorship interest in the Subject Compositions; and (ii) all royalties and other income credited paid and/or payable to Artist-Writer and/or Seller in respect of those sound recordings as set forth on Schedule C attached hereto and made a part hereof, as well as any arrangement, adaptation, edition, translation or sample of such recording(s) or any other derivative work(s) based thereon (the "**Subject Recordings**"), including, without limitation, the so-called "featured artist" or "featured performer" share of "neighboring rights" royalties payable in respect of the featured performances of Artist-Writer embodied in the Subject Recordings by the applicable society or agency in the territory concerned (e.g., SoundExchange in the United States pursuant to Section 114(g) of the U.S. Copyright Act) (collectively, the "**Royalties**"). As of the Effective Date, Purchaser is entitled, regardless of when earned, to receive all Royalties otherwise payable to Seller on or after October 1, 2022.

Accordingly, until further instructed by Purchaser or its successors or assigns, you are hereby authorized and instructed to remit, in accordance with the Purchase Agreement, all Royalties, along with all statements and correspondence pertaining thereto, to Purchaser at the following address:

Reservoir Media Management, Inc.
200 Varick Street, Suite 801A
New York, New York  10014
Attn: Royalty Department
Email: royalties@reservoir-media.com
Federal I.D. Number:  71-1031874

Please mark your records accordingly and acknowledge receipt of this notification by signing the enclosed copy and returning it to Purchaser at the address set forth above.

Very truly yours,

_____

**S. Gregory Hays**, as and only as the Chapter 7 trustee of the Bankruptcy Estate of Todd Anthony Shaw p/k/a "Too Short"

ACKNOWLEDGED:

By:_____

Name:_____

Title:_____

<u>**EXHIBIT 5**</u>

<u>**SME Letter of Direction**</u>

**S. Gregory Hays**,
as and only as the Chapter 7 trustee
of the bankruptcy estate of Todd Anthony Shaw
c/o Hays Financial Consulting, LLC
2964 Peachtree Road NW, Ste. 555
Atlanta, GA 30305

April 5, 2023

Sony Music Entertainment
Attention: Royalty Helpdesk
301 Route 17 North, 11th Floor
Rutherford, NJ 07070

> **Re:**   <u>**Notice of Assignment of Royalties – Todd Anthony Shaw  p/k/a "Too Short"**</u>

Gentlepersons:

Reference is made to the Sony Music ("**Sony**") vendor numbers concerning the Sony account numbers and names listed on <u>Schedule A</u> attached to and made a part of this letter (the "**Sony Accounts**").

Please be advised that as of April 5, 2023 (the "**Effective Date**") in accordance with the express terms of that certain sale order [Doc. No. <mark>xxx</mark>] (the "**Sale Order**") of the United States Bankruptcy Court, Northern District of Georgia, Atlanta Division entered in the Bankruptcy Case (Case No. 09-61855-BEM) of Todd Anthony Shaw p/k/a "Too Short" on <mark>XXXXX</mark>, 2023, and pursuant to an asset purchase agreement between S. Gregory Hays, as and only as the Chapter 7 trustee ("**Seller**") of the bankruptcy estate (the "**Bankruptcy Estate**") of Todd Anthony Shaw p/k/a "Too Short", individually and sometimes d/b/a Srand Music (BMI) ("**Artist-Writer**"), on the one hand, and Reservoir Media Management, Inc. ("**Purchaser**"), on the other hand, Seller assigned to Purchaser all of the Bankruptcy Estate's rights to receive royalties and other income, including, to the extend assignable to Purchaser, any audit recoveries, that are credited to the Sony Accounts and paid and/or payable to Seller on or after October 1, 2022 (the "**Royalties**").

Accordingly, until such time as you receive further instruction from Purchaser or its successors or assigns, Sony is hereby authorized and directed, as of the Effective Date and thereafter:

> (i)      to pay to Purchaser, accompanied by statements, all Royalties, regardless of when earned such payments to be made via wire as follows:

>> Reservoir Media Management, Inc.
>> 200 Varick Street, Suite 801A
>> New York, New York  10014
>> Attn: Royalty Department
>> Federal I.D. Number:  71-1031874
>> Email: royalties@reservoir-media.com

> (ii)     to send any and all correspondence concerning the Royalties to Purchaser at the following address:

>> Reservoir Media Management, Inc.

200 Varick Street, Suite 801A
New York, New York  10014
Attn: Royalty Department
Federal I.D. Number:  71-1031874
Email: royalties@reservoir-media.com

Please mark your records accordingly.  Your acknowledgement of receipt of this Notice of Assignment by signing the enclosed copy and returning it to Purchaser at the address set forth above would be appreciated.

Very truly yours,

_____
**S. Gregory Hays**, as and only as the Chapter 7
trustee of the Bankruptcy Estate of
Todd Anthony Shaw  p/k/a "Too Short"

ACKNOWLEDGED:

By: _____

Name: _____

Title:_____

**EXHIBIT 5A**

**Sony Change Request Payee Form**

*See attached*

# SONY MUSIC ENTERTAINMENT CHANGE REQUEST: PAYEE FORM

**Please complete and return this form by:**

Email:  royalty.statements@sonymusic.com

*\* Designates required field*

Fax:  (201) 777-3047 [Attention: Royalty Helpdesk]

**\* Account Type:**

Mail:  Sony Music Entertainment
Attention: Royalty Helpdesk
301 Route 17 North, 11th Floor
Rutherford, NJ 07070 USA

☒ Artist      ❑ Publisher      ❑ Management

❑ Producer   ❑ Third Party/Other

**\* Change Request (select one):**

❑ Payee (Vendor) Add Request

☒ Payee  (Vendor) Change Request

❑ Payee (Vendor) Change Request (related to death of royalty participant)

> ➢ Include recently certified copy of the letter testamentary (legal will) or letters of administration providing details on who should be receiving these royalties and a copy of the death certificate.

☒ I approve adding a new participant as my authorized representative. My authorized representative will be entitled to receive a copy of my royalty summary statement by mail and access to Sony Music's Artist Portal. In addition, I authorize Sony Music to answer any questions my representative raises concerning my royalty accounting. I understand that to revoke this access I must advise the Sony Music Entertainment Royalty Helpdesk in writing.

**\* Print Name of Sony Music Royalty Payee (Vendor):** S. Gregory Hays, Chapter 7 trustee of the bankruptcy estate of Todd Anthony Shaw p/k/a Too Short

**\* Address:**  c/o Hays Financial Consulting, LLC

2964 Peachtree Road NW, Ste. 555, Atlanta, GA 30305  Attn: Gregory Hays

**\* Telephone Number:** _____  **\* Email Address:**  ghays@haysconsulting.net / saskue@haysconsulting.net

**\* Print Name of _NEW_ Payee or Authorized Representative:**  Reservoir Media Management, Inc.

**\* Address:**  200 Varick Street, Suite 801A
New York, NY 10014

**\* Telephone Number:**  212-675-0541      **\* Email Address:**  royalties@reservoir-media.com

**Please indicate all accounts effected by this change request. If it is _ALL_, then write "ALL ACCOUNTS":**   ALL ACCOUNTS of the Bankruptcy Estate of Todd Anthony Shaw p/k/a Too Short

By signing below, I warrant and represent that: (a) I have full and complete authority to request the change(s) set forth herein to the account(s) referenced above, and, if the party requesting such change(s) is an entity, I am fully authorized to act and request such change(s) on behalf of such entity; ~~(b) the implementation of the change(s) requested herein will not violate or infringe upon the rights of any other party;~~ (c) the information stated herein is truthful and accurate; ~~and (d) I shall indemnify and hold Sony Music Entertainment harmless against any and all claims and any and all damages, losses or expenses Sony Music Entertainment may incur by reason of implementation of the change(s) requested herein and/or as a result of the breach of any of the foregoing warranties and representations.~~

*\* Notarize this form here*

**\* PRINT YOUR NAME HERE:**
S.  Gregory Hays, Chapter 7 trustee of the bankruptcy estate of Todd Anthony Shaw p/k/a "Too Short"

**\* TODAY'S DATE:**
_____

**\* SIGN HERE Sony Music Royalty Payee (Vendor):** _____

❑ Check here to confirm a W-9 Tax Form (U.S. resident), W8BEN or 8233 (non U.S. resident) has been attached. **IF A TAX FORM IS NOT PROVIDED, SONY MUSIC ENTERTAINMENT MAY BE REQUIRED TO WITHHOLD TAXES FROM YOUR ROYALTY PAYMENT.**

Thank you for assisting us in maintaining up to date records regarding your royalty account. Once your form is received by Sony Music, your change request will be reviewed. We will contact you if additional supporting documentation is required in order to ensure the accuracy and validity of your request. Sony Music reserves the right to require you to sign and deliver an affidavit affirming the information provided to Sony Music herein.

v16

**EXHIBIT 6**

**UMPG Letter Of Direction**

**S. Gregory Hays,**
as and only as the Chapter 7 trustee
of the bankruptcy estate of Todd Anthony Shaw
c/o Hays Financial Consulting, LLC
2964 Peachtree Road NW, Ste. 555
Atlanta, GA 30305

As of the 5 day of April, 2023

Universal Music Publishing Group ("**Universal**")
2100 Colorado Avenue,
Santa Monica, CA 90404
Attn: Chief Counsel

Gentlepersons:

      1.     Please be advised that: (a) on January 26, 2009, Todd Anthony Shaw p/k/a "Too Short" ("**Writer**") filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code in the United States Bankruptcy Court, Northern District of Georgia, Atlanta Division; and (b) S. Gregory Hays was appointed and remains the Chapter 7 trustee ("**Grantor**") for Writer's bankruptcy estate (the "**Bankruptcy Estate**"), and as such, Grantor is the sole representative of the Bankruptcy Estate under 11 U.S.C. Section 323(a).

      2.     By the terms and conditions of: (i) that certain co-publishing agreement dated as of February 2, 1988, between Zomba Enterprises Inc. (ASCAP) and Willesden Music Inc. (BMI), on the one hand, and Randy Austin and Todd Shaw d/b/a Srand Music (BMI), on the other hand, as amended by that certain amendment thereto dated as of April 5, 1989; and (ii) that certain co-publishing agreement dated as of April 1, 1994, between Zomba Enterprises Inc., on the one hand, and Dangerous Music, Inc. f/s/o Todd Shaw p/k/a "Too Short", on the other hand, as amended by that certain amendment thereto dated as of May 9, 1997 (collectively, the "**Agreements**"), Universal is required (subject to the terms and conditions of the Agreements) to make certain payments to Grantor.

      3.     Although the Agreements provide for all royalty amounts becoming payable thereunder ("**Royalty Payments**") to be paid to Grantor, in accordance with the express terms of that certain sale order [Doc. No. xxx] (the "**Sale Order**") of the United States Bankruptcy Court, Northern District of Georgia, Atlanta Division entered in the Bankruptcy Case (Case No. 09-61855-BEM) of Writer on XXXXX, 2023, Grantor hereby requests and authorizes Universal to pay one hundred percent (100%) of all Royalty Payments directly to Reservoir Media Management, Inc. (the "**Authorized Party**").  Authorized Party requests that all Royalty Payments be paid by direct deposit in accordance with the information specified on Universal's payment information and tax forms, which are attached hereto.

      4.     Grantor hereby acknowledges and confirms that all payments hereunder shall constitute payments to Grantor under the Agreements.

      5.     Universal's compliance with this authorization shall constitute an accommodation to Grantor alone. This authorization and Universal's compliance therewith shall not constitute an assignment of Grantor's rights under the Agreements to the Authorized Party. The Authorized Party is not a beneficiary of any advances or Royalty Payments and/or the Agreements.  This letter shall not be deemed to give any right or remedy to the Authorized Party.

For the avoidance of doubt, this Letter of Direction is freely revocable by Grantor, Universal and/or the Authorized Party at any time.

Very truly yours,

_____

**S. Gregory Hays**, as and only as the Chapter 7 trustee of the bankruptcy estate of Todd Anthony Shaw p/k/a "Too Short"

**EXHIBIT 7**

**BMI Letter of Direction**

**S. Gregory Hays**,
as and only as the Chapter 7 trustee
of the bankruptcy estate of Todd Anthony Shaw
c/o Hays Financial Consulting, LLC
2964 Peachtree Road NW, Ste. 555
Atlanta, GA 30305

As of April 5, 2023

Broadcast Music, Inc. ("**BMI**")
7 World Trade Center
250 Greenwich Street
New York, NY 10007-0030

     Re:     Letter of Direction – Todd Anthony Shaw p/k/a "Too Short"

Gentlepersons:

Please be advised that, as of April 5, 2023 (the "**Effective Date**") in accordance with the express terms of that certain sale order [Doc. No. xxx] (the "**Sale Order**") of the United States Bankruptcy Court, Northern District of Georgia, Atlanta Division entered in the Bankruptcy Case (Case No. 09-61855-BEM) of Todd Anthony Shaw p/k/a "Too Short" on XXXXX, 2023, and pursuant to an asset purchase agreement between S. Gregory Hays, as and only as the Chapter 7 trustee ("**Seller**") of the bankruptcy estate (the "**Bankruptcy Estate**") of Todd Anthony Shaw p/k/a "Too Short", individually and sometimes d/b/a Srand Music (BMI) ("**Writer**"), on the one hand, and Reservoir Media Management, Inc. ("**Reservoir**"), on the other hand, Seller has sold, transferred and/or otherwise assigned to Reservoir, among other things, an undivided one hundred percent (100%) interest in one hundred percent (100%) of the Bankruptcy Estate's share of the so-called "writer's share" of public performance royalties payable by BMI in respect of the Compositions (as defined below), payable on or after October 1, 2022, regardless of when earned (collectively, the "**Royalties**").

"**Compositions**" means the musical works and musical compositions in the BMI songwriter catalogue of Writer (BMI Writer Account No. 003288223) that are listed on Schedule A annexed hereto and by this reference made a part hereof, as well as any arrangements, adaptations, editions, translations, or samples of such compositions or any other derivative works based thereon.

Accordingly, until such time as BMI receives further instruction from Reservoir or its successors or assigns, BMI is hereby directed and authorized by the undersigned, as of the Effective Date and thereafter, in accordance with the payment instructions below, to pay all Royalties to Reservoir. All payments and statements as well as any notices or correspondence in connection with the Royalties and/or the Compositions should be sent to Reservoir at the following address:

     Reservoir Media Management, Inc.
     200 Varick Street, Suite 801A
     New York, New York 10014
     Attn: Royalty Department
     Federal I.D. Number:  71-1031874
     Email: royalties@reservoir-media.com

Please mark your records accordingly. Your acknowledgement of receipt of this Notice of Assignment by signing the enclosed copy and returning it to Reservoir at the address set forth above would be appreciated.

Very truly yours,

_____

**S. Gregory Hays**, as and only as the Chapter 7
trustee of the bankruptcy estate of
Todd Anthony Shaw p/k/a "Too Short"

ACKNOWLEDGED AND AGREED:

**BROADCAST MUSIC, INC. ("BMI")**

By:_____

Name:_____

Title:_____

**EXHIBIT 7A**

**BMI Royalty Assignment Verification Form**

*See attached*



**INSTRUCTIONS FOR COMPLETING THE BMI ROYALTY ASSIGNMENT FORM**

A. Complete a separate form for EACH person or company to whom you wish to assign your royalties. Sign and date the form in front of a notary public who should sign and stamp where indicated.

B. **ONCE YOUR ASSIGNMENT IS SUBMITTED TO BMI, YOU WILL HAVE PERMANENTLY SOLD YOUR ROYALTY STREAM. IT CANNOT BE WITHDRAWN OR LIMITED IN TIME. TO RECLAIM YOUR ROYALTIES, AN ASSIGNMENT WILL HAVE TO BE MADE BACK TO YOU FROM THE OTHER PARTY.**

C. If BMI does not already have the social security number (for a person) or Taxpayer Identification Number (for a company or trust) in its records, you must submit an IRS Form W-9 for the person or company to which you have assigned your royalties. You can get a Form W-9 at www.irs.gov.

D. If you executed a separate assignment document for the same transaction covered by the BMI Royalty Assignment Form, please do not send that document to BMI. The form will be used to update our records to pay the other party and no attempt will be made to compare the form with any separate document.

E. If your assignment is for less than your whole catalogue you must attach to the form a schedule listing the title and BMI work number of the individual works and cues whose royalties are being assigned. <u>Sign each page.</u> Only the works on the schedule will be processed as part of the assignment.

F. Return the form (with the W-9, if applicable) by postal mail to BMI Performing Rights Administration, 10 Music Square East, Nashville, TN 37203. Attn: Royalty Assignment Group, or as an attachment to an e-mail sent to RAF@bmi.com.

G. A $500 processing fee will be deducted from the first royalties payable under the assignment. The fee is $250 if the entity to which you are assigning your royalties is a corporation, LLC or trust solely owned by you. The fee is waived if the form is submitted with an application for BMI affiliation or with the submission of a BMI Estate Questionnaire for a deceased affiliate.

H. If you have any questions about the completion of the form, please send them by e-mail to RAF@bmi.com. We will reply as promptly as possible.

*When BMI processes your assignment, it will create a payee account for each person, company or trust to which you assigned your royalties and you will not have access to that account or any information in it without their permission.*

RAF-INSTR 3/12



## ROYALTY ASSIGNMENT FORM

**USE THIS FORM TO ASSIGN ROYALTIES EARNED BY WORKS IN YOUR BMI CATALOGUE TO ANOTHER PERSON OR COMPANY. YOUR "WORKS" INCLUDE THOSE SUBMITTED TO BMI ON REGISTRATION FORMS, ONLINE OR VIA CUE SHEETS FROM THIRD PARTIES. AN ASSIGNMENT WITH RESPECT TO LESS THAN A WHOLE CATALOGUE WILL BE ACCEPTED ONLY IF ALL THE WORKS OF WHICH ROYALTIES ARE BEING ASSIGNED ARE IN YOUR CATALOGUE WHEN THIS FORM IS RECEIVED AND ARE LISTED ON AN ATTACHED SCHEDULE. IF YOU ARE ASSIGNING YOUR COPYRIGHTS UNDER A SONGWRITER/PUBLISHER AGREEMENT, YOU SHOULD NOT USE THIS FORM. PUBLISHER ROYALTIES WILL BE PAID TO THE PUBLISHER THAT ACQUIRED THE COPYRIGHTS.**

1. My name  Gregory Hays, Chapter 7 trustee of the bankruptcy estate of Todd Anthony Shaw p/k/a "Too Short" d/b/a Srand Music(BMI)    2. My social security number  ..................................

3. I am permanently and irrevocably assigning (Insert a number between 1 and 100)  100    % of my royalties

as indicated in number 4 below from my BMI account number(s)  003288223 (Writer Account) ...........  to
(State their name, complete address and contact person if a company or other entity)

Reservoir Media Management, Inc. .................................................................................

200 Varick Street, Suite 801A .......................................................................................

New York, New York  10014  Attn: Rell Lafargue, President & COO .......................................

E-mail address of above party (for online access to account)  jm@reservoir-media.com; royalties@reservoir-media.com

If a company or other entity is entered above, is it <u>solely</u> owned by you? ☐ Yes ☐ No

4. My assignment applies to (You must <u>initial</u> inside <u>one</u> applicable box below)

☐ my royalties earned from all works that are in my BMI catalogue on the date of this assignment or that may be entered into in my BMI catalogue afterwards.

☐ my royalties earned only from the works that are in my BMI catalogue on the date of this assignment, but not my royalties earned by works that may be entered into my catalogue afterwards.

☐ my royalties earned only by the works on the attached schedule.    the Bankruptcy Estate's

<u>**CERTIFICATION AND TRANSFER:**</u>  **I warrant and represent to BMI that, by my signature below, I am knowingly and without coercion assigning as specified above ~~my~~ right to receive ~~my~~ BMI royalties to the party named above, that I have consulted a legal or financial advisor regarding the implications of the assignment or have knowingly waived my right to do so, that I am making the assignment with full knowledge and understanding of its consequences with respect to payment of ~~my~~ BMI royalties, that I have received valuable consideration for making the assignment, that I intend for the assignment to be irrevocable, and that I have not made the assignment with the intent to evade the income tax or other laws of the United States or of any state or local jurisdiction or foreign nation to which I may be subject.**

_____  Today's Date: ..........................................
        Sign on the line above

Sworn to and subscribed before me at _____  on _____  20____

_____    *IMPRINT NOTARY*
        Signature of Notary Public          *STAMP HERE:*

*This assignment will not be processed if any portion is incomplete. BMI will update its records to pay the assignee as of the royalty distribution following completion of processing. However, due to the nature of some assignments, several royalty distributions may be made before processing is completed. Also, the limitations of BMI's systems may cause some royalties on some assigned works to be paid to the assignor, including but not limited to retroactive royalty payments and foreign royalties. Assignments are only accepted subject to those conditions and no retroactive adjustments are available. The fee for processing an assignment is $500 per payee, except if the payee is a corporation, LLC or trust of which you are sole owner, for which the fee is $250. There is no fee if this assignment is submitted with an application for BMI affiliation or with an Estate Questionnaire for a deceased BMI affiliate.*

RAF 3/12

**EXHIBIT 8**

**Certification of Assignment of SoundExchange Feature Artist Royalties**

*See attached*



**ASSIGNMENT OF SOUNDEXCHANGE
FEATURED ARTIST ROYALTIES**

As a general matter, SoundExchange will only pay Featured Artist royalties directly to the performer who earned the royalties. SoundExchange will, however, honor an assignment of Featured Artist royalties provided that <u>all</u> of the following conditions have been met:

1.  The assignment is made by a performer who is directly registered with SoundExchange to an assignee, who must also be directly registered with SoundExchange (either prior to the assignment or in connection with the assignment).

2.  Performers whose royalties are subject to liens, levies, court orders or other encumbrances are not eligible to assign their royalties.

3.  The assignment is irrevocable.

4.  The performer making the assignment has earned at least $25,000 in featured artist royalties from SoundExchange during the three (3) year period immediately prior to the date of the assignment. SoundExchange will not honor any assignment that includes future recordings.

5.  The assignment is related to an arms-length transaction between the undersigned for the fair market value of the performer's SoundExchange featured artist royalties, and is not part of, or a condition to, enter into a new, or amend an existing, recording, publishing, management or other agreement. Notwithstanding the foregoing, if the assignment is part of a larger transaction for, all or a portion of, the performer's professional assets (e.g., a purchase of publishing rights, sound recording royalties, SoundExchange royalties, merchandise, etc.); the performer must have earned a minimum of $100,000 in featured artist royalties from SoundExchange.

6.  ~~The assignment agreement has been personally signed by the performer.~~ Any assignments by minors must be reaffirmed upon their reaching the age of majority.

7.  The undersigned acknowledge that they each have been represented by independent counsel for the purpose of advising them in connection with the arms-length transaction or fair market value related to this assignment.

Version 3-31-22

~~The undersigned hereby represents and warrants to SoundExchange that the conditions set forth above have been met (or, in the case of condition 6, will be met) with regard to the recordings set forth on Exhibit A attached hereto.~~

Any assignment implemented by SoundExchange shall apply to future royalties and royalties unpaid as of when the assignment is processed by SoundExchange. SoundExchange will not process any assignments retroactively.

All post-assignment adjustments, including debits and credits, shall be the sole responsibility of assignee, regardless of when the royalty-bearing transmissions occurred or the royalties accrued.

All Letters of Direction currently on file with SoundExchange paying a portion of the featured artist royalties assigned herein to creative participants (e.g., producers, mixers, engineers) will be transferred to the assignee's account and SoundExchange will continue to pay the creative participants.

If any dispute arises between the undersigned regarding this assignment that results in litigation, SoundExchange will put all assigned royalties on hold until the parties resolve the dispute and communicate such resolution (i.e., court order or settlement agreement) to SoundExchange. For the avoidance of doubt, SoundExchange will not resolve the dispute for the parties.

~~The undersigned will, at all times, defend, indemnify and hold harmless SoundExchange, Inc. and its predecessors-in-interest, successors, and affiliates, and their respective board members, officers and employees, from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and any reasonable outside counsel fees, relating to or arising out of this assignment.~~

IN WITNESS WHEREOF, the undersigned do hereby execute this Agreement by duly authorized officials as of the last date set forth below:

PERFORMER                                              ASSIGNEE

*Signed: _____          Signed: _____

Printed Name: S. Gregory Hays, Chapter 7 Trustee,          Printed Name: Rell Lafargue
              Todd Anthony Shaw p/k/a "Too Short"

SoundExchange Payee ID: 2179729174          Title: President & COO

SoundExchange Payee Name: S. Gregory Hays, Chapter 7 Trustee,          Company: Reservoir Media Management, Inc.
                          Todd Anthony Shaw

Date: _____          Assignee Payee ID: 1000073760

                                              Assignee Payee Name: Reservoir Media Management, Inc.

                                              Date: _____

*This document must be (i) signed by the performer, (ii) dated, and (iii) notarized.  SoundExchange will not accept a submission that is signed by a proxy or representative for the performer.

Version 3-31-22

**EXHIBIT 9**

**SoundExchange Account Authorization Form**

*See attached*



### ACCOUNT AUTHORIZATION FORM – PRIMARY CONTACT

LEGAL NAME OF PERFORMER

(Print): __Todd Anthony Shaw p/k/a "Too Short"_____

SOUNDEXCHANGE PAYMENT NAME [company or individual]

(Print): ____S. Gregory Hays, Chapter 7 Trustee, Todd Anthony Shaw____

I hereby authorize the following individual or entity to act on my behalf with respect to managing, maintaining and administering my account with SoundExchange, Inc. This includes, but is not limited to, modifying payee contact information; claiming repertoire; and collecting foreign royalties pursuant to a membership agreement and international mandate signed either by me or the following authorized individual or entity.

NAME OF AUTHORIZED INDIVIDUAL OR ENTITY:

(Print): __Reservoir Media Management_____

☒ I further authorize the above-named individual or entity to execute Letters of Direction on my behalf. (check box or leave blank)

This Account Authorization Form is effective as of the date set forth below, and may be revoked by me at any time for any reason. I hereby confirm that SoundExchange, and each of its directors, officers, employees, agents, representatives, successors and assigns ("Affiliates") may rely on this Account Authorization Form until notified of revocation via a SoundExchange Revocation of Account Authorization Form signed by me. ~~I hereby agree to indemnify and hold SoundExchange and each of its Affiliates harmless from and against any and all claims, liabilities, suits, losses, damages, and expenses, including, without limitation, costs and reasonable attorney's fees, arising in connection with or related to this Account Authorization Form.~~

This Account Authorization Form shall be governed by and construed in accordance with the laws of the ~~District of Columbia.~~ the State of Georgia, without regard to its conflict of laws principles.

SoundExchange requires that this Account Authorization Form be signed by the Performer.

**PERFORMER**

Performer Signature: _____

Performer Legal Name (Print): __S. Gregory Hays, Chapter 7 Trustee, Todd Anthony Shaw__

Date of Signature: _____