**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re:<br><br>Todd Anthony Shaw,<br><br>Debtor. | CHAPTER 7<br><br>Case No. 09-61855<br><br>Honorable Barbara Ellis-Monro |

## OBJECTION TO SALE MOTION

Todd Anthony Shaw (the "**Debtor**"), by and through his undersigned attorneys, files this Objection (the "**Objection**") to the *Trustee's Motion for Authority to Sell Property of the Bankruptcy Estate Free and Clear of Liens, Claims, Interests, and Encumbrances Seeking Continuance of Sale Hearing or, Alternatively, Rejection of Sale Motion* [Doc. No. 280] (the "**Sale Motion**").[1]

Via this Objection, the Debtor seeks: (1) a continuance of any final hearing on the Sale Motion (the "**Sale Hearing**") until Debtor's Conversion Motion (as defined herein) is decided and/or until after a sufficient amount of time is provided for the Debtor to conduct discovery with regard to the Sale Motion; or, (2) in the alternative, a rejection of the Sale Motion. In support hereof, the Debtor respectfully as follows:

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Sale Motion or the Conversion Motion (as defined herein), as the context requires.

1

## **PRELIMINARY STATEMENT**

As the Trustee himself has acknowledged, this Chapter 7 case is an unusual one in that it is positioned to generate sufficient funds to pay all claimants in full and to also leave a significant surplus for the Debtor. *See* Sale Motion at ¶ 33. In that regard, it is more akin to a Chapter 11 reorganization in which the Trustee, and all estate stakeholders, have been content to rely, for over a decade, on the regular post-petition income generated by the Debtor, primarily through royalty and other similar interests generated by the Shaw Music Catalogue, for payment on their claims. This approach has been successful, leading to a reduction in claims from over $2.9 million as of the Petition Date, to less than $600,000 today (when counting the $1 million the Trustee currently has on hand), *see* Sale Motion ¶¶ 9, 20, with remaining amounts likely to be resolved in the coming months and any remaining assets to then be surrendered back to the Debtor (effectively, the equity holder in this case).

Via the Sale Motion, the Trustee seeks to suddenly change course. Instead of continuing to rely on the regular royalty payments generated by the Shaw Music Catalogue – which royalty payments are set to continue for decades (*i.e.*, for 70 years after the Debtor's death)[2] – the Trustee seeks to sell the catalogue itself. While the Trustee claims that the $7.55 million proposed purchase price is a "wonderful result in this Case," the Trustee acknowledges that that is so, not based on a standalone valuation, but only vis-à-vis the remaining outstanding creditor claims. *See* Sale Motion ¶¶ 33-35. But that is a mere truism. $7.55 million is, of course, a large

---

[2] *See* 17 U.S.C.A. § 30(a) ("Copyright in a work created on or after January 1, 1978, subsists from its creation and, except as provided by the following subsections, endures for a term consisting of the life of the author and 70 years after the author's death.").

2

number compared to the less than $600,000 in claims that remain outstanding. But that says nothing about the actual value of the Shaw Music Catalogue – it is arguably worth millions of dollars more than $7.55 million, due to the longevity of the rights at issue alone. In forcing a sale at such a low price, the Trustee proposes to force the Debtor to accept pennies on the dollar for his interests in the Shaw Music Catalogue. To do so is to breach the Trustee's fiduciary duties, which, given the surplus nature of this case, run to the Debtor himself just as much as to his creditors.[3]

Given this reality, the Debtor has been forced to act to protect his interests. As detailed in the Debtor's *Motion to Convert Debtor's Chapter 7 Case to a Case Under Chapter 11 of the Bankruptcy Code* (the "**Conversion Motion**"), which is filed contemporaneously herewith, the Debtor first approached the Trustee to discuss a potential resolution of the Sale Motion without the need for a sale of the Shaw Music Catalogue. As of the date of this filing, no agreement has been reached on the terms of that arrangement. As a result, the Debtor has been forced to file the Conversion Motion, which seeks nothing more than to maintain the status quo – *i.e.*, via that motion, the Debtor seeks to convert this case to a case under Chapter 11 as part of which the Debtor will, forthwith, propose a plan that will use the same royalty interests that the Trustee has been collecting and distributing to satisfy creditor claims since the inception of this case, along with other non-estate income as necessary, to pay all remaining outstanding claims in full.

---

[3] *In re Kile*, 415 B.R. 723, 728 (Bankr. D. Ariz. 2009) ("Where there are surplus funds, the trustee also owes a fiduciary duty to the debtor."); *In re Stoll*, 252 B.R. 492, 495 (B.A.P. 9th Cir. 2000) ("When as in this case an estate will have a surplus that will be returned to the debtor after all of the creditors have been paid in full, the debtor has an economic interest in the estate that is similar to that held by the creditors who will be paid from the estate.").

3

To the extent the Conversion Motion is granted, the Sale Motion will be moot, as the sale proceeds will no longer be needed to satisfy creditor claims, and the Chapter 7 trustee will, in any case, no longer be administering the bankruptcy estate. The Debtor therefore respectfully requests a continuance of the final Sale Hearing until after the Conversion Motion is decided.

Alternatively, if the Court determines that the final Sale Hearing is to go forward, the Debtor respectfully submits that he should be granted sufficient time to seek documentary and testimonial discovery from the Trustee, the proposed purchaser, and relevant third parties like the Trustee's broker and other potential purchasers, regarding the sale process that led to the $7.55 million offer at issue for the Shaw Music Catalogue.  Among other things, the Debtor intends to request: (1) copies of all marketing materials; (2) a list of potential purchasers to whom such materials were provided; (3) any and all responses received from potential purchasers; (4) copies of all confidentiality agreements negotiated with potential purchasers; (5) copies of all diligence items provided to potential purchasers and any related communications; (6) copies of any and all initial indications of interest provided by potential purchasers and any related communications; and (7) copies of any and all offers for the Shaw Music Catalogue and any related communications.  Once these materials are provided, the Debtor will also need sufficient time to depose the Trustee and/or other applicable parties.  The Debtor respectfully requests a continuance of the final Sale Hearing for a sufficient time so that this discovery can be conducted.

Finally, and solely in the alternative, if the Debtor's request for a continuance of the final Sale Hearing is not granted, the Debtor requests that the Sale Motion be denied.  The Trustee has failed to live up to his obligation "to maximize the value obtained from a sale," which duty has

4

been described as "greater than that of a prudent man who is dealing with his own property" in certain cases. *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998). Instead, the Trustee seeks permission to accept a sale price under which the Debtor will receive but a fraction of the value that he, and his beneficiaries, would otherwise be entitled to, in respect of their interests in the Shaw Music Catalogue, for the next 70+ years. And, the Trustee provides no sound business reasons for why such a drastic, value-destructive sale is needed immediately. Nothing and no one is forcing the Trustee to sell the Shaw Music Catalogue at a discount now – instead, all stakeholders seem content to continue to rely on royalty payments from the Shaw Music Catalogue, for the pay down of their claims, as they have for the entirety of this case. For those reasons alone, should the Court reject the Debtor's request for a continuance of the final Sale Hearing, the Sale Motion should be denied in its entirety.

## BACKGROUND

The full factual background on this matter is provided in the Conversion Motion which is incorporated herein by reference.

With respect to the Sale Motion specifically, in it, the Trustee provides little to no detail regarding the marketing process in which the Trustee engaged with respect to the Shaw Music Catalogue, nor the negotiations that ensued between the Trustee and Reservoir Media Management, Inc., ("**Reservoir**"), as the potential purchaser. Indeed, other than noting that the court approved the retention of MCE Management, LLC, as the Trustee's broker in March 2021, the only other information included in the Sale Motion on the sale process is that the "Trustee has been marketing the relevant assets since employing MCE in 2021." *See* Sale Motion ¶¶ 14-16. That is hardly substantively descriptive. The Individual Estate Property Record and Report

5

[Doc. No. 262] filed by the Trustee in August 2022 (the "**August 2022 Trustee Report**") fares no better.  In that filing, the Trustee again references the fact that he has "employed a music broker to sell the bankruptcy estate's interest in the music catalog and corresponding royalty stream," but he again fails to provide any substantive information about the sale process itself other than to note that, as of March 2021, the "music broker and the trustee" were "gathering information for the marketing and sale of same."

Given this, the Debtor is left to guess at how the Trustee has been valuing and marketing the Shaw Music Catalogue.  The Debtor does not know if the Trustee conducted his own appraisal of the catalogue.  The Debtor does not know if any potential purchasers – including Reservoir itself – conducted their own appraisals.  The Debtor does not know how, and to whom, the catalogue has been marketed.  The Debtor does not know what initial offers have been received and from whom.  The Debtor does not know what negotiations have taken place between potentially interested parties and the Trustee.  The Debtor does not know what Reservoir's initial offer was.  The Debtor does not know what negotiations have taken place between Reservoir and the Trustee.  In short, no substantive information is available regarding (i) the Trustee's marketing and sale process; (ii) how the Trustee determined that Reservoir's offer was sufficient, or (iii) how the Trustee determined that accepting Reservoir's offer was the highest and best use of the estate's interests in the Shaw Music Catalogue and therefore in the best interest of all stakeholders (including the Debtor himself).

Similarly, no business reasons, let alone required "sound" business reasons, are offered in the Sale Motion as to why a sale of the Shaw Music Catalogue is required immediately when this case has already been pending for over a decade.  Instead, the chronological background section

6

in the Sale Motion jumps from 2009, when an agreement was reached with a third party regarding payment of royalties to the estate, to 2021 when a broker was employed, to 2023 when a proposed sale was agreed to. Scant reference is made to the intervening years, during which claims were reduced from $2.9 million to less than $600,000 (when including the $1,000,000 that the Trustee currently has on hand), which was effectuated largely through the collection of royalties on the Shaw Music Catalogue. No explanation is offered as to why those efforts could not continue now and why a sale of the catalogue is instead immediately required. And no justification is offered as to why that option should be pursued in light of the extreme prejudice it will cause to the Debtor who will unfairly lose an asset that is otherwise set to provide regular cash flows for decades to come.

## **OBJECTION**

### I. The Sale Hearing Should be Continued Until After A Decision on the Conversion Motion

Via the Conversion Motion, the Debtor seeks to convert this case from one under Chapter 7 to one under Chapter 11. Should that motion be granted – and the Debtor has already satisfied his *prima facie* burden – the Sale Motion will be rendered moot. *See, e.g.*, *In re Carter*, No. 00-12200-WHD, 2004 WL 5846718, at *1 (Bankr. N.D. Ga. June 22, 2004) (noting that the "the conversion of [a] case" from chapter 7 to chapter 13 renders moot a "Trustee's motion to sell … Property"). Specifically, under Bankruptcy Code Section 348(e), conversion of a case from Chapter 7 to Chapter 11 under Section 706 of the Bankruptcy Code, "terminates the service of any trustee" that is "serving in the case before such conversion." Upon conversion then, the Trustee will no longer have an interest in this case and thus no basis to proceed with the Sale Motion.

7

"Mootness is a ground which should ordinarily be decided in advance of any determination on the merits." *Soto v. City of Cambridge*, 193 F. Supp. 3d 61, 69 (D. Mass. 2016). In this matter then, when the entire Sale Motion may be mooted via a decision on the Conversion Motion, the Conversion Motion should be decided first. The Sale Hearing should therefore be continued until after that happens.

**II.     The Sale Hearing Should be Continued To Allow for Sufficient Time for Discovery**

Sale motions, like the Trustee's motion here, are contested matters governed by Fed. Bankr. R. 9014. Pursuant to Rule 9014, the discovery rules of the Federal Rules of Civil Procedure 26-37 are generally applicable to contested matters, with certain limited exceptions. Thus, while a "discovery conference and disclosures" are not required, objecting parties such as the Debtor here otherwise have "all the regular means of discovery available to" them. *In re Rosebud Farm, Inc*., 619 B.R. 202, 209 (Bankr. N.D. Ill. 2020). While parties cannot delay in their pursuit of discovery, the Debtor is not doing so here – indeed the Debtor is raising his entitlement to discovery in this very Objection in advance of the initial hearing on the Trustee's Sale Motion, which is currently scheduled to occur telephonically on July 11, 2023. Such discovery is needed before the Debtor can fully pursue his Objection on substantive grounds as, absent such discovery, the Debtor continues to be in the dark regarding the Trustee's reasons for filing the Sale Motion now and the process in which the Trustee engaged in the lead-up to filing that motion. *In re Sherman*, 639 B.R. 618, 625 (Bankr. D.N.M. 2022) (noting that, in contested matters, debtor is entitled to discovery to determine if there is evidence that a counterparty is being "unreasonable," which would provide grounds to "pursue her objection").

Based on that, in addition to requesting a continuance until after the Conversion Motion is decided, the Debtor also respectfully requests a continuance of any final Sale Hearing for a sufficient period of time to allow the Debtor to conduct discovery. The categories of potentially relevant documents and related deposition topics are noted above. *See supra* p. 4. And, as necessary, such discovery can be pursued concurrently with consideration of the Conversion Motion.

**III.  If The Sale Hearing Is Not Continued, the Sale Motion Should be Denied**

In order to sustain his burden with respect to the Sale Motion, the Trustee must satisfy the business judgment standard. *See In re Diplomat Const., Inc.*, 481 B.R. 215, 218-19 (Bankr. N.D. Ga. 2012). Under that standard, the Trustee has the burden to establish "sound business reasons for the terms of the proposed sale." *Id*. And while that standard is somewhat deferential, in "appropriate circumstances" it is proper for a court to interfere with the trustee's judgment "for the purpose of safeguarding the interest of parties concerned" including, where necessary, the debtor itself. *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998).

The court's decision in *Matter of Cossett*, 51 B.R. 166, 167 (Bankr. S.D. Ohio 1985) is instructive in that regard. In that case, a chapter 7 trustee sought to sell property for a sale price which appeared exceedingly low, arguing that it represented the highest and best offer for the property since it was the price that was brought "at auction." *Id*. at 168. The debtor objected, contending that the property was worth significantly more. And the court agreed with the debtor, noting that it was "surprised, and greatly unsettled by the proposed sales price," which, at the then-current stage of those proceedings, appeared "to be less than 50% of the fair market value of the property." *Id*. In that regard, the court noted that it was relying on the debtor's own

9

appraisals which could be presumed to be "somewhat inflated." *Id*. But the court nevertheless still agreed with the debtor that the sale price was insufficient given the trustee's failure to provide any "other evidence to the contrary" in terms of value. *Id*. Indeed, "only oral arguments" were presented in the case. No party offered evidence "concerning the value" of the asset to be sold "nor did any party request an opportunity" to provide such evidence. *Id*. "[N]othing in the statutes of the Bankruptcy Code, its legislative history, or case law, indicat[es] that [a] Court should acquiesce to a proposal that estate property be sold at a price vastly beneath its appraised market value." *Id*.

So to in this case. Per the applicable royalty and other related agreements, the Shaw Music Catalogue is already generating approximately $450,000-500,000 annually. In addition, those amounts are likely to spike significantly in the near term as the Debtor intends to go out on tour shortly. The publicity of such a tour is likely to lead to substantially increased play time for his music and therefore substantially increased royalty payments. But even conservatively estimating that only $450,000-$500,000 will continue to be available annually (that amount is likely to be higher) and even assuming such amounts are only available for the next couple of decades (that period is likely to be longer), the Shaw Music Catalogue is worth significantly more than the Trustee is proposing to sell it for. To accept a mere $7.55 million for what is literally a cash payment stream totaling many times that "shocks the conscience" and must be denied. *Cossett*, 51 B.R. at 168.

And this is so even though a sale at $7.55 million would be sufficient to pay all creditors in full and therefore only harm the Debtor. "As an officer of the Court," the Trustee "has a duty to realize the maximum return for the estate" and ***all*** of its stakeholders. *In re Mondie Forge,*

10

*Inc.*, 148 B.R. 499, 502 (Bankr. N.D. Ohio 1992). In instances such as this one, where "the Debtor will receive significant surplus funds from the sale of" estate property, the Trustee also "has a duty to maximize that." *In re Berman*, 352 B.R. 533, 542 (Bankr. D. Mass. 2006), *aff'd in part, rev'd in part and remanded*, No. 06CV40240-NG, 2008 WL 11518554 (D. Mass. Mar. 19, 2008). The Trustee is a fiduciary, **_not only_** for creditors, but also "for the debtor . . . to protect the debtor's rights to the surplus of the estate." *In re Nuckolls*, 67 B.R. 855, 857 (Bankr. W.D. Va. 1986) quoting COLLIER'S HANDBOOK FOR TRUSTEES AND DEBTORS IN POSSESSION, § 4.02 (L. King ed. 1982). A Chapter 7 debtor is "a party in interest and has standing to object to a sale" of estate assets and "otherwise participate in litigation surrounding the assets of the estate" if there "could be a surplus after all creditors' claims are paid." *In re 60 E. St. Equities, Inc.*, 218 F.3d 109, 115-116 (2nd Cir. 2000).

If the Sale Motion is to be heard now, and the final Sale Hearing is not continued so that the Conversion Motion can be considered first and discovery conducted, then the Sale Motion must be denied. This is because there is no evidentiary basis – let alone a sufficient evidentiary basis – on which the Trustee can satisfy even his basic business judgement burden with regard to the proposed $7.55 million sale price. Indeed, the Trustee's own reports to the Court belie his claim about value – the August 2022 Trustee Report confirms that the Trustee collected royalty payments in the total amount of $411,146.47 for 2019, $327,383.44 for 2020, and $603,867.20 for 2021 – *i.e.*, an average annual amount of approximately $450,000. Projecting out those amounts alone, over the next couple of decades, demonstrates that the value of the Shaw Music Catalogue is nowhere close to the mere $7.55 million that the Trustee says it is and instead much more closely aligned to the multiples of that number that the Debtor says it is. Given the

Trustee's inability to satisfy his basic evidentiary burden, if a final hearing on the Sale Motion is not to be continued, then that motion must be denied.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an order: (i) continuing any final hearing on the Sale Motion until after the Court has ruled on the Conversion Motion and/or until after the Debtor has had a sufficient amount of time to conduct discovery with respect to the Sale Motion; (ii) in the alternative, denying the Sale Motion; and (iii) granting such other and further relief that the Court deems appropriate.

Dated: July 7, 2023

BARNES & THORNBURG LLP

By: */s/ Christina M. Baugh*
Christina M. Baugh
Georgia Bar No. 241880
3340 Peachtree Rd N.E., Suite 2900
Atlanta, GA 30326
Telephone: (404) 264-4026
Email: CBaugh@btlaw.com

-and-

Aaron Gavant (*pro hac vice* admission pending)
One N. Wacker Drive, Suite 4400
Chicago, Illinois 60606
Telephone: (312) 214-4583
Facsimile: (312) 759-5646
E-mail: aaron.gavant@btlaw.com

-and-

PKA LAW

Tiffany R. Almy (*pro hac vice* admission pending)
75 Gold Street, Suite 100
Brooklyn, NY 11201
Telephone: (646) 809-4341
tiffany@pkalaw.com

*Counsel for Debtor Todd Anthony Shaw*

12