**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| In re:<br><br>Todd Anthony Shaw,<br><br>Debtor. | CHAPTER 7<br><br>Case No. 09-61855<br><br>Honorable Barbara Ellis-Monro |

## <u>OBJECTION TO APPLICATION OF<br>MCE MANAGEMENT, LLC FOR COMPENSATION</u>

BARNES & THORNBURG LLP

Christina M. Baugh
Georgia Bar No. 241880
3340 Peachtree Rd N.E., Suite 2900
Atlanta, GA 30326
Telephone: (404) 264-4026
Email: cbaugh@btlaw.com

Aaron Gavant (admitted *pro hac vice*)
One N. Wacker Drive, Suite 4400
Chicago, Illinois 60606
Telephone: (312) 214-4583
E-mail: agavant@btlaw.com

PKA LAW

Tiffany R. Almy (admitted *pro hac vice*)
75 Gold Street, Suite 100
Brooklyn, NY 11201
Telephone: (646) 809-4341
tiffany@pkalaw.com

*Counsel for Debtor Todd Anthony Shaw*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND............................................................................ 2

STANDARD OF REVIEW .............................................................................. 4

OBJECTION .................................................................................................... 7

   I.    MCE Is Not Entitled To Any Compensation Under Its Engagement Agreement ............... 7

   II.   There Is No Basis to Forcibly Amend MCE's Engagement Terms Here ........................ 9

   III.   The "Reasonableness" Factors Cited by MCE Are Irrelevant and Inapplicable............ 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Dan River, Inc.*,
　No. 04-10990-WHD, 2005 WL 6486371 (Bankr. N.D. Ga. Sept. 30, 2005) ..........................5

*In re Frank Fehr Brewing Co.*,
　268 F.2d 170 (6th Cir. 1959) .................................................12

*In re Fundamental Long Term Care, Inc.*,
　626 B.R. 51 (Bankr. M.D. Fla. 2021), aff'd, No. 8:11-BK-22258-MGW, 2022
　WL 710320 (M.D. Fla. Jan. 31, 2022).................................................10, 14

*In re Gateway Access Sols., Inc.*,
　368 B.R. 428 (Bankr. M.D. Pa. 2007) .......................................10

*In re Harman*,
　No. 04-17195-WHD, 2006 WL 6591823 (Bankr. N.D. Ga. Oct. 12, 2006)...................8, 9, 14

*Henlopen Hotel Corp. v. Aetna Ins. Co.*,
　251 F. Supp. 189 (D. Del. 1966)...............................................11

*In re HNRC Dissolution Co.*,
　340 B.R. 818 (E.D. Ky. 2006) .................................................14

*In re Leek*,
　128 B.R. 832 (Bankr. M.D. Fla. 1991) .....................................8

*In re Marsico*,
　No. 01-12120-JMD, 2004 WL 97647 (Bankr. D.N.H. Jan. 5, 2004) .....................13

*In re Marvel Entm't Group*,
　140 F.3d 463 (3d Cir. 1998)...................................................13

*In re Mercury Companies, Inc.*,
　No. 08-23125 MER, 2015 WL 5920163 (Bankr. D. Colo. Oct. 9, 2015)...............12

*In re Merry-Go-Round Enterprises, Inc.*,
　244 B.R. 327 (Bankr. D. Md. 2000) .........................................10

*In re Sky Valley, Inc.*,
　135 B.R. 925 (Bankr. N.D. Ga. 1992) .....................................8

*In re Smart World Techs., LLC,*
    552 F.3d 228 (2d Cir. 2009)......................................................................................5

*Travellers Int'l, AG v. TWA (In re TWA),*
    134 F.3d 188 (3d Cir. 1998)....................................................................................12

*In re XO Commc'ns, Inc.,*
    323 B.R. 330 (Bankr. S.D.N.Y. 2005) ....................................................................6

**Statutes**

11 U.S.C. 328(a) .........................................................................................................6

11 U.S.C. § 363 ...........................................................................................................2

**Other Authorities**

*Bankruptcy*, 50 MERCER L. REV. 537, 554 (1999).....................................................6

BLACK'S LAW DICTIONARY (11th ed. 2019) .............................................................6

Todd Anthony Shaw (the "**Debtor**"), by and through his undersigned attorneys, files this objection (the "**Objection**") to the Application of MCE Management, LLC ("**MCE**") for Compensation [Dkt. No. 348] (the "**MCE Fee Application**")[1] and, in support hereof, respectfully states as follows:

## PRELIMINARY STATEMENT

MCE, who was engaged by the Trustee to solicit potential purchasers for a sale transaction that never closed, now seeks fees to which it is not entitled including for services it was not engaged to provide. Its request should be denied.  The plain terms of its Engagement Agreement mandate such denial.  And there is no basis to forcibly amend those terms in that no developments occurred here that were "not capable of being anticipated" at the time the Engagement Agreement was agreed to.  *See* 11 U.S.C. § 328(a).  To the contrary, following MCE's engagement, the Trustee pursued a typical sale process that simply did not result in a sale. This was not because anything nefarious was afoot (MCE's unfounded, and borderline defamatory, allegations to the contrary notwithstanding).  Instead: (1) the Trustee moved to have a potential sale approved; (2) that motion was opposed by a party in interest (here, the Debtor); (3) the Court acknowledged that that objection had a basis that the Trustee would be required to refute at an evidentiary hearing; and (4) rather than wait for that evidentiary hearing to proceed, the potential purchaser withdrew its offer.  Given that result, and in particular the failure of the sale to close, MCE apparently wishes it had negotiated a different arrangement.   But its agreement to a standard contingency structure – and that contingency's non-occurrence – do not provide any basis for MCE to be allowed to renegotiate its retention terms now.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the MCE Fee Application.

1

## <u>FACTUAL BACKGROUND</u>

On March 16, 2021, the Trustee filed an application with the Bankruptcy Court [Dkt. No. 209] seeking approval to retain MCE on a contingency basis in accordance with an engagement agreement attached thereto (such application the "**MCE Retention Application**" and the engagement agreement attached there to the "**Engagement Agreement**").  Pursuant to the Engagement Agreement, the Trustee would hire MCE solely to provide certain expressly defined "Services" namely, soliciting a certain "limited number of potential purchasers," regarding the bankruptcy estate's interests in various musical compositions, master recordings and other related rights (as defined by the Engagement Agreement the "**Artist's Assets**") in connection with the Trustee's pursuit of "a possible sale or transfer of Artist's Assets" (as defined by the Engagement Agreement the "**Transaction**").  *See* Engagement Agreement § 1.  MCE acknowledged, *id.*, that before any such Transaction could be consummated, such Transaction would first have to be approved by the Bankruptcy Court "in accordance with" the Bankruptcy Code – *i.e.*, including the Bankruptcy Code's provisions requiring notice and an opportunity to object before any sale transaction could be approved.  *See* 11 U.S.C. § 363 ("The trustee, *after notice and a hearing*, may use, sell, or lease, other than in the ordinary course of business, property of the estate…") (emphasis added).

As compensation for its services, MCE agreed to a standard contingency arrangement under which it would only be paid if a Transaction was successfully consummated.  No hours-based compensation was included.  Instead, pursuant to Section 3 of the Engagement Agreement, the Trustee agreed to pay MCE "a fee of seven percent (7%) of "the gross monies or other consideration paid and/or credited for Artist's Assets" at "the closing of such" Transaction.  *See*

Engagement Agreement § 3. MCE was to be paid based only on such "selling price" and only "out of such gross monies" as received by the bankruptcy estate in connection with the Transaction. Engagement Agreement at § 3; MCE Retention Application at ¶ 7. No other consideration was contemplated or agreed to.

Consistent with Section 328(a) of the Bankruptcy Code, on March 23, 2021, the Bankruptcy Court granted the MCE Retention Application [Dkt. No. 210] including preapproving the contingency fee arrangement contemplated by the Engagement Agreement. In its order, the Bankruptcy Court noted that, before receiving such contingency fee, MCE would first need to file a fee application at the appropriate time.

Following MCE's retention, it struggled to identify potential purchasers willing to pay fair market value for the Artist's Assets finding none, for example, within the initial exclusivity period identified by the Engagement Agreement which expired on October 1, 2021. Over two years after its retention, MCE finally identified one potential purchaser – Reservoir Media Management, Inc. – who agreed to acquire the Artist's Assets but only at a price that the Debtor contended was unfairly low. *See* Trustee's Sale Motion and Debtor's Objection to Sale Motion [Dkt. Nos. 280, 293]. The Debtor objected to that Sale. *Id*. And, either because it decided to allocate its capital elsewhere, or perhaps recognizing that there was a chance its offer might, in any case, be rejected by the Bankruptcy Court at a scheduled hearing on the Debtor's objection, Reservoir Media withdrew its purchase offer and the Trustee subsequently withdrew its sale motion [Dkt. No. 325].

As of the date hereof, the Debtor understands that the Trustee has no plans to search for another potential purchaser. Instead, the Trustee intends to continue to collect royalty payments

associated with the Artist's Assets until all remaining creditors are paid in full.  In other words, with or without the successful consummation of the services MCE was engaged to provide, it appears that the bankruptcy estate will recover the same amount – *i.e.*, the amount needed to pay all creditors in full.  Paying additional compensation to MCE, or indeed any other party, at this point for additional services that have not already been approved by the Bankruptcy Court, will simply be a net negative, vis-à-vis the remaining creditors, and cause further delays in the final closing of this bankruptcy case.

Presumably recognizing this, along with the fact that, as a contractual matter, it was not entitled to compensation, following the Trustee's withdrawal of its sale motion in August 2023, MCE did not initially seek payment of any fees.  Now almost six months later, however, MCE has apparently had a change of heart and, via the MCE Fee Application, seeks hundreds of thousands of dollars of compensation not contemplated by its Engagement Agreement. Diverting such funds for the payment of an unearned sales commission, rather than protecting such money for distribution to creditors, would directly impact all parties with an interest in the bankruptcy estate who would, through no fault of their own, see their distributions delayed and/or potentially reduced.  All for a service provided by MCE – *i.e.*, the procurement of a purchaser for the Artist's Assets – that ultimately did not provide any additional value to the bankruptcy estate given that a sale to that purchaser did not close.

### STANDARD OF REVIEW

As it must, MCE moves for compensation pursuant to Section 328 of the Bankruptcy Code, and not Section 330 of the Bankruptcy Code.  *See* MCE Fee Application at p. 1 (MCE "seeks entry of an order under section 328(a) of the Bankruptcy Code…") and p. 13 ("Movant

prays that the Court enter an order granting the Application, awarding MCE compensation of $528,500 under section 328(a)…").   Together, Sections 328 and 330 "establish a two-tiered system for judicial review and approval of the terms of" a professional's retention which are "mutually exclusive."   *In re Smart World Techs*., *LLC*, 552 F.3d 228, 233 (2d Cir. 2009). Section 330 requires a court to conduct a post-hoc analysis of professional fees so as to confirm whether they constitute "reasonable compensation." Under Section 328, on the other hand, "compensation terms are approved in advance of the services being rendered," and a court's ability "to consider in hindsight the actual services rendered or the results obtained" are "severely constrained."   *In re Dan River, Inc*., No. 04-10990-WHD, 2005 WL 6486371, at *4 (Bankr. N.D. Ga. Sept. 30, 2005); *Smart World*, 552 F.3d at 228.  In that regard, there is "no question that a bankruptcy court may not conduct a § 330 inquiry into the reasonableness of the fees and their benefit to the estate if the court already has approved the professional's employment under 11 U.S.C. § 328."  *Smart World*, 552 F.3d at 228.  Instead, under section 328, when a professional submits its fee application for final approval, it does so merely as a "ministerial matter" to provide "opportunity for parties in interest to object," *e.g*., with respect to contractual compliance with the preapproved arrangement.  *Smart World*, 552 F.3d at 234; *Dan River*, 2005 WL 6486371, at *7.

The only exception, in this regard, is a party's right to object to a pre-approved fee arrangement based on its terms and conditions proving to be "**improvident** in light of developments **not capable of being anticipated** at the time of the fixing of such terms and conditions."  *See* 11 U.S.C. § 328(a) (emphasis added).  Each of the above-highlighted terms are critical – and limiting.  "Improvident" means "lacking foresight and care in the management of

5

property," or "of or relating to a judgment arrived at by using misleading information or a mistaken assumption." *See* BLACK'S LAW DICTIONARY (11th ed. 2019). As a result, "improvident" is a standard that can rarely be met: a "finding of improvidence pursuant to section 328 is a difficult determination to make and therefore, courts rarely disturb the original terms and conditions of a professional's employment." *In re XO Commc'ns, Inc*., 323 B.R. 330, 339 (Bankr. S.D.N.Y. 2005). Similarly, it is not enough for a party to point to mere "unanticipated" or "unforeseen" developments as a basis to modify a pre-approved compensation arrangement. Instead, it must identify developments so extraordinary that they were not even "**capable of being anticipated**" at the time the arrangement was agreed to. As one commentator explained, "whether the event was ***actually*** anticipated is immaterial." *See* Landry III, Robert J. & James R. Higdon, *A Primer on 11 U.S.C. 328(a) and its Use in Alternative Methods in Bankruptcy*, 50 MERCER L. REV. 537, 554 (1999) (internal citations omitted) (emphasis added). The relevant inquiry is "whether the event was ***capable*** of anticipation." *Id*. A simple finding that the professional seeking compensation "did not anticipate a change in circumstances does not satisfy section 328(a)." *Id*. Instead, to alter a fee agreement under section 328, the party seeking that modification must demonstrate that it was ***not possible to anticipate*** the change in circumstances.

Based on the foregoing, a Section 330 reasonableness analysis, including the 12 factor *Johnson* test cited by MCE in its fee application, is not relevant to MCE's fee request here. Instead, the only questions before the Court are: (1) have the contractual preconditions for payment in MCE's Engagement Agreement, which have already approved by the Court, been met; and (2) if they have not, did intervening developments occur, which were incapable of

being anticipated at the time the Engagement Agreement was agreed to, such that the parties' existing arrangement should now be viewed as improvident and revisited. They have not. And they did not. The MCE Fee Application must therefore be denied.

## **OBJECTION**

## I.    **MCE Is Not Entitled To Any Compensation Under Its Engagement Agreement**

MCE's attempts at obfuscation notwithstanding, it is clear that MCE is not contractually entitled to the fees it requests under the plain terms of the MCE Engagement Agreement – MCE effectively admits as such in its fee application. *See* MCE Fee Application at ¶ 7.

First, MCE was engaged to "solicit certain of Artist's Assets to a limited number" of targets in order for the Trustee "to pursue a possible sale or transfer of Artist's Assets" as part of a "Transaction" – nothing more and nothing less. *See* Engagement Agreement, § 1. Notwithstanding that limited role (which role the Bankruptcy Court *did* approve), MCE claims to have also provided certain additional services including acting "as a consultant" to the estate to: (1) "conduct due diligence on various property rights, income streams, statements, agreements, and assignments related to the Debtor's music catalog," (2) "identify any other rights and income streams which may not have been disclosed by the Debtor," (3) "help review and negotiate the terms of the various agreements and documents related to the review and potential sale of the catalog," and (4) to "advise the Trustee regarding all of the above." *See* MCE Fee Application at ¶ 4. MCE also claims to have spent time "identif[ying] additional unscheduled Royalties" which were of value to the estate. *See* MCE Fee Application at ¶¶ 9-10. MCE seeks extra-contractual compensation for all of these "extra" services. But there is only one of two possibilities with respect to these "extra" services: (1) they were not truly "extra," as a contractual matter, and

instead merely ancillary to – and therefore subsumed within – MCE's sole contractual obligation; or (2) they were so distinct from MCE's sole contractual obligation so as to be outside the scope of MCE's Engagement Agreement and therefore not judicially approved. In the former case, MCE did not provide any "extra" services – it merely did what a broker normally does in reviewing and preparing an asset for sale.[2] And, in the latter case, the mere fact that MCE purportedly chose to provide extra services, without any contractual obligation – or, indeed, right – to do so, does not provide it with a basis to redo the terms of its Engagement Agreement post-hoc. A professional "cannot recover fees for services rendered" if that professional "has not been authorized to so serve by a court order." *In re Sky Valley, Inc.*, 135 B.R. 925, 936 (Bankr. N.D. Ga. 1992). This is true "regardless of the quality of the services rendered." *See In re Leek*, 128 B.R. 832, 834–35 (Bankr. M.D. Fla. 1991) (noting that the record was clear that professional seeking compensation "was never authorized" by the court to provide the services at issue and that for "this reason none of the services rendered … regardless of the quality of the services rendered, can be compensated").

Second, aside from specifying the limited service that MCE was engaged to provide, the Engagement Agreement also severely circumscribes the circumstances under which MCE is entitled to compensation in the form of the 7% commission that MCE negotiated. The *Harman* case, relied on by MCE itself in its fee application, puts those terms in sharp relief. In *Harman*, under the governing retention application, a broker's fee was to be paid "upon the acquisition of a ready, willing and able purchaser." *In re Harman*, No. 04-17195-WHD, 2006 WL 6591823, at

---

[2] For the same reason, Reservoir Media (the potential purchaser) never sought to negotiate separate payment from the Trustee for its own "diligence" of the items it was looking to purchase – the costs of that diligence were ancillary to, and therefore subsumed within, the costs of its consideration of a Transaction.

*6 (Bankr. N.D. Ga. Oct. 12, 2006).  Thus, when the sale at issue in that case fell through, the

court nonetheless ruled that the broker's fee was still due because the broker had in fact

identified such a ready, willing and able purchaser, thereby satisfying its compensation

precondition even absent a fully-consummated sale.  *Id*. at * 7.  By contrast, under the

Engagement Agreement at issue here, MCE was only entitled to compensation "at the closing

of" a Transaction and only from "the gross monies or other consideration paid and/or credited for

Artist's Assets" by the purchaser identified by MCE.  *See* Engagement Agreement § 3.  There

was no closing of a Transaction here and therefore also no "gross monies or other consideration

paid and/or credited for Artist's Assets."  As a result, as opposed to *Harman*, the precondition in

MCE's Engagement Agreement was never met and MCE is therefore not entitled to

compensation.

## II.   There Is No Basis to Forcibly Amend MCE's Engagement Terms Here

Because MCE is not entitled to compensation as a contractual matter under its Court-

approved Engagement Agreement, it is forced to instead argue that that agreement should be

forcibly re-written under the rarely applied Section 328 exception.  Under that provision, only in

the extraordinary circumstance where a professional's engagement terms have proven to be

"improvident" in light of "developments not capable of being anticipated at the time of the fixing

of such terms" can those engagement terms be tweaked.  That circumstance is not present here.

As an initial matter, the Section 328 exception is most commonly invoked **not** by a

retained professional like MCE here but, instead, by a trustee or other party-in-interest who

typically argues that, in retrospect, a contingency arrangement should be revised because, *e.g.*,

the contingent condition was met too quickly such that the professional stands to recover **too**

*much*.  *See, e.g., In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327, 335 (Bankr. D. Md. 2000) (considering, and rejecting, Section 328 challenge to professional's contingency fee arrangement which, due to settlement, led to professional being owed over 19 times more than it would have received had it been retained on hourly basis).  Even then, such arguments rarely succeed.  *Id.*[3]  But MCE is not even making that argument.  Instead, MCE asserts the opposite, namely that the very contract it negotiated and agreed to is paying it **too little**.  Such an invocation of Section 328 is out of the ordinary with good reason – the Bankruptcy Code is not in the business of protecting freely contracting professionals from the impact of their own bargain.  *See, e.g., In re Gateway Access Sols., Inc.*, 368 B.R. 428, 434 (Bankr. M.D. Pa. 2007) (holding that it was "not the duty of" the court to protect the parties from the risk of "contingent interests" and instead assuming that the parties "understood the risks and repercussions involved in choosing" a particular contractual arrangement).  If MCE believed it deserved more or different compensation, it was free to negotiate for such compensation **before** it agreed to its Engagement Agreement (or it could have turned down the engagement entirely).  Having failed to do so on the front end, it is not the judicial system's job to save MCE from itself on the back end.  Instead, MCE's Engagement Agreement – and all parties' expectations under that agreement – should be honored here so as to ensure that parties can rely on similar contractual arrangements going forward. *Merry-Go-Round Enterprises,* 244 B.R. at 337 quoting *Matter of Nat'l Gypsum Co.*, 123 F.3d 861, 863 (5th Cir. 1997) (noting that, to protect the bankruptcy

_____

[3] *See also In re Fundamental Long Term Care, Inc.*, 626 B.R. 51, 58 (Bankr. M.D. Fla. 2021), aff'd, No. 8:11-BK-22258-MGW, 2022 WL 710320 (M.D. Fla. Jan. 31, 2022) ("[A] contingency fee agreement is not improvident even if the fees appear excessive in hindsight at the end of the case, or even if an unexpected event such as a settlement or sale affects the rate claimed by the professional, as long as the event was *capable* of anticipation at the time the fee agreement was pre-approved.")(emphasis in original)

system and "attract the most competent professionals to assist in complicated commercial bankruptcy cases," courts "must protect" contingency fee "agreements and expectations, once found to be acceptable").

Regardless, MCE's fee request is doomed for the independent reason that MCE itself does not argue that Section 328's standard has been satisfied. Specifically, MCE does not argue, as it must, that "developments not capable of being anticipated" occurred here such that its compensation terms should now be viewed as "improvident" for the bankruptcy estate, as Section 328 requires. Instead, MCE argues only that it would be "unjust" not to "allow" for the "payment of reasonable and equitable compensation to MCE." *See* MCE Fee Application at ¶ 20. That is not the standard, however, and for good reason – such a standard would stand the entire concept of contingency arrangements on their head. In a contingency arrangement, a retained professional negotiates for the right to possibly be paid at a "substantially higher" rate than it typically would be, in exchange for assuming "the possibility that, despite the expenditure of great time and effort," the professional "may recover nothing." *Henlopen Hotel Corp. v. Aetna Ins. Co*., 251 F. Supp. 189, 191 (D. Del. 1966). That is the trade off – the professional might get paid significantly more, but it also might get paid nothing. And the rate of a contingency fee is commensurately higher to reflect that risk. Here, MCE concedes that it agreed to a contingency arrangement, and the higher rate that that entitled it to (*i.e.*, a 7% commission) for the commensurately higher level of risk it agreed to take on (*i.e.*, that a sale might not close). The basis for that higher rate would be eviscerated based on the argument that MCE puts forward – *i.e.,* if the sale had been successful, it would have been entitled to its contingent fee and now, even though the sale was not successful, it should still be entitled to its

11

fee because that is "reasonable and equitable" for MCE.  *See* MCE Fee Application at ¶ 20. "Heads I win, tails you lose" is not the law.

The only development MCE even alludes to in its fee application as a purported basis for its super-contractual compensation request – and, again, even this is not described by MCE as a Section 328 development "not capable of being anticipated" – is the Debtor's objection to the Trustee's proposed sale of certain of the Artist's Assets to Reservoir Media and Reservoir Media's subsequent, voluntary withdrawal of its purchase offer.  *See* MCE Fee Application at ¶ 20.  In regards to that proposed sale, the Trustee took one view, with respect to the asset valuation underpinning it, and the Debtor took another view – "[u]nsurprisingly, reasonable minds can and do often disagree as to valuation issues."  *In re Mercury Companies, Inc*., No. 08-23125 MER, 2015 WL 5920163, at *9 (Bankr. D. Colo. Oct. 9, 2015).  Consistent with that, nothing was extraordinary about parties' conflicting views here – to the contrary, that the Trustee and Debtor would have conflicting views was entirely predictable and hardly the type of development "not capable of being anticipated" that could satisfy the high Section 328 bar applicable to MCE's fee request here.  *See, e.g., Travellers Int'l, AG v. TWA (In re TWA)*, 134 F.3d 188, 192 (3d Cir. 1998) *55 (discussing disagreement surrounding the fair valuation of a debtor's assets); *In re Frank Fehr Brewing Co*., 268 F.2d 170, 177 (6th Cir. 1959) (noting that there was "considerable disagreement about the value of [the debtors'] 'current assets' in the event of liquidation.").  In any case, far from being unanticipated, that Reservoir Media might voluntary withdraw its purchase offer is completely ordinary.  Such withdrawals happen routinely, in similar transactions and for a myriad of reasons.  Occam's razor suggests that Reservoir Media simply found a more lucrative way to expend the funds it had initially allocated

to a purchase of the Artist's Assets (*e.g.*, by purchasing another catalog). If MCE could not have anticipated such an outcome at the time it entered into its Engagement Agreement, it is in the wrong business.

Given the above, MCE's only basis for why it should be permitted to forcibly amend the terms of its engagement here appears to be MCE's unfounded, and borderline defamatory accusations, that Debtor engaged in "frivolous efforts" which amounted to "harassment," "threats, and intimidation," that "ultimately scared off the Purchaser." MCE Fee Application at ¶¶ 15, 20, 22(f). But it is MCE, rather than the Trustee, who makes "frivolous" allegations. Indeed, the Court itself recognized the ***non-frivolity*** of the Debtor's sale objection when it required the Trustee to put forth evidence, in response to that objection, with respect to, *e.g.*, the marketing that went into the proposed sale, the value of the assets to be sold, and whether the sale was an exercise of sound business judgment of the Trustee. *See* 7/11/23 Hearing Tr. [Dkt. No. 312] at 46:24-47:7. Those are the exact bases on which the Debtor's objection were based.[4] MCE apparently takes issue with the vigor with which the parties defended their positions, with respect to that objection. But "antagonism and animosity between" interested parties "can be expected in any bankruptcy proceeding," *In re Marvel Entm't Group*, 140 F.3d 463, 474 (3d Cir. 1998). And, while MCE would have preferred that all parties just agree to the proposed sale it helped arrange, the fact that not all parties did hardly renders the process here one "not capable of being anticipated" at the time MCE entered into its Engagement Agreement. *See, e.g., In re Marsico*, No. 01-12120-JMD, 2004 WL 97647, at *6 (Bankr. D.N.H. Jan. 5, 2004) (noting that it

---

[4] *See, e.g.*, Debtor's Objection to Sale Motion [Dkt. No. 293] at p. 5 (noting that Trustee had failed to provide any detail regarding ("the marketing process in which the Trustee engaged"); p. 11 (arguing that the Trustee had failed to "satisfy even his basic business judgement burden with regard to the proposed" sale)

was "unmistakable" that there would be "personal animosities between the Debtor and both of the" interested parties at issue in that case).

Indeed, even in the *Harman* case, a principal case relied on by MCE in its fee application, the court found that outright egregious behavior by other parties in interest – including locking out potential purchasers, destroying dozens of marketing signs and actively telling purchasers that a broker did not have authority to sell certain property – did ***not*** rise to the level of Section 328 "unanticipated" circumstances given that the broker was "fully aware" that the party in interest at issue there would object to the sale and not be cooperative. *Harman*, 2006 WL 6591823 at *4 (finding that broker was entitled to compensation, not under the Section 328 exception, but instead under the plain terms of its retention application). There is no allegation that the Debtor engaged in any such behavior here because it did not – it simply objected to a sale. That does not provide any basis to forcibly amend MCE's fee arrangement.

## III. The "Reasonableness" Factors Cited by MCE Are Irrelevant and Inapplicable

Presumably recognizing the weakness of its Section 328 argument, MCE spends the vast majority of the argument section of its fee application, *see* MCE Fee Application, pp. 9-13, focused on the reasonableness factors that courts consider when considering a professional's fee application, post-hoc, under Section 330 of the Bankruptcy Code. But the Bankruptcy Court's pre-approval of MCE's fee structure here, under Section 328 of the Bankruptcy, took that "agreed upon compensation ***out of the realm*** of the usual 'reasonableness' review under section 330," and subjected it "to review ***only*** under the 'improvident in light of developments not capable of being anticipated' standard" of Section 328. *See In re HNRC Dissolution Co*., 340 B.R. 818, 821–22 (E.D. Ky. 2006) (emphasis added); *see also Fundamental Long Term Care*,

14

626 B.R. at 57 (Bankr. M.D. Fla. 2021) ("[O]nce the terms of an attorney's employment are approved under § 328, they cannot be challenged as 'unreasonable' under § 330 of the Bankruptcy Code."). This aspect of MCE's fee application is thus irrelevant and should be disregarded. The question is not whether the fees that MCE now demands, untethered from the terms of the Engagement Agreement, could be deemed reasonable. Those fees are made up whole cloth – no one ever agreed to pay them. Instead, the only question is whether MCE's Engagement Agreement can be forcibly re-written under the circumstances here. For the reasons described above, they cannot. And the MCE Fee Application must therefore be denied.

*      *      *

Like any broker for an asset in which there are multiple conflicting interests, MCE knew, or should have known, at the time it negotiated its Engagement Agreement that any sale process it participated in might be subject to challenge by those with divergent views. Those divergent views are presumably what led to MCE being offered a lucrative contingency arrangement – *i.e.*, to the tune of a potential 7% commission – to participate in the potential sale process. In the end, MCE effectively bet wrong on that contingency and so is now entitled to nothing. But that is a risk of every contingency arrangement – they hinge on specific conditions which may or may not come to fruition. Nothing about MCE's engagement, or the ensuing developments that occurred here, were "not capable of being anticipated." They were, instead, entirely predictable. There is thus no basis to amend MCE's contractual arrangement here pursuant to which even MCE is forced to concede that it is not entitled to any of the fees it now demands. The MCE Fee Application must be denied.

*      *      *

**WHEREFORE**, the Debtor respectfully requests that this Court enter an order denying the MCE Fee Application and granting such other and further relief that the Court deems appropriate.

Dated: February 15, 2024

BARNES & THORNBURG LLP

By: */s/ Christina M. Baugh*
Christina M. Baugh
Georgia Bar No. 241880
3340 Peachtree Rd N.E., Suite 2900
Atlanta, GA 30326
Telephone: (404) 264-4026
Email: cbaugh@btlaw.com

-and-

Aaron Gavant (admitted *pro hac vice*)
One N. Wacker Drive, Suite 4400
Chicago, Illinois 60606
Telephone: (312) 214-4583
Facsimile: (312) 759-5646
E-mail: agavant@btlaw.com

-and-

PKA LAW
Tiffany R. Almy (admitted *pro hac vice*)
75 Gold Street, Suite 100
Brooklyn, NY 11201
Telephone: (646) 809-4341
tiffany@pkalaw.com

*Counsel for Debtor Todd Anthony Shaw*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 15, 2024, I electronically filed the foregoing OBJECTION TO APPLICATION OF MCE MANAGEMENT, LLC FOR COMPENSATION with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing upon all attorneys of record.

*/s/ Christina M. Baugh*
Christina M. Baugh
Georgia Bar No. 241880

17